# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CHRISTOPHER SCHIRO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CEMEX, S.A.B. de C.V., FERNANDO A. GONZÁLEZ OLIVIERI and JOSÉ ANTONIO GONZALEZ FLORES,<br><br>Defendants | Case No. 1:18-cv-02352<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiffs Carlos Llantada, Jr., Richard Storm, and Stationary Engineers Local 39 Pension Trust Fund ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cemex, S.A.B. de C.V. ("Cemex" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired securities of Cemex between August 14, 2014 and March 13, 2018, both dates inclusive (the "Class Period"), and

who were damaged thereby. Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     Cemex S.A.B. de C.V. is an operating as well as a holding company, which generally operates its business through subsidiaries that, in turn, hold interests in Cemex's cement and ready-mix concrete operating companies, as well as other businesses. Cemex operates throughout the Americas, Europe, Africa, the Middle East, and Asia.

3.     Per Cemex's SEC filings, one of its subsidiaries, Cemex Latam Holdings, S.A. ("Cemex Latam") is the holding company for Cemex's "most significant operations" in Brazil, Colombia, Costa Rica, Guatemala, Nicaragua, Panama and El Salvador.  Through Cemex Latam, Cemex owns approximately 99.7% of Cemex Colombia S.A. ("Cemex Colombia"), its main subsidiary in Colombia and the second largest cement producer in Colombia.   As of December 31, 2017, Cemex's operations in Colombia represented 4% of its net sales and 4% of its total assets.

4.     During the Class Period, Defendants touted the construction of a new cement plant in Maceo, Colombia which they expected to "increase [Cemex Latam's] cement production capacity in Colombia from 4.5 million to close to 5.5 million tons per year."  Cemex Colombia acquired the land for the construction from CI Calizas y Minerales SA ("CI Calizas"), a Colombian company described online as a cement and concrete supplier.  The negotiations for the acquisition took place with a legal representative of CI Calizas.

5.     Throughout that time, the Company repeatedly assured the market that, "[u]nder the supervision and with the participation of our management, *including our Chief Executive*

*Officer and principal financial and accounting officers*," they had verified that effective internal controls were in place.

6.     Simultaneously, both in its annual Form 20-F filings with the SEC and on its website, Defendants portrayed and continues to portray Cemex as a company of integrity. Specifically, the Company states on its website that "We act with honesty and transparency in all our interactions because we care for our people, for our communities and for our natural resources."  Indeed, Cemex touts its commitment to integrity with an entire page on its website devoted exclusively to detailing its commitment to "Ethics + Compliance." Cemex identifies seven topics of compliance, one of which is "anti-bribery."  The anti-bribery section states:

**The Golden Rule.** CEMEX does not tolerate bribery in any form.

**What is it?** Under applicable laws in the United States, Europe, and other places where CEMEX does business, it is a crime for CEMEX directly, or through an intermediary, to offer, pay, or promise to pay, a bribe or anything of value to a government official (including employees of state-owned enterprises and officers of public international organizations) for the purpose of obtaining or retaining business. The term "anything of value" includes both monetary and non-monetary gifts and bribes, and can include favors and other types of consideration.

**Why is it important?** Bribery and corruption represent illegal, unethical and socially irresponsible activities that can have harsh implications, such as:

- Grave harm to corporate and personal reputations

- Substantial civil and criminal penalties

- Loss of important market opportunities

- Market distortions and perpetuation of improper business practices

- Costly and stressful litigation for companies and individuals

- Harmful and corrosive impact on societies and communities

7.     Despite such vehement declarations of effective internal controls and ethical compliance, top executives at Cemex Latam and Cemex Colombia paid bribes worth

3

approximately $20.5 million to a legal representative of CI Calizas in connection with the acquisition of the land, mining rights and benefits of the tax-free area for the plant.

8.     Defendants' financial results, statements regarding internal controls, statements regarding the new cement plant, as well as statements regarding its code of ethics, and its anti-bribery policies in particular, were therefore materially false and misleading throughout the Class Period because they failed to disclose that: (i) top executives and Cemex Latam and Cemex Colombia had engaged in an unlawful bribery scheme in connection with the Company's business dealings in Colombia; (ii) Cemex falsely characterized the $20.5 million payment in its quarterly and annual filings with the SEC; (iii) the discovery of the foregoing conduct would likely subject the Company to heightened regulatory scrutiny and potential criminal sanctions, which could result in a material adverse impact on CEMEX's results of operations, liquidity and financial condition; and (iv) there were material weaknesses in the Company's internal controls over financial reporting.

9.     On September 23, 2016, post-market, *two years after* the Company first announced the construction of the cement plan in Colombia, Cemex disclosed the Company's dismissal of two senior executives after an internal probe found that payments worth $20.5 million relating to a land deal in Colombia had breached company protocols.  In addition to the termination of the two senior executives directly involved in the bribery scheme, the chief executive officer of Cemex Latam and director of Cemex Colombia, Carlos Jacks, resigned.  On this news, Cemex's ADS price fell $0.17, or 2.28%, to close at $7.26 on September 26, 2016.

10.     A month and a half later, on December 9, 2016, Cemex disclosed receipt of a subpoena from the SEC seeking information about the irregular payments in connection with the cement plant being built by Cemex Colombia in order "to determine whether there have been any violations of the U.S. Foreign Corrupt Practices Act." In both the September 23 and

4

December 9, 2016 disclosures, the Company assured investors that "If any legal or administrative actions are brought against CEMEX Latam and these are ultimately resolved against CEMEX Latam, *these actions are currently not expected to have a material adverse impact on CEMEX's results of operations, liquidity and financial condition*."

11.     On April 28, 2017, Cemex *admitted* in its annual Form 20-F to a "*material weakness*" in internal controls relating to the bribery scandal.

12.     Then, on March 14, 2018, Cemex disclosed that it received subpoenas from the U.S. Department of Justice ("DOJ") seeking to determine whether the Company had committed violations of the Foreign Corrupt Practices Act ("FCPA") in connection with the building of the new cement plant in Colombia.  However, the Company revealed that the DOJ investigation also encompassed "*other jurisdictions*" aside from Colombia.  In the March 14, 2018 disclosure, *the Company no longer claimed that it did not expect potential sanctions to have a "material impact on its results of operations, liquidity and financial condition."*

13.     On this news, Cemex's ADS price fell $0.12, or 1.64%, to close at $7.21 on March 14, 2018.

14.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

17.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Cemex's ADSs trade on the NYSE, located within this Judicial District.

18.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

19.     Plaintiffs Richard Storm, Jr., Carlos Llantada, and International Union of Operating Engineers Stationary Engineers Local 39 Health and Welfare Trust Fund, which maintains its principal place of business in California, as set forth in the certifications previously filed with this Court, purchased Cemex securities at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities laws violations alleged herein.

20.     Defendant Cemex, founded in 1906, is headquartered in Mexico, with the Company's principal executive offices located at Avenida Ricardo Margain Zozaya, 325, Colonia Valle del Campestre, San Pedro Garza Garcia, NL 66265 Mexico.  Cemex's American Depository Shares ("ADSs") trade on the NYSE under the ticker symbol "CX."

21.     Defendant Fernando A. González Olivieri ("Olivieri") has served at all relevant times as the Company's Chief Executive Officer ("CEO") and Director.

22.     Defendant José Antonio González Flores ("Flores") has served at all relevant times as the Company's Chief Financial Officer ("CFO") and Executive Vice President of Finance and Administration.

6

23.     The Defendants referenced above in ¶¶ 21-22 are sometimes referred to herein as the "Individual Defendants."

24.     The Individual Defendants possessed the power and authority to control the contents of Cemex's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

25.     Cemex S.A.B. de C.V. is an operating as well as a holding company, which generally operates its business through subsidiaries that, in turn, hold interests in CEMEX's cement and ready-mix concrete operating companies, as well as other businesses. Cemex operates throughout the Americas, Europe, Africa, the Middle East, and Asia.  Per Cemex's SEC filings, one of its subsidiaries, Cemex Latam Holdings, S.A. ("Cemex Latam") is the holding company for CEMEX's "most significant operations" in Brazil, Colombia, Costa Rica, Guatemala, Nicaragua, Panama and El Salvador.   Through Cemex Latam, Cemex owns approximately 99.7% of Cemex Colombia S.A. ("Cemex Colombia"), its main subsidiary in Colombia and the second largest cement producer in Colombia.  As of December 31, 2017, Cemex's operations in Colombia represented 4% of its net sales and 4% of its total assets.

7

26.     Throughout the Class Period, Cemex represented on its website that its "competitive advantage" is "leveraging our global knowledge in our local markets."   As described more fully below, this representation was false and misleading as Cemex gained competitive advantage in Colombia, including the acquisition of land for the construction of a new cement plant, using improper bribery payments.

27.     Colombia is a country that is plagued by corruption.   Indeed, so pervasive are instances of bribery in Colombia that even Colombia's former national director of anti-corruption in the Colombian attorney general's office, Luis Gustavo Moreno Rivera, has been charged for engaging in a foreign bribery scheme.

28.     To convince investors that Cemex did not participate in this culture of corruption, Cemex maintained unambiguous anti-bribery policies, described both in its annual 20-F SEC filings and on its website throughout the Class Period. Given the Company's public emphasis on ethics and compliance as well as the known culture of corruption in Colombia, Cemex had a clear reason to shine a discerning eye on the operations of Cemex Latam and Cemex Colombia. Cemex also represented throughout the Class Period that it had effective internal controls, thus assuring the market that it had an appropriately strong risk assessment process that would operate effectively to implement controls that would prevent, or detect and correct, misstatements resulting from apparent collusion or management override of controls in relation to significant unusual transactions and effective monitoring controls to detect non-compliance with its policies related to the financial reporting of significant unusual transactions.

**Foreign Corrupt Practices Act of 1977**

29.     Cemex, whose stock is listed on the New York Stock Exchange under ticker "CX" is subject to the dictates of the FCPA.   Congress enacted the FCPA, 15 U.S.C. §§ 78dd-1, *et seq.* (1998), to prohibit bribery and corruption of foreign officials and to promote fair business

practices, integrity, and accountability in companies operating on a global stage. Specifically, the FCPA's anti-bribery provision makes it a crime to "corruptly" offer any kind of payment to a foreign official "in order to assist . . . in obtaining or retaining business." 15 U.S.C. § 78dd-2.

30.     The FCPA also requires companies whose securities are listed in the U.S. to adhere to its accounting provisions. The "books and records" provision requires a company to "make and keep books, records, and accounts . . . in reasonable detail [] to reflect accurately and fairly transactions and dispositions of [] assets, and to devise and maintain a system of internal accounting controls . . ." 15 U.S.C. § 78m(b)(2); 15 U.S.C. § 78m(b)(5).

31.     There is no materiality threshold under the books-and-records provision. Instead, issuers must maintain books and records that accurately and fairly represent the company's activity, as well as "devise and maintain a system of internal accounting controls sufficient to assure management's controls, authority, and responsibility over the firm's assets."

32.     When a Company mischaracterizes bribery payments in their filings with the SEC, it is in violation of the books-and-records accounting provisions of the FCPA.

### Confidential Witnesses

33.     Confidential witnesses confirmed the culture of corruption at Cemex and the improper dealings relating to the construction of the new cement plant in Maceo Colombia specifically.  The confidential witnesses included:

1) Confidential Witness ("CW") 1 was a security manager at a Cemex Colombia plant for over 15 years, including the time frame when Cemex negotiated and acquired the land for the construction of the Maceo cement plant through and including the Company's revelation that two top Cemex Latam and Colombia executives had been fired for making bribery payments in connection with the Maceo plant. CW1 reported

to the head of security, Daniel Morales, who reported to Carlos Jacks Chavarria, the president of Cemex Colombia who resigned in the wake of the bribery scandal.

2) CW2 worked in community relations at Cemex Colombia from October 1994 through May 2013. In that position, CW2 studied and analyzed the social and environmental conditions around Cemex's physical locations. CW2 worked on the Maceo project at the time of its inception.

3) CW3, who joined Cemex in 2012 as an apprentice in budgeting and for responsibility and social communications programs, left in July 2013, but then returned to work on financial planning for innovation at Cemex from November 2013 through 2014.

34.    CW1 heard that the Company paid "facilitation fees" for government permits in connection with the building of the Maceo plant. CW1 stated that such bribes were commonly paid by the Company. Aside from the Maceo plant, CW1 provided two examples. First, the government closed the Payande mine and took away Cemex's licenses five years ago. Cemex paid the San Luis town hall in cash to reopen the mine, which it did two months later. CW1 accompanied the Cemex executives involved to the San Luis town hall. Second, according to CW1, the Caracolito plant does not have a construction license, but it was more cost effective for the Company to pay bribes to avoid closure rather than pay bribes to obtain the license itself and pay the resulting fines. CW1 also noted that Cemex would send gifts to journalists or treat them to expensive lunches so they would not report negatively on the Company.

35.    CW1 stated that many Cemex Colombia colleagues went to "work security" at the construction site for the plant in Maceo, Colombia. At various points during the Class Period, those colleagues told CW1 about "inconsistencies and mismanagement" there, including rumors of financial mismanagement even before news of the bribery scandal came out. CW1 reported that there was rampant inflation of all expenses related to the construction of the plant, including

10

fuel expenses, supplies, hiring of unnecessary laborers, and higher per diem allowance for personnel working at Maceo to buy their silence.   According to CW1, everyone at Cemex Colombia knew about the mismanagement of the Maceo plant.

36.   CW2 also confirmed that there were "strange dealings" connected with the purchase of properties for the Maceo project.   Indeed, CW2 reports receiving a message from Mauricio Mantilla, the director of the Caracolito plant, stating "Careful, []- there are strange things" at Maceo. CW2 reports that after asking Cemex's environmental lawyer, Jose Luis Garcia about the ownership of the Maceo properties and the related negotiations, he told CW2, "these are delicate topics; stick to your job- social and community relations. The property issue isn't for you."   CW2 posed the same question to Alvaro Urea, a consultant who worked for Cemex, and was told to "stay out of it." According to CW2, "with Maceo, it was always: don't look into it. Don't ask. Don't get involved."   CW2 described this as very different than the experience CW2 had with other plants.  CW2 was terminated a few months later.

37.   CW3 corroborated that at Cemex, political favors were "kind of recurrent." Moreover, CW3 participated in a chat group with other Cemex employees of the same generation and noted that when news about the Maceo bribery scandal broke, a lawyer in the chat group stated that she had been aware of strange issues relating to the plant.

38.   CW1 also detailed other troubling aspects of Cemex's operations in Colombia. For example, CW1 stated that Cemex hired Alvaro Urea, a consultant who used to work for Cemex to purchase plots of land for the Company.  When the Company needed to expand the road leading to the Maceo plant to accommodate heavy trucks and oversized loads coming and going from the plant, Urea arranged to purchase the land around the road, to allow for the expansion, for a substantially higher sale price than the lot's worth and then split the profits with the landowners and with those who hired him at Cemex.

11

39.     CW1 also maintains that Cemex Colombia fired director of security, Daniel Morales Duque, within six months of the Maceo bribery scandal coming to light "because he knew too much." CW1 explained that "things happen here [in Colombia]" which is why security is expected to know everything about who is working, what they do, and, where land acquisition is involved, security accompanies employees during the negotiations. In other words, someone employed in security for the Maceo Colombia cement plant would have direct knowledge of "dealings" relating to the acquisition of land for the plant.

**<u>Materially False and Misleading Statements Issued During the Class Period</u>**

40.     Throughout the Class Period, Cemex issued false and misleading statements touting the construction of its new plant in Colombia, emphasizing its commitment to ethics and anti-bribery policies, and representing that its internal controls were effective and its reported financials were accurately characterized and free from fraud. In addition, the Company at all times described its "competitive advantage" on its website as "leveraging our global knowledge in our local markets." This statement, as well as the other Class Period statements described below, was false and misleading as Cemex gained competitive advantage in Colombia, including the acquisition of land for the construction of a new cement plant, using improper bribery payments.

41.     The Class Period begins on August 14, 2014, when Cemex filed a Form 6-K and issued a press release entitled "Cemex Announces New CLH Cement Plant in Colombia," announcing the construction of a cement plant in Colombia. The press release stated in relevant part:

> CEMEX, S.A.B. de C.V. ("CEMEX") (NYSE: CX) announced today that its subsidiary, CEMEX Latam Holdings, S.A. ("CLH") (BVC: CLH), will begin the construction of a cement plant in Colombia. The total investment is expected to reach approximately US$340 million and to increase CLH's cement production capacity in Colombia from 4.5 million to close to 5.5 million tons per year.

12

The first phase of this project includes the construction of a new grinding mill that is expected to start cement production during the second quarter of 2015. The rest of the plant will be completed during the second half of 2016. The plant will operate using modern and efficient technology to comply with high quality and environmental standards.

This facility will be strategically located in the Antioquia department. This region has enjoyed high levels of economic growth and is expected to further benefit from the construction of infrastructure projects under the highway concession program in Colombia.

42.     The Company reiterated this disclosure regarding the cement plant in an Exhibit to Form 6-K filed on September 3, 2014 concerning "proposed private placements of debt securities."

43.     The foregoing statements were misleading because Defendants failed to disclose that top executives at Cemex Latam and Cemex Colombia had violated Company protocols by paying $20.5 million in bribes to the legal representative of the selling entity of the land acquired for the construction of the new cement plant, thus putting the Company at risk of regulatory investigation and/or action for potential violations of the FCPA.

44.     On October 22, 2014, the Company issued a press release, attached to a Form 6-K as Exhibit 1, regarding the third quarter 2014 results for Cemex Latam.  In that press release, Cemex Latam CEO Carlos Jacks, on behalf of Cemex, spoke about the new cement plant in Colombia, which the Company referred to as the "greenfield project," and stated:

Over the past years we have worked intensively to expand our operations in our markets, and we continue strengthening our footprint with expansion projects like the  new cement plant in Colombia and  the  grinding  facility in Nicaragua. Our solid asset base together with our unique portfolio of building solutions, will allow us to continue promoting growth in our markets.

The press release did not reveal that Cemex and its subsidiaries facilitated the "expansion project" in Colombia through bribery.

45.     In its third quarter 2014 results, set forth in Exhibit 2 to the press release, the Company reported its operating results by sector, including the South, Central America, and the Caribbean sector, which encompasses Colombia, and reported its Consolidated Income Statement and Balance Sheet.  In those results, Cemex did not properly account for the $20.5 million bribery payment made in connection with its new cement plant in Colombia.

46.     During an Earnings Call for the third quarter of 2014, which took place the following day, on October 23, 2014, Defendant Olivieri once again touted the construction of the new cement plant but failed to mention that it came about as a direct result of bribery:

> Also during the quarter, we announced that our subsidiary, CLH, has begun the construction of a new cement plant in the Antioquia region in Colombia, with a production capacity of close to 1 million tons per year. The total investment is expected to reach approximately $340 million. This facility will operate with modern and efficient technology with high quality and environmental standards and reduced production costs. In fact, we expect this new facility to consume 15% less fuel and 10% less electricity compared to our other cement plants in the country, all of which operate with dry technology.

47.     Cemex reported its fourth quarter 2014 and full year 2014 results on February 5, 2015, in three attachments to a Form 6-K.  Cemex once again reported its operating results, including net income and expenses, both by sector (including the South, Central America, and the Caribbean sector that encompasses Colombia) and consolidated, but failed to properly book the $20.5 million bribery payment made in connection with its new cement plant in Colombia.

48.     On February 25, 2015, the Company filed a Form 6-K "in connection with providing information to prospective investors.  The 6-K included an attachment which, among other things, repeated the prior disclosures regarding the construction of the new cement plant in Colombia but added that it would be "financed with Cemex Latam's free cash flow."  The Form 6-K did not also add that the Company had facilitated the acquisition of the land on which it built the cement plan with $20.5 in improper bribery payments.

14

49.     On April 27, 2015, Cemex filed an annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2014 (the "2014 20-F").  As with its previous Class Period filings, Cemex did not properly account for the $20.5 million bribery payment.

50.     The 20-F also included "management's annual report on internal control over financial reporting," which represented:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934). Under the supervision and with the participation of our management, ***including our Chief Executive Officer and principal financial and accounting officers***, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2014 using criteria established in "Internal Control—Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our management has concluded that internal control over financial reporting was effective as of December 31, 2014.

Emphasis added.

51.     The above referenced statements were false and misleading because the Company (as it later admitted) had material weaknesses in its internal controls, which enabled the executives of Cemex Latam and Cemex Colombia to issue $20.5 million in bribes to a legal representative of CI Calizas SA, and to continue their employment without consequence for at least two years.

52.     In the 2014 20-F, the Company also touted its Code of Ethics, stating in relevant part:

> ### Item 16B—<u>Code of Ethics</u>
>
> We have adopted a written code of ethics that applies to all employees, including our principal executive officer, principal financial officer and principal accounting officer, to ensure that all of our employees abide by the same high standards of conduct in their daily interactions.
>
> Our code of ethics provides the following main guidelines:

***

(viii) ***Anti-bribery: we reject all forms of corruption; paying or receiving bribes is illegal and highly unethical, and can lead to severe consequences for all parties involved, including jail for individuals and harsh penalties to our company; we are committed to conducting our business with transparency and integrity, and try to ensure that all transactions comply with anti-bribery laws, including requirements to maintain complete and accurate books and records;***

***

We ensure awareness and enforcement of our code of ethics through our ethics committees, training programs, and secured internal communications channels. We periodically evaluate and update the provisions of our code of ethics.

You may view our code of ethics in the corporate governance section of our website (www.cemex.com)...

(Emphasis added.)

53.     The Company's Code of Ethics and Business Conduct (latest version available on the Company's website) stated in relevant part:

We reject all forms of corruption. Paying or receiving bribes is illegal and highly unethical, and can lead to severe consequences for all parties involved, including jail for individuals and harsh penalties for the Company. ***We are committed to conducting our business with transparency and integrity, and will therefore ensure that all transactions comply with anti-bribery laws, including requirements to maintain complete and accurate books and records***.

Emphasis added.

54.     The 2014 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the information contained in the 2014 20-F "fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report."

55.     On April 23, 2015, the Company filed a Form 6-K, with three exhibits, reporting its first quarter results for 2015.  On July 22, 2015, the Company filed a Form 6-K, with three exhibits, reporting its second quarter results for 2015.  In reporting its operating results for the quarter, both by sector and consolidated, Cemex did not properly account for the $20.5 million

bribery payment made to a legal representative of CI Calizas SA in connection with the acquisition of the land, the mining title and the free zone for the construction of its cement plant in Colombia.

56.     On October 22, 2015, the Company filed a Form 6-K, with three exhibits, reporting its third quarter results for 2015. In reporting its operating results for those quarters, both by sector and consolidated, Cemex did not properly account for the $20.5 million bribery payment made to a legal representative of CI Calizas SA in connection with the acquisition of the land, the mining title and the free zone for the construction of its cement plant in Colombia.

57.     Moreover, Exhibit 3 provided an update on the building of the cement plant in Colombia, stating, in relevant part, "construction of grinding phase was completed during recent months and production trials were carried out successfully."  The Exhibit did not reveal, however, that Cemex was only able to construct the plant because it facilitated the acquisition of the land with improper bribery payments to the legal representative of the selling entity.

58.     On February 4, 2016, the Company filed a Form 6-K, with three exhibits, reporting its fourth quarter and full year results for 2015. In reporting its operating results both by sector and consolidated, Cemex did not properly account for the $20.5 million bribery payment made to a legal representative of CI Calizas SA in connection with the acquisition of the land, the mining title and the free zone for the construction of its cement plant in Colombia.

59.     On March 1, 2016, Cemex filed a Form 6-K with Cemex and its subsidiaries consolidated financial statements for the years ended December 31, 2015, 2014, and 2013 as well as Cemex's individual financial statements for the same years. Exhibit 1 to the 6-K provided an update on construction of the Colombia cement plant.  Exhibit 1 also provided additional background regarding Cemex Colombia's acquisition of the land, the mining title and the free zone for construction of the plant:

In connection with the construction of the new cement plant in the municipality of Maceo (Antioquia) in Colombia (note 14), on August 28, 2012, CEMEX Colombia signed a memorandum of understanding ("MOU") with CI CALIZAS S.A. for the acquisition of the land, the mining title and the free zone for the construction of such cement plant. After the execution of the MOU, one of CI CALIZAS S.A.'s partners was linked to a legal process for expiration of property and, as a result, the Attorney General's Office, among other measures, suspended CI CALIZAS S.A.'s rights to dispose of the assets offered to CEMEX Colombia. In order to protect its interests, CEMEX Colombia presented to the competent authorities the information of the cement project under development and explained how this measure affected the transfer of full ownership rights of the related assets under negotiation. Considering CEMEX Colombia's efforts, and as a temporary solution while the request for the revocation of the measures against CI CALIZAS is resolved, CEMEX Colombia entered into a lease contract with the authority acting as depository of the affected assets pursuant to which CEMEX Colombia is authorized to continue with the necessary works for the construction of the cement plant and consequently to protect all the infrastructure works and investments already made by CEMEX Colombia. Additionally, CEMEX Colombia became party in the legal proceeding to enforce its rights under the MOU and to conclude the negotiation once the proceeding is resolved. As of December 31, 2015, CEMEX Colombia considers that its investments in the development of the plant are protected by virtue of the lease contract. Nonetheless, if there is a final adverse resolution of the authority with respect to CI CALIZAS S.A.'s rights to dispose of the land, the mining title and the free zone, and if CEMEX Colombia exhausts all legal resources available against the adverse resolution, in such event that the lease could not be extended, the resolution could have a material adverse effect on the Company's results of operations, liquidity or financial condition.

60.     On March 9, 2016, Cemex filed a Form 6-K with an Exhibit containing "certain information" the Company anticipated "disclosing to prospective investors." In that exhibit, Cemex once again described the construction of the cement plant in Colombia and reiterated that it will be financed with Cemex Latam's free cash flow, which statements were false and misleading for the reasons stated above.

61.     On April 22, 2016, Cemex filed an annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 20-F"). As with its previous Class Period filings, Cemex did not properly account for the $20.5 million bribery payment when setting forth its net operating

income and expenses both by sector (including the South, Central America, and the Caribbean sector that encompasses Colombia) and consolidated.

62.     The 2015 20-F also included "managements' annual report on internal control over financial reporting" similar in substance to the report set forth in ¶ 50.  Those statements were false and misleading for the reasons stated in ¶ 51.

63.     In the 2015 20-F, the Company once again emphasized its "Code of Ethics" in the same manner and form it did in the 2014 20-F.  The 2015 20-F also repeated the previously disclosed descriptions of the construction of the cement plant in Colombia and provided an update on the legal proceedings described in ¶ 59, relating to the acquisition pursuant to which Cemex Colombia was to receive the land to construct its new cement plant.  Cemex quantified its "investments in the development of the cement plant…at approximately U.S. $185 million."

64.     The 2015 20-F contained signed certifications pursuant to SOX by the Individual Defendants, stating that the information contained in the 2015 20-F "fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report."

65.     On June 7, 2016, Cemex filed a Form 6-K that reiterated the update to legal proceedings impacting the construction of the cement plant in Colombia, as described in the 2015 20-F.

66.     The foregoing statements were false and misleading for the reasons stated above.

67.     At all relevant times throughout the Class Period, Cemex also represented on its website, https://www.cemex.com that it's "competitive advantage" is "leveraging our global knowledge in our local markets."  Defendants did not divulge, however, that in Colombia, the Company gained a competitive advantage by paying bribes in connection with the land it needed to acquire to construct its new cement plant.

68.    The Company also stated on its website at all relevant times that "We act with honesty and transparency in all our interactions because we care for our people, for our communities and for our natural resources."  Indeed, Cemex touts its commitment to integrity with an entire page on its website devoted exclusively to detailing its commitment to "Ethics + Compliance." Cemex identifies seven topics of compliance, one of which is "anti-bribery."  The anti-bribery section states:

**The Golden Rule.** CEMEX does not tolerate bribery in any form.

**What is it?** Under applicable laws in the United States, Europe, and other places where CEMEX does business, it is a crime for CEMEX directly, or through an intermediary, to offer, pay, or promise to pay, a bribe or anything of value to a government official (including employees of state-owned enterprises and officers of public international organizations) for the purpose of obtaining or retaining business. The term "anything of value" includes both monetary and non-monetary gifts and bribes, and can include favors and other types of consideration.

**Why is it important?** Bribery and corruption represent illegal, unethical and socially irresponsible activities that can have harsh implications, such as:

- Grave harm to corporate and personal reputations

- Substantial civil and criminal penalties

- Loss of important market opportunities

- Market distortions and perpetuation of improper business practices

- Costly and stressful litigation for companies and individuals

- Harmful and corrosive impact on societies and communities

69.    The foregoing statements were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) top executives and Cemex Latam and Cemex Colombia had engaged in an unlawful bribery scheme in connection with the Company's business dealings in Colombia in

violation of Company protocols; (ii) Cemex falsely characterized the $20.5 million payment in its quarterly and annual filings with the SEC; (iii) the discovery of the foregoing conduct would likely subject the Company to heightened regulatory scrutiny and potential criminal sanctions, which could result in a material adverse impact on CEMEX's results of operations, liquidity and financial condition; and (iv) there were material weaknesses in the Company's internal controls over financial reporting.

### The Truth Begins to Emerge

70.    On September 23, 2016, post-market, more than two years after the Company first announced the construction of the cement plant in Colombia, Cemex issued a press release, filed on Form 6-K with the SEC, announcing that an internal probe had uncovered that two senior executives had improperly paid $20 million in bribes in connection with the acquisition of land, mining rights and benefits of the tax-free area where it was building a new cement plant in Maceo, northern Colombia.  The press release, which stated that the two senior executives had been terminated as a result, merely characterized the payments as a breach of company protocols but did not give investors any reason to suspect the payments had violated any law or regulation that would subject Cemex to regulatory scrutiny.  The press release also claimed that Cemex could not assess the likelihood of regulatory action but assured investors that any such actions, "are currently not expected to have a material adverse impact on CEMEX's results of operations, liquidity and financial condition."  Specifically, the press release stated:

> On September 23, 2016, CEMEX, S.A.B. de C.V. (NYSE: CX) ("CEMEX") informed the Mexican Stock Exchange (*Bolsa Mexicana de Valores*) that CEMEX's indirect subsidiary, CEMEX Latam Holdings, S.A. ("CEMEX Latam"), informed the Colombian Stock Exchange (*Bolsa de Valores de Colombia*) and Colombian Financial Superintendency (*Superintendencia Financiera de Colombia)* that with respect to the matter previously reported by CEMEX Latam regarding the new cement plant being built by CEMEX Colombia S.A. ("CEMEX Colombia") in the department of Antioquia in the municipality of Maceo, Colombia ("Maceo"), internal audits and investigations performed in

21

accordance with the Corporate Governance policies and Code of Ethics of CEMEX Latam and CEMEX, have raised questions about the payment procedures related to the acquisition of the land and mining rights and benefits of the free tax zone in which the new cement plant is being built in Maceo. These payments did not adhere to CEMEX's and CEMEX Latam's established protocols.

As officers responsible for the implementation and execution of the above referenced payments, two members of senior management of CEMEX Latam and CEMEX Colombia (the Vice President of Planning of CEMEX Latam and CEMEX Colombia and the General Counsel of CEMEX Latam Holdings and CEMEX Colombia), have been terminated effective immediately. In addition, the Chief Executive Officer of CEMEX Latam/Director of CEMEX Colombia has resigned, effective today.

71.     On this news, Cemex's ADS price fell $0.17, or 2.28%, to close at $7.26 on September 26, 2016.

72.     On October 3, 2016 Cemex filed a Form 6-K providing additional information regarding the improper payments disclosed on September 23, 2016, which it had provided to the Mexican Stock Exchange the day before.  Specifically, the Company explained that the bribery payments had been deposited in the bank accounts of the legal representative "as advances under the [memorandum of understanding]," signed in August of 2012, pursuant to which "CEMEX Colombia acquired all of the shares of a subsidiary of the Maceo selling entity which was the owner of the special tax and trade zone benefits" and "for the other land CEMEX Colombia was purchasing."  Given that that MOU was signed in August 2012, it took Cemex *four years* to reveal the bribery payments to the market.  With this announcement, Cemex continued to maintain that it does not expect "a material adverse impact on CEMEX's results of operations, liquidity and financial condition."

73.     Less than two months later, on December 9, 2016, Cemex issued a press release, filed on Form 6-K with the SEC, disclosing receipt of a subpoena from the SEC seeking information about "the matter previously reported by CEMEX regarding the new cement plant

22

being built by CEMEX Colombia" in order "to determine whether there have been any violations of the U.S. Foreign Corrupt Practices Act ("FCPA")."   The press release made clear that the subpoena "does not mean that the SEC has concluded that Cemex or any of its affiliates has broken the law" and assured investors that "***CEMEX does not expect this matter to have a material adverse impact on its consolidated results of operations, liquidity or financial position.***" (Emphasis added)

74.    The Company then admitted on April 28, 2017, when it filed its annual report on Form 20-F, that its "internal control over financial reporting was not effective." Cemex made clear that this "material weakness" in internal controls "relates, in part, to the previously disclosed irregular payments to a non-governmental individual made in connection with the construction by CEMEX Colombia of a new integrated cement plant in the Antioquia department near the municipality of Maceo, Colombia (the "Maceo Project")."   The Form 20-F described the internal control deficiency as follows:

> We have identified a material weakness in our internal control over financial reporting. Our management, including CEMEX, S.A.B. de C.V.'s Chief Executive Officer and Executive Vice President of Finance and Chief Financial Officer, has concluded that our disclosure controls and procedures were not effective as of December 31, 2016 to achieve their intended objectives. We have identified the following material weakness in our internal control over financial reporting: our risk assessment process did not operate effectively to implement controls that would prevent, or detect and correct, misstatements resulting from apparent collusion or management override of controls in relation to significant unusual transactions. In addition, we did not design and operate effective monitoring controls to detect non-compliance with our policies related to the financial reporting of significant unusual transactions. This material weakness relates, in part, to the previously disclosed irregular payments to a non-governmental individual made in connection with the construction by CEMEX Colombia of a new integrated cement plant in the Antioquia department near the municipality of Maceo, Colombia (the "Maceo Project"). As of December 31, 2016, the investigations of this failure, and the implementation of our remediation plan to address it, were not far enough advanced to provide a sufficient level of assurance that such circumvention or override of controls and misuse of funds by management would be prevented.

75.     Then, on March 14, 2018, Cemex disclosed that the U.S. Department of Justice also began investigating the Company over payments made by the Company related to a cement plant it is building in Colombia to determine whether any violations of federal bribery laws occurred.   However, according to the press release announcing the DOJ investigation, the Company revealed that not only would the DOJ conduct a probe into its operations in Colombia but would also investigate its operations in "other jurisdictions":

> [O]n March 12, 2018, the DOJ issued a grand jury subpoena to CEMEX, S.A.B. de C.V. relating to its operations in Colombia ***and other jurisdictions***.

While stating, as it did when it announced the SEC investigation, that it could not predict the "duration, scope, or outcome" of the investigation, the Company no longer claimed that it "does not expect this matter to have a material adverse impact on its consolidated results of operations, liquidity or financial position."

76.     This materialization of the risk created by the undisclosed improper payments as well as the new information that a new regulatory agency would investigate not only Colombian operations, but operations in other locations as well, caused Cemex's ADS price to drop $0.12, or 1.64%, to close at $7.21 on March 14, 2018.

77.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

### PLAINTIFFS' CLASS ACTION ALLEGATIONS

78.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Cemex securities traded on the NYSE during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the

Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

79.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cemex securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Cemex or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

80.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

81.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

82.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Cemex;

- whether Defendants caused Cemex to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Cemex securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

83.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

84.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Cemex securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased and/or sold Cemex securities between the time the Defendants failed to disclose or

misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

85.　Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

86.　Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### <u>Against All Defendants</u>

87.　Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

88.　This Count is asserted against Cemex and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

89.　During the Class Period, Cemex and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

90.　Cemex and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

27

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Cemex securities during the Class Period.

91.     Cemex and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Cemex were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of Cemex, their control over, and/or receipt and/or modification of Cemex's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Cemex, participated in the fraudulent scheme alleged herein.

92.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Cemex personnel to members of the investing public, including Plaintiffs and the Class.

93.     As a result of the foregoing, the market price of Cemex securities was artificially inflated during the Class Period.  In ignorance of the falsity of Cemex's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Cemex securities during the Class

Period in purchasing Cemex securities at prices that were artificially inflated as a result of Cemex's and the Individual Defendants' false and misleading statements.

94.     Had Plaintiffs and the other members of the Class been aware that the market price of Cemex securities had been artificially and falsely inflated by Cemex's and the Individual Defendants' misleading statements and by the material adverse information which Cemex and the Individual Defendants did not disclose, they would not have purchased Cemex's securities at the artificially inflated prices that they did, or at all.

95.     As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

96.     By reason of the foregoing, Cemex and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Cemex securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act Against The Individual Defendants

97.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

98.     During the Class Period, the Individual Defendants participated in the operation and management of Cemex, and conducted and participated, directly and indirectly, in the conduct of Cemex's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's inadequate internal safeguards in data security protocols.

99.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Cemex's

financial condition and results of operations, and to correct promptly any public statements issued by Cemex which had become materially false or misleading.

100.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Cemex disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Cemex to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Cemex within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Cemex securities.

101.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Cemex.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.   Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: August 2, 2018

Respectfully submitted,

**POMERANTZ, LLP**

*/s/Jeremy A. Lieberman*
Jeremy A. Lieberman
Tamar A. Weinrib
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:  (917) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: taweinrib@pomlaw.com

Patrick V. Dahlstrom
**POMERANTZ LLP**
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile:  (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

Frank R. Schirripa
Daniel B. Rehns
**HACH ROSE SCHIRRIPA &
CHEVERIE, LLP**
112 Madison Avenue, 10th Floor
New York, New York 10016
Telephone: (212) 213-8311
Facsimile: (212)779-0028
E-mail: fschirripa@hrsclaw.com
E-mail: drehns@hrsclaw.com

*Co-Lead Counsel for Lead Plaintiffs and
the Proposed Class*

Peretz Bronstein
**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 697-6484
Email:  peretz@bgandg.com

*Additional Counsel for Lead Plaintiffs
Carlos Llantada and Richard Storm*