UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHRISTOPHER SCHIRO, Individually and on
Behalf of All Others Similarly Situated,

                             Plaintiff,

         v.

CEMEX, S.A.B. de C.V., FERNANDO A.
GONZÁLEZ OLIVIERI and JOSÉ
ANTONIO GONZALEZ FLORES,

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:      18 Civ. 2352 (VEC)

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

Jay B. Kasner
Scott D. Musoff
Michael D. Moritz
SKADDEN, ARPS, SLATE
   MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
Phone: (212) 735-3000
Fax: (212) 735-2000
jay.kasner@skadden.com
scott.musoff@skadden.com
michael.moritz@skadden.com

*Attorneys for CEMEX, S.A.B. de C.V.,*
   *Fernando Ángel González Olivieri and*
   *José Antonio González Flores*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS .........................................................................................6

    A.    The Parties ...................................................................................6

    B.    Cemex Colombia .........................................................................8

    C.    The Maceo Project ......................................................................9

    D.    CEMEX Discloses the Company's Discovery of Improper Conduct in
        Colombia .....................................................................................9

    E.    CEMEX Discloses its Receipt of an SEC Subpoena ...........................11

    F.    Disclosures Regarding Internal Controls .......................................12

    G.    This Action .................................................................................13

ARGUMENT ...........................................................................................................13

I.    PLAINTIFFS' FIRST CLAIM FOR RELIEF UNDER SECTION 10(b) OF THE
    EXCHANGE ACT AND SEC RULE 10b-5 SHOULD BE DISMISSED ......................13

    A.    Plaintiffs Fail To Adequately Plead Any Actionable Misstatement Or
        Omission .....................................................................................14

        1.    Plaintiffs Fail to Adequately Plead Any Actionable Misstatement
            or Omission in Connection with an Alleged "Bribery Payment" .............14

        2.    Plaintiffs Fail to Adequately Plead that the Company
            Misrepresented its Financial Statements........................................20

        3.    Allegations Regarding Company Policies Are Not Actionable................21

        4.    Plaintiffs Fail to Adequately Plead Falsity of the SOX
            Certifications..........................................................................23

    B.    Plaintiffs Fail To Adequately Plead Materiality ...................................25

        1.    Plaintiffs Fail to Adequately Plead that Any Statement was
            Material ................................................................................25

        2.    Plaintiffs Fail to Plead that CEMEX's Opinions About the
            Materiality of Investigations into the Maceo Project were False .............26

C.      Plaintiffs Fail To Plead A Strong Inference Of Scienter .......................................27

    1.      Plaintiffs Fail to Adequately Plead that Defendants Had Knowledge That Any of Their Statements Were False or Misleading................................................................................28

    2.      The Confidential Witness Testimony Does Not Support an Inference that Defendants Were Reckless ..................................32

    3.      The Rogue Employees' Conduct Cannot Be Imputed to CEMEX ...........34

D.      Plaintiffs Fail To Adequately Plead Loss Causation .............................................36

E.      Plaintiffs Llantada And Storm Fail To State A Claim Under *Morrison*................37

II.     PLAINTIFFS FAIL TO STATE A "CONTROL PERSON" CLAIM AGAINST THE INDIVIDUAL DEFENDANTS UNDER SECTION 20(a) OF THE EXCHANGE ACT.................................................................................................39

CONCLUSION...................................................................................................................40

## TABLE OF AUTHORITIES

### CASES

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012)............................................................................ 6, 38

*In re Alstom SA Securities Litigation*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005)............................................................ 36

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................ 7

*Axar Master Fund, Ltd. v. Bedford*,
    308 F. Supp. 3d 743 (S.D.N.Y. 2018)............................................................ 27

*In re Axis Capital Holdings, Ltd. Securities Litigation*,
    456 F. Supp. 2d 576 (S.D.N.Y. 2006)................................................. 14, 20, 21

*In re Banco Bradesco S.A. Securities. Litigation*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017)................................................. 3, 14, 20

*Balintulo v. Ford Motor Co.*,
    96 F.3d 160 (2d Cir. 2015)............................................................................ 17

*Barrett v. PJT Partners Inc.*
    No. 16-CV-2841 (VEC), 2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017).................. *passim*

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)....................................................................................... 25

*In re Braskem S.A. Securities Litigation*,
    246 F. Supp. 3d 731 (S.D.N.Y. 2017).................................................... 20, 23

*Campo v. Sears Holdings Corp.*,
    371 F. App'x 212 (2d Cir. 2010) ................................................................... 32

*Campo v. Sears Holdings Corp.*,
    635 F. Supp. 2d 323 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010)............... 16

*In re Citigroup Inc. Securities Litigation*,
    753 F. Supp. 2d 206 (S.D.N.Y. 2010)........................................................... 34

*In re Citigroup, Inc. Securities Litigation*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Trust v.
    Citigroup Inc.*, 165 F. App'x 928 (2d Cir. 2006) ............................................. 18

*City of Brockton Retirement System v. Avon Products, Inc.*
     No. 11 Civ. 4665(PGG), 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ........ 5, 29, 30, 31

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG,*
     752 F.3d 173 (2d Cir. 2014).................................................................................*passim*

*Coronel v. Quanta Capital Holdings Ltd.,*
     No. 07 Civ. 1405(RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ............................ 21

*Das v. Rio Tinto PLC,*
     No. 16-cv-09572 (ALC), 2018 WL 4189512 (S.D.N.Y. Aug. 21, 2018).................*passim*

*In re Digital Music Antitrust Litigation,*
     812 F. Supp. 2d 390 (S.D.N.Y. 2011).................................................................... 17

*In re Doral Financial Corp. Securities Litigation,*
     563 F. Supp. 2d 461 (S.D.N.Y. 2008), *aff'd sub nom. W. Va. Inv. Mgmt. Bd. v.*
     *Doral Fin. Corp.*, 344 F. App'x 717 (2d Cir. 2009)........................................ 16

*Dura Pharmaceuticals, Inc. v. Broudo,*
     544 U.S. 336 (2005)............................................................................... 37

*Employees Retirement System of the City of Providence v. Embraer S.A.,*
     No. 16 Civ. 6277 (RMB), 2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018)...............*passim*

*Ernst & Ernst v. Hochfelder,*
     425 U.S. 185 (1976).............................................................................. 27

*Ganino v. Citizens Utilities Co.*
     228 F.3d 154 (2d Cir. 2000)........................................................... 43

*Glaser v. The9, Ltd.,*
     772 F. Supp. 2d 573 (S.D.N.Y. 2011)...............................................*passim*

*Harris v. AmTrust Financial Services., Inc.,*
     135 F. Supp. 3d 155 (S.D.N.Y. 2015), *aff'd,* 649 F. App'x 7 (2d Cir. 2016).. 28, 31, 36, 37

*In re Iconix Brand Group,*
     15 Civ. 4860 (PGG), 2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017)........................ 31, 32

*Jones v. Perez,*
     550 F. App'x 24 (2d Cir. 2013) .................................................................. 33

*In re JP Morgan Chase Securities Litigation,*
     363 F. Supp. 2d 595 (S.D.N.Y. 2005)................................................... 18

*Kalnit v. Eichler,*
     264 F.3d 131 (2d Cir. 2001).................................................................. 32

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)............................................................................ 5, 36, 39

*In re Lone Pine Resources, Inc.*,
    No. 12 Civ. 4839(GBD), 2014 WL 1259653 (S.D.N.Y. Mar. 27, 2014) .................. 25, 26

*Menaldi v. Och-Ziff*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016)............................................................ 3, 14, 15, 18

*Monroe County Employees' Retirement System v. YPF Sociedad Anonima*,
    15 F. Supp. 3d 336 (S.D.N.Y. 2014)...................................................................... 5, 37

*Morrison v. National Australia Bank Ltd.*,
    561 U.S. 247 (2010)......................................................................................... 5, 6, 38

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    135 S. Ct. 1318 (2015)..................................................................................... 4, 26, 27

*Patel v. L-3 Communications Holdings Inc.*,
    No. 14-CV-6038 (VEC), 2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016).......... 4, 25, 26, 35

*In re Petrobras Securities Litigation*,
    862 F.3d 250 (2d Cir. 2017).................................................................................. 6, 38

*In re Petrobras Securities Litigation*,
    150 F. Supp. 3d 337 (S.D.N.Y. 2015)..................................................................... 38, 39

*Rahman v. Kid Brands, Inc.*,
    736 F.3d 237 (3d Cir. 2013)................................................................................. 15, 33

*In re Sanofi Securities Litigation*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016)...................................................................... 3, 20

*Santa Fe Industries, Inc. v. Green*,
    430 U.S. 462 (1977).......................................................................................... 33, 39

*In re Satyam Compensation Services Ltd. Securities Litigation*,
    915 F. Supp. 2d 450 (S.D.N.Y. 2013)......................................................................... 39

*Slayton v. Am. Express Co.*
    604 F.3d 758 (2d Cir. 2010).................................................................................... 31

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*,
    531 F.3d 190 (2d Cir 2008)............................................................................ 27, 28, 29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................. 27

*Tongue v. Sanofi,*
    816 F.3d 199 (2d Cir. 2016).................................................................................. 7, 27

*In re Turquoise Hill Resources Ltd. Securities Litigation,*
    No. 13 Civ. 8846(LGS), 2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) ......................... 32

*United States v. Bestfoods,*
    524 U.S. 51 (1998)........................................................................................... 16, 17

*United States v. Hoskins,*
    No. 16-1010-cr, 2018 WL 4038192 (2d Cir. Aug. 24, 2018) ........................................ 1

*Wilbush v. Ambac Financial Group, Inc.,*
    271 F. Supp. 3d 473 (S.D.N.Y. 2017)................................................................... 34

*Wilson v. Merrill Lynch & Co.,*
    671 F.3d 120 (2d Cir. 2011)............................................................................... 39

*In re Yukos Oil Co. Securities Litigation,*
    No. 04-CV-5243, 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006)........................... 14

## STATUTES

15 U.S.C. § 78j(b) ....................................................................................................... 13

15 U.S.C. § 78u-4(b) .................................................................................................... 16

15 U.S.C. § 78u-4(b)(2)(A) ......................................................................................... 27

15 U.S.C. § 78u-4(b)(4) ............................................................................................... 36

15 U.S.C. § 7241 .......................................................................................................... 4

18 U.S.C. § 1350 .......................................................................................................... 4

## RULES

Fed. R. Civ. P. 9(b) ..................................................................................................... 27

## REGULATIONS

SEC Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b) .......................................................... 13

SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45, 150-01 (Aug. 19, 1999)............... 25, 26

Defendants CEMEX, S.A.B. de C.V. ("CEMEX" or the "Company"), Fernando Ángel González Olivieri and José Antonio González Flores (together, the "Individual Defendants," and together with CEMEX, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Class Action Complaint (Dkt. No. 39) ("Amended Complaint" or "AC").

## PRELIMINARY STATEMENT

This action is yet another attempt in a growing trend of securities purchasers seeking to assert claims under the federal securities laws against international companies for failing to disclose alleged wrongdoing after the commencement of a government investigation relating to the Foreign Corrupt Practices Act ("FCPA"),[1] but *before* the company has been charged with wrongdoing. This action, which commenced after CEMEX timely notified the market that it had two days earlier received a subpoena from the U.S. Department of Justice ("DOJ") and more than 17 months after the Company voluntarily disclosed information about wrongdoing in a Colombian subsidiary, lacks detail of any corporate malfeasance regarding CEMEX's statements. CEMEX—a global leader in the building materials industry headquartered in Mexico—has not been charged with wrongdoing by any investigative body in any country in connection with the underlying acts alleged in the Amended Complaint. The attempt to hold CEMEX liable for securities fraud—based on the purported failure to more quickly disclose additional improper acts for which it has not been charged—is meritless, warranting dismissal of the Amended Complaint.

---

[1] The FCPA creates liability for "(1) [i]ssuers of securities . . . or any officer, director, employee, or agent of such issuer, or any stockholder acting on behalf of the issuer, using interstate commerce in connection with the payment of bribes; (2) American companies and American persons using interstate commerce in connection with the payment of bribes; and (3) foreign persons or businesses taking acts to further certain corrupt schemes, including ones causing the payment of bribes, while present in the United States." *United States v. Hoskins*, No. 16-1010-cr, 2018 WL 4038192, at *1 (2d Cir. Aug. 24, 2018) (citations omitted).

During the Class Period and before receipt of a government subpoena, CEMEX disclosed that it had learned of certain rogue employees' wrongdoing within a Colombian subsidiary, one of CEMEX's more than 50 operating subsidiaries that are spread across the world.  Specifically, CEMEX disclosed that after the Company received an anonymous complaint alleging malfeasance in Colombia, CEMEX and its regional subsidiaries investigated the allegations, identified the wrongdoers in Colombia, dismissed them and brought the matter to the attention of the Colombian Attorney General.  CEMEX also disclosed that the Company conducted an internal audit and updated internal controls.  The Company then promptly notified the public in December 2016 that CEMEX had received a subpoena from the Securities and Exchange Commission ("SEC").  In that same disclosure, and numerous times again over the next year and a half, CEMEX stated that it was possible a DOJ investigation might follow; and in March 2018, CEMEX disclosed that two days earlier it had received a DOJ subpoena.  This is a model example of company behavior that is *not* intentional fraud—CEMEX made full and timely disclosures about ongoing investigations and the Company's assessment of its internal controls.

Plaintiffs' reliance on the oft-rejected assertion that CEMEX should have nonetheless confessed it committed criminal offenses *before* it has even been charged with any wrongdoing clearly fails.  As the Second Circuit has held, and this district has reinforced, companies do not have such a duty.  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014); *Emps. Ret. Sys. of Providence v. Embraer S.A.*, No. 16 Civ. 6277 (RMB), 2018 WL 1725574, at *5–6 (S.D.N.Y. Mar. 30, 2018).  For that reason and the following others, the Amended Complaint should be dismissed in its entirety with prejudice:

**Plaintiffs fail to adequately plead any actionable misstatement or omission.**  As a threshold matter, Plaintiffs inadequately plead their principal allegation of underlying

wrongdoing—that the Company knowingly facilitated or ratified an illegal bribery scheme within its Colombian subsidiary to secure a cement plant in Colombia.  Nor do Plaintiffs adequately plead what law the Company broke, how any law was broken or that the Company has been charged with *any* wrongdoing in *any* jurisdiction, let alone bribery.  By failing to plead the "who, what, when, where, and how" of the alleged wrongdoing, Plaintiffs' claims fail.  *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 632 (S.D.N.Y. 2017); *Menaldi v. Och-Ziff* ("*Menaldi I*"), 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016); *see also Das v. Rio Tinto PLC*, No. 16-cv-09572 (ALC), 2018 WL 4189512, at *7 (S.D.N.Y. Aug. 31, 2018).

Even if Plaintiffs adequately pleaded that alleged criminal conduct attributable to CEMEX had occurred—which they did not—Plaintiffs nonetheless fail to plead that CEMEX would have had a duty to disclose that conduct.  The alleged wrongdoing is uncharged and unadjudicated and binding Second Circuit precedent dictates that companies have no "rite of confession," *i.e.*, there is no duty to disclose uncharged and unadjudicated conduct.  *UBS*, 752 F.3d at 184.  To the extent the Company had any disclosure obligations, CEMEX *did disclose* wrongdoing by certain rogue employees in its Colombian subsidiary (before receipt of any subpoena), and then CEMEX disclosed the government subpoenas when it received them.  CEMEX also updated the market about internal and governmental investigations, including the possibility that a DOJ investigation might arise.  *See id.*; *Embraer*, 2018 WL 1725574, at *5–6.

Next, Plaintiffs' assertions regarding the misleading nature of the Company's financial disclosures fail because even if the underlying conduct occurred, there are no allegations that the Company's financials were *inaccurate* and companies have no duty to disclose that part of their income might be derived from improper means.  *Embraer*, 2018 WL 1725574, at *7; *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016).  Claims regarding the Company's anti-

bribery policies also fail because these types of company statements have been recognized as aspirational goals and not guarantees, rendering them non-actionable "puffery." *UBS*, 752 F.3d at 183; *Embraer*, 2018 WL 1725574, at *8.  Plaintiffs' assertions regarding the Individual Defendants' certifications under Section 302 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241, and 18 U.S.C. § 1350 ("SOX Certifications") fail as well because the certifications make clear that the information was *to the best of the individuals' respective knowledge* and Plaintiffs fail to plead particularized facts that the individuals' respective knowledge was anything to the contrary.  *Rio Tinto*, 2018 WL 4189512, at *15.

Moreover, Plaintiffs fail to plead that any alleged misstatement or omission was material, a *sine qua non* to stating a claim.  *Patel v. L-3 Commc'ns Holdings Inc.*, No. 14-CV-6038 (VEC), 2016 WL 1629325, at *16 (S.D.N.Y. Apr. 21, 2016) (Caproni, J.).  Changes of less than 5% to financial statements are presumed to be immaterial and Plaintiffs do not plead that anything here exceeded that threshold.  *Id.*  Plaintiffs similarly fail to plead that the SAB 99 qualitative factors would tip the scales towards materiality because, for instance, the Colombian business—as a whole—represents only four percent of the Company's net sales and assets. (*See* AC ¶¶ 3, 25.) Consequently, Plaintiffs additionally fail to plead that there was any falsity in CEMEX's statements that it believed the investigations would *not* have a material effect.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015).

**Plaintiffs fail to plead a strong inference of scienter.**  Plaintiffs fail to adequately plead that Defendants had knowledge of facts or access to information at the time of their statements that contradicted those statements.  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587–88 (S.D.N.Y. 2011).  Plaintiffs also fail to plead that the Individual Defendants (upon whom Plaintiffs seem to rely for corporate scienter) received information about inadequacies of the Company's controls,

especially considering the alleged wrongdoing occurred in a Colombian subsidiary.  *Barrett v.*

*PJT Partners Inc.*, No. 16-CV-2841 (VEC), 2017 WL 3995606, at \*9 (S.D.N.Y. Sept. 8, 2017)

(Caproni, J.).  Additionally, the fact that the Company commenced an internal investigation

supports an *opposing* inference that Defendants had not known of wrongdoing.  *City of Brockton*

*Ret. Sys. v. Avon Prods., Inc.*, No. 11 Civ. 4665(PGG), 2014 WL 4832321, at \*24 (S.D.N.Y.

Sept. 29, 2014).  Further, allegations from three so-called "confidential witnesses" lack any

specificity about Defendants' knowledge of wrongdoing, thus weighing against any allegation of

recklessness.  *Glaser*, 772 F. Supp. 2d at 590–91.  Plaintiffs also fail to plead that any knowledge

of rogue Colombian employees should be imputed to CEMEX; they were employed in a

subsidiary and Plaintiffs do not plead that they acted for the benefit of the parent CEMEX or

aided in the implementation of internal controls.  *Barrett*, 2017 WL 3995606, at \*7–8.

       **Plaintiffs fail to adequately plead loss causation.**  Loss causation requires a corrective

disclosure or the materialization of a risk that was *concealed*.  *See Lentell v. Merrill Lynch &*

*Co.*, 396 F.3d 161, 172–73 (2d Cir. 2005).  CEMEX had publicly warned about the possibility of

a DOJ investigation *since 2016*, when the Company disclosed the SEC subpoena.  This was more

than a year before the Company received a DOJ subpoena, which it promptly disclosed two days

later.  Thus, Plaintiffs' assertion that CEMEX's stock dropped in March 2018 *due to the*

*revelation of a DOJ subpoena* fails for lack of loss causation because the possibility of the

investigation had not been concealed.  *Monroe Cty. Emps. Ret. Sys. v. YPF Sociedad Anonima*,

15 F. Supp. 3d 336, 357–58 (S.D.N.Y. 2014).

       **Plaintiffs Llantada and Storm fail to state a claim under *Morrison v. National***

***Australia Bank Ltd.*, 561 U.S. 247 (2010).**  A plaintiff alleging a claim under Section 10(b) must

plead that it purchased or sold a security listed on a U.S. national exchange or otherwise engaged

in a "domestic" transaction.  *Morrison*, 561 U.S. at 273.  If Plaintiffs fail to plead they purchased

or sold a domestically-listed security, to establish that their *own transactions* were domestic,

Plaintiffs must plead that irrevocable liability was incurred or legal title was transferred in the

U.S., regardless of where they were located.  *In re Petrobras Sec.*, 862 F.3d 250, 262 (2d Cir.

2017); *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012).

Plaintiffs Llantada and Storm allege that they purchased CEMEX "common stock" during the

Class Period.  But CEMEX does not have any "common stock" listed on a U.S. exchange.

Instead, only its American Depositary Shares ("ADS") are listed on a domestic exchange.[2]

Llantada and Storm do not plead that they otherwise engaged in a domestic transaction.

      **Plaintiffs' claim for so-called "control-person liability" against the Individual**

**Defendants should be dismissed.**  Plaintiffs fail to adequately plead (i) a primary violation of

the Exchange Act, (ii) control by the Individual Defendants in connection with the alleged

wrongful acts, or (iii) culpable participation by the Individual Defendants in any wrongdoing.

*Barrett*, 2017 WL 3995606, at *10.

## STATEMENT OF FACTS

**A.**    **The Parties**

      CEMEX is a century-old company, founded, organized under the laws of, and with its

principal executive offices located in, Mexico.  (AC ¶ 20.)  CEMEX is one of the largest cement

companies in the world and the world's second largest ready-mix concrete company, with

operations across the Americas, the Caribbean, Europe, Asia, the Middle East and Africa.  (Ex.

---

[2] An ADS is "a security that represents an ownership interest in a specified number of a company's ordinary shares," *Embraer*, 2018 WL 1725574, at *1 n.3, which "have been deposited with a U.S. bank."  *Petrobras*, 862 F.3d at 258 n.6 (citation omitted).

1, Form 20-F, Apr. 30, 2018 ("2017 20-F"), at 25, 37.)[3]  As of December 31, 2017, CEMEX

reported over $28 billion of total assets and about 40,000 global employees.  (*Id.* at 38, 221.)

 While Plaintiffs assert in a "Joint Declaration" that they purchased CEMEX "common

stock" (*see* Dkt. No. 24-1 ¶¶ 2–3), the Company does not have any publicly-listed and traded

shares of "common stock" in the U.S.  Instead, only CEMEX's ADSs trade in the U.S. (on the

New York Stock Exchange), under the symbol "CX."  (Ex. 1, 2017 20-F, at F-7.)[4]

 Defendant Fernando Ángel González Olivieri is the Chief Executive Officer of CEMEX,

as well as a director.  (AC ¶ 21.)  Defendant José Antonio González Flores is the Executive Vice

President of Finance and Chief Financial Officer of CEMEX.  (AC ¶ 22.)[5]

 Plaintiff Carlos Antonio Llantada Estrada is an investment banker residing in Mexico

City, Mexico, who alleges that he "purchased [and sold] CEMEX common stock during the

Class Period."  (Dkt. No. 24-1 ¶ 2.)  Plaintiff Richard Storm, Jr. is a retired real estate developer

and bank executive residing in Tennessee, who alleges that he "purchased CEMEX common

stock during the Class Period."  (*Id.* ¶ 3.)  Plaintiff Stationary Engineers Local 39 Pension Trust

Fund is a fund that allegedly "purchased and/or sold Cemex, S.A.B. de C.V. American

Depository Receipts" during the putative Class Period.  (Dkt. No. 19-1, Ex. B ¶ 4.)[6]

---

[3] On this Motion, the Court may consider documents "incorporated into the complaint by reference, . . . documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted).  Although at the motion to dismiss stage "we must take all of the factual allegations in the complaint as true," the Court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Barrett*, 2017 WL 3995606, at *3 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  All exhibits ("Ex.") cited herein are attached to the concurrently-filed Declaration of Michael D. Moritz, dated September 14, 2018.

[4] The Amended Complaint merely states that Plaintiffs "purchased Cemex securities."  (AC ¶ 19.)

[5] Plaintiffs assert that Messrs. González Olivieri and González Flores respectively served as CEO and CFO "at all relevant times" (AC ¶¶ 21–22), but they did not hold such positions at the time of the alleged 2012 bribery payment.  (*Cf.* AC ¶ 72.)  Both were appointed to their current positions in 2014.  (*See* Ex. 2, Form 6-K, May 16, 2014, at 1; Ex. 3, Form 6-K, May 21, 2014, at Ex. 1.)

[6] After Plaintiffs contested each other's appointment as lead plaintiff and then made an "about-face" to seek joint appointment—which was evidently "in tension with earlier arguments"—the Court agreed to appoint them joint lead

*(cont'd)*

**B.**     **Cemex Colombia**

CEMEX Colombia, S.A. ("Cemex Colombia") is one of CEMEX's many subsidiaries around the world.  As of December 31, 2017, CEMEX operates in over 50 countries and maintains a presence in more than 100 countries, and of CEMEX's more than 40,000 global full-time employees, about 2,700 work in Colombia.  (Ex. 1, 2017 20-F, at 221.)  Only two of CEMEX's 56 global cement facilities are in Colombia.  (*Id.* at 38.)  As Plaintiffs note, the Colombian business as a whole as of the end of 2017 represented approximately 4% of CEMEX's net sales and total assets.  (AC ¶¶ 3, 25; Ex. 1, 2017 20-F, at 86.)

Cemex Colombia is a subsidiary of CEMEX Latam Holdings, S.A. ("Cemex Latam"). (Ex. 1, 2017 20-F, at 65.)  Cemex Latam (of which more than 25% is not owned by CEMEX) is the main holding company for CEMEX's operations in seven countries, including Colombia, and it is a subsidiary of CEMEX España, S.A., which is four subsidiary levels down from Defendant CEMEX.  (*Id.* at 5, 65, 85, F-108; AC ¶ 3.)  In simplified form, Cemex Colombia is located in the Company's corporate structure as follows:



(*See id.* at 65.)[7]

_____

*(cont'd from previous page)*

plaintiffs, "[n]otwithstanding the applicants' shifting and apparently self-serving positions," concluding that their joint representation would nonetheless "best serve the class."  (Dkt. No. 35 at 1–2.)

[7] This hierarchy is only a limited representation; as per Cemex's 2017 Form 20-F, "[t]he chart has been simplified to show only some of CEMEX's major holding companies and/or operating companies in the main countries in which CEMEX operates, and/or relevant companies in which we hold a significant interest, and does not include all of

*(cont'd)*

Managerially, Cemex Colombia falls within CEMEX's "South, Central America and the Caribbean" ("SAC") operating segment.  (*Id.* at 85.)  The SAC region, which is led by its own President, includes the company's initiatives in Colombia, Panama, Costa Rica, "Caribbean TCL" (Trinidad & Tobago, Jamaica and Barbados), and "Rest of South, Central America and the Caribbean" (including but not limited to Puerto Rico, Dominican Republic, Nicaragua, Guatemala, Argentina, Cayman Islands, Guadalupe, Martinique and Haiti).  (*Id.* at 85–91.)

## C.    The Maceo Project

In August 2012—years before the beginning of the putative Class Period—Cemex Colombia signed a memorandum of understanding with CI Calizas y Minerales S.A. ("CI Calizas") to purchase land and gain rights to a mining title and "free zone" in Maceo, Colombia in order to build a new cement plant (the "Maceo Project").  (AC ¶ 72.)  CEMEX publicly disclosed that Cemex Colombia had conducted the transaction with an individual understood to be a representative of CI Calizas (the "Representative") and that the money for the transaction was paid by Cemex Colombia to the Representative.  (AC ¶¶ 70, 72.)

Two years later, on August 14, 2014, CEMEX issued a press release that Cemex Latam would begin construction of the plant, which would generate about 1,300 new jobs.  (AC ¶ 41; Ex. 4, Form 6-K, Aug. 14, 2014, at Ex. 1.)

## D.    CEMEX Discloses the Company's Discovery of Improper Conduct in Colombia

On September 26, 2016—midway through the putative Class Period—CEMEX voluntarily issued the first of many public disclosures regarding the Company's discovery of improper conduct within its Cemex Colombia subsidiary.  In relevant part, CEMEX disclosed:

_____

*(cont'd from previous page)*
CEMEX's intermediary holding companies and all CEMEX's operating subsidiaries."  (*Id.*)  In CEMEX's 2017 Form 20-F, it enumerates a list of 178 Company subsidiaries.  (*See id.* at Ex. 8.1.)

> [I]nternal audits and investigations performed in accordance with the Corporate Governance policies and Code of Ethics of CEMEX Latam and CEMEX, have raised questions about the payment procedures related to the acquisition of the land and mining rights and benefits of the free tax zone in which the new cement plant is being built in Maceo. These payments did not adhere to CEMEX's and CEMEX Latam's established protocols.

(AC ¶ 70; Ex. 5, Form 6-K, Sept. 26, 2016, at 1.)  CEMEX further added that the Vice President of Planning and the General Counsel of Cemex Latam/Cemex Colombia were immediately terminated, while the CEO of Cemex Latam/Director of Cemex Colombia resigned effective as of the disclosure's date.  (AC ¶ 70.)  CEMEX further disclosed its subsidiaries' cooperation:

> CEMEX Colombia and CEMEX Latam have brought this matter to the attention of the Colombian Attorney General and presented to him the results of their audits and investigations concerning these payments, which were made to a non-governmental third party in the amount of approximately U.S.$20 million. CEMEX Latam and CEMEX Colombia have pledged to cooperate with the Colombian Attorney General, as required.

(Ex. 5, Form 6-K, Sept. 26, 2016, at 1.)  CEMEX added it did not expect these events to have a material impact on CEMEX's "results of operations, liquidity and financial condition."  (*Id.*)

One week later and 17 months before the end of the putative Class Period, CEMEX disclosed additional information:

> An internal audit process revealed that CEMEX Colombia made payments for an aggregate amount equivalent to approximately U.S.$20.5 million to the same person that was the legal representative of the Maceo selling entity and of CEMEX Colombia. . . .
>
> The payments made by CEMEX Colombia for the properties and mining rights in Maceo, as well as for the adjacent land, were made in violation of CEMEX and CEMEX Latam's internal policies and, potentially, of applicable Colombian laws. As a consequence, CEMEX Latam and CEMEX Colombia have brought the matter to the attention of the Colombian Attorney General so that it can take any actions it deems appropriate. As per the requirements of the audit committees of CEMEX and CEMEX Latam, CEMEX Colombia has also retained external counsel to assist CEMEX Latam and CEMEX Colombia in their collaboration with the Colombian Attorney General. In accordance with CEMEX Latam's controls and customary procedures, an independent audit team reporting to

external legal counsel in Colombia has been engaged. CEMEX's external auditors are also reviewing CEMEX's internal audit documentation.

(*See* AC ¶ 72; Ex. 6, Form 6-K, Oct. 3, 2016, at 1.)

## E.    **CEMEX Discloses its Receipt of an SEC Subpoena**

On December 9, 2016, CEMEX disclosed that the SEC had served a document subpoena on the Company, "seeking information to determine whether there have been any violations of the [FCPA]. This subpoena arises from the matter previously reported by CEMEX regarding the new [Maceo] cement plant." (AC ¶ 73; Ex. 7, Form 6-K, Dec. 9, 2016, at 1.) CEMEX explained the background of the allegations and that the subpoena did not imply the Company had broken the law. (Ex. 7, Form 6-K, Dec. 9, 2016, at 1.) The Company further stated that its subsidiaries had brought the matter to the attention of the Attorney General of Colombia. (*Id.*) CEMEX nonetheless included cautionary language that additional regulatory investigations might arise:

> ***It is possible that the United States Department of Justice or investigatory entities in other jurisdictions may also open investigations into this matter***. To the extent they do so, CEMEX intends to cooperate fully with those inquiries, as well. At this point, CEMEX is unable to predict the duration, scope, or outcome of the SEC investigation or any other investigation that may arise; however, CEMEX does not expect this matter to have a material adverse impact on its consolidated results of operations, liquidity or financial position.

(*Id.* (emphasis added).)

In an SEC filing on February 28, 2017, CEMEX disclosed that it learned of the wrongdoing through an anonymous reporting line in 2016, and this disclosure again referenced the SEC subpoena and the possibility that an investigation could follow from the DOJ or others. (Ex. 8, Form 6-K, Feb. 28, 2017, at Ex. 1, 61, Ex. 2, 32.) CEMEX then reinforced on April 28, 2017 and March 5, 2018 the potential of a DOJ investigation. (Ex. 9, Form 20-F, Apr. 28, 2017 ("2016 20-F"), at 121; Ex. 10, Form 6-K, Mar. 5, 2018, at Ex. 1, 63, Ex. 2, 33.)

**F.** **Disclosures Regarding Internal Controls**

CEMEX publicly reports periodic financial information in filings with the SEC, and the Individual Defendants have signed SOX Certifications in the Company's Form 20-F annual filings.  In Form 20-Fs for the years 2014 and 2015, *before* the Company disclosed it had discovered wrongdoing, the Individual Defendants stated that "to the best of [their] knowledge," and "based on [their] knowledge," CEMEX was in compliance with all regulations.  (Ex. 11, Form 20-F, Apr. 27, 2015 ("2014 20-F"), at Ex. 12.1, 12.2, 13.1; Ex. 12, Form 20-F, Apr. 22, 2016 ("2015 20-F"), at Ex. 12.1, 12.2, 13.1.)  The filings also contained statements from CEMEX's outside auditor, KPMG Cárdenas Dosal, S.C., who opined, "CEMEX, S.A.B. de C.V. and subsidiaries maintained, in all material respects, effective internal control over financial reporting."  (Ex. 11, 2014 20-F, at F-3; Ex. 12, 2015 20-F, at F-3.)

After CEMEX disclosed the discovery of wrongdoing in its Colombian subsidiary, the Company then disclosed as a "Risk Factor" in its Form 20-F for the year 2016, filed April 28, 2017, that CEMEX had identified certain weaknesses in internal controls:

> We have concluded that our internal control over financial reporting was not effective as of December 31, 2016, and our remediation efforts are ongoing. As a result, our ability to report our results of operations accurately, including our ability to make required filings with government authorities, may be adversely affected if our remediation efforts are not adequate. In addition, the trading price of our securities may be adversely affected by a related negative market reaction.

(Ex. 9, 2016 20-F, at 23.)  After identifying specific weaknesses, the Company added:

> Since September 2016, we engaged legal counsel, forensic and other advisors to investigate and advise with regard to different matters regarding the Maceo Project, including with respect to our internal controls. We subsequently filed a criminal complaint against four former employees of CEMEX Colombia. The implicated employees, allegedly acting in collusion, were able to intentionally circumvent the then existing internal controls.

> While the irregularities occurred in a number of periods prior to 2016, CEMEX performed a qualitative and quantitative evaluation of the resulting financial

statement effects and concluded that ***none of them individually, or in aggregate, were material to any such periods. Accordingly, we have not restated any previously issued financial statements***.

(*Id.* at 234–35 (emphasis added); *see also* AC ¶ 74.)  The Company added that it created a new approval policy for transactions at its subsidiaries and a committee to oversee large investments, enhancements to internal controls and a written code of ethics.  (Ex. 9, 2016 20-F, at 236.)

**G.**   **This Action**

On March 14, 2018, CEMEX timely disclosed that it had (two days earlier) received a grand jury subpoena from the DOJ.  (AC ¶ 75.)  Among other things, CEMEX stated:

> CEMEX, S.A.B. de C.V. intends to cooperate fully with the SEC, DOJ, and any other investigatory entity. As of March 14, 2018, CEMEX, S.A.B. de C.V. is unable to predict the duration, scope, or outcome of either the SEC investigation or the DOJ investigation, or any other investigation that may arise, or, because of the current status of the SEC investigation and the preliminary nature of the DOJ investigation, the potential sanctions which could be borne by CEMEX, S.A.B. de C.V., or if such sanctions, if any, would have a material adverse impact on CEMEX, S.A.B. de C.V.'s results of operations, liquidity and financial condition.

(Ex. 13, Form 6-K, Mar. 14, 2018, at 1.)  This action was commenced two days later.  (*See* Dkt. No. 1.)

## ARGUMENT

### THE AMENDED CLASS ACTION COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

**I.**   **PLAINTIFFS' FIRST CLAIM FOR RELIEF UNDER SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 SHOULD BE DISMISSED**

The elements of a claim under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b), promulgated thereunder, and Plaintiffs' associated pleading obligations, are well-settled.  *See Barrett*, 2017 WL 3995606, at *3–4.

A. **Plaintiffs Fail To Adequately Plead Any
Actionable Misstatement Or Omission**

    1.    Plaintiffs Fail to Adequately Plead Any Actionable Misstatement
or Omission in Connection with an Alleged "Bribery Payment"

At its core, the Amended Complaint has one premise: a CEMEX subsidiary in Colombia

made a $20.5 million bribery payment and the parent company failed to disclose it.  Plaintiffs

must plead with particularity both that (1) such illegal conduct in fact occurred, and (2) even if it

occurred, CEMEX had a duty to disclose it.  Plaintiffs' claims fail on both fronts.

      (a)    *Plaintiffs fail to adequately plead that the
alleged underlying conduct occurred.*

As Judge Carter observed just weeks ago, when "securities fraud claims are based on

failure to disclose uncharged illegal conduct, 'the complaint must state a plausible claim that the

underlying conduct occurred.'"  *Rio Tinto*, 2018 WL 4189512, at *7 (citing *Menaldi I*, 164 F.

Supp. 3d at 578).  Thus, "[i]f the complaint fails to allege facts which would establish such an

illegal scheme, then the securities law claims premised on the *nondisclosure* of the alleged

scheme are fatally flawed."  *In re Axis Capital Holdings, Ltd. Sec. Litig.*, 456 F. Supp. 2d 576,

585 (S.D.N.Y. 2006).  Further, the criminal acts at issue must be pleaded with specificity:

"Blanket allegations that payments were made . . . , standing alone, do not satisfy Rule 9(b)'s

requirement to plead the 'who, what, when, where, and how' of the alleged transactions."

*Bradesco*, 277 F. Supp. 3d at 632 (citation omitted); *see also In re Yukos Oil Co. Sec. Litig.*, No.

04 Civ. 5243 (WHP), 2006 WL 3026024, at *14 (S.D.N.Y. Oct. 25, 2006) (plaintiffs failed "to

plead with particularity sufficient facts demonstrating that [defendant's] tax strategy violated

Article 40 of the Russian Federation Tax Code").

Despite the Amended Complaint's singular proposition of CEMEX not disclosing and

accounting for a "$20.5 million bribery payment made in connection with its new cement plant

in [Maceo,] Colombia" (*see, e.g.,* AC ¶¶ 45, 47, 49), the Amended Complaint is devoid of facts demonstrating the Company facilitated an illegal scheme.  First, Plaintiffs do not plead that the Company or *any* of its current and/or former employees were charged with bribery in connection with the Maceo Project, or otherwise, in any jurisdiction.  Further, the Amended Complaint is devoid of specificity about what law the Company allegedly broke in securing the Maceo plant, whether it be in Colombia or the U.S.  And to the extent Plaintiffs allege the Company violated the FCPA, Plaintiffs do not plead with particularity how the Company did that, not to mention the fact that the Company *has not* been charged with having violated the FCPA or similar laws in Mexico or Colombia.  *See Rio Tinto*, 2018 WL 4189512, at *8–9 (dismissing § 10(b) claim where plaintiff failed to plead an alleged bribery payment violated the FCPA); *Menaldi I*, 164 F. Supp. 3d at 578–79 (plaintiffs failed to plead that defendant company "violated any law," and failed to "explain how the FCPA prohibits [the issuer's] conduct").  Additionally, Plaintiffs also fail to adequately plead how the Company's *disclosures* indicated that the Company had facilitated or ratified a bribery scheme to secure the Maceo plant, instead of opposing inferences which could be drawn, such as the Company having been wronged by these rogue employees.

Allegations from three so-called "confidential witnesses" ("CW") do not assist Plaintiffs in pleading the "who, what, when, where, and how" of illegal activities of the Company to secure the Maceo Project.[8]  CW1, allegedly a security manager at one Colombian plant (not Maceo) merely claims to have "heard" the Company paid "fees" (AC ¶ 34), and that colleagues told CW1 of "rumors" of "mismanagement."  (AC ¶ 35.)  CW2, allegedly a Colombian community

---

[8] "[W]hen dealing with confidential witnesses, courts should assess the '"detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia."'  If, after that assessment, 'anonymous source allegations are found wanting with respect to these criteria . . . [courts] must discount them steeply."'  *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 244 (3d Cir. 2013) (citations omitted).  Further, "as is obvious, confidential sources cannot be used to 'merely parrot [] . . . conclusory allegations contained in the complaint."'  *Glaser*, 772 F. Supp. 2d at 590 (citation omitted).

15

relations employee *whose employment ended before the putative Class Period began* (*see* AC

¶ 33), only adds that there were "strange dealings" (AC ¶ 36), and CW3, allegedly an

"apprentice" whose employment ended in 2014 (AC ¶ 33), merely contributes that someone else

told him in a chat group that she had "been aware of strange issues."  (AC ¶ 37.)  The securities

laws require pleading *with particularity*; these remarkably vague allegations lack any of that.

And they are based on *rumors*, which do not suffice under the heightened pleading standards of

the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78-u-4(b).  *See*

*Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 336 (S.D.N.Y. 2009) ("[G]eneric and

conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the

heightened pleading standard of [the PSLRA]." (citation omitted)), *aff'd*, 371 F. App'x 212 (2d

Cir. 2010).[9]  The confidential witness statements here do not include *who* did anything improper;

nor when such conduct occurred; nor how anything occurred.  Statements from three low-level

employees without alleged involvement in the Maceo transactions, based on hearsay of "rumors"

about "strange dealings," do not sufficiently allege that the *Company* committed bribery or any

other criminal conduct, nor that the Company approved of any such conduct; and it is

collectively far from pleading with specificity the "who, what, when, where, and how" of illegal

acts (for which the Company has *not* been charged).

Even if, *arguendo*, Plaintiffs adequately pleaded the above, they nonetheless fail to plead

that the conduct of a few rogue employees in a Colombian subsidiary could be imputed to

CEMEX.  "It is a general principle of corporate law deeply 'ingrained in our economic and legal

systems' that a parent corporation . . . is not liable for the acts of its subsidiaries."  *United States*

---

[9] *See also In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (discounting confidential witness statements where they contained "no time frame" of meeting, "no indication of where" within the company hierarchy certain individuals were located, and "no information" regarding how extensively certain reports were discussed), *aff'd sub nom. W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.*, 344 F. App'x 717 (2d Cir. 2009).

*v. Bestfoods*, 524 U.S. 51, 61 (1998) (citation omitted).  Despite Plaintiffs' reference that

CEMEX is a majority owner of Cemex Colombia (AC ¶ 3), liability may not be imposed on a

parent for actions of its subsidiary "merely based on a parent's ownership of a controlling interest

in the subsidiary."  *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 418 (S.D.N.Y.

2011) (applying Delaware and New York law); *see also Balintulo v. Ford Motor Co.*, 796 F.3d

160, 168 (2d Cir. 2015) (parent not liable for foreign subsidiary's actions absent establishing

"extraordinary circumstances").  Plaintiffs do not plead any reason to ignore corporation

distinctions; thus, they fail to plead that any conduct in Colombia could even be imputed *through

the corporate veil* and across continents, to the parent, CEMEX, in Mexico.

> (b)  *Plaintiffs fail to adequately plead that CEMEX had a duty
> to disclose the alleged uncharged, unadjudicated conduct.*

Even if Plaintiffs had adequately pleaded that the Company engaged in an illegal bribery

scheme to secure the Maceo Project—which they have not—Plaintiffs nonetheless fail to

adequately plead that the Company had any duty to disclose the underlying *uncharged* conduct,

let alone that the Company had any such duty *before* it disclosed in 2016 that CEMEX had

learned of wrongdoing.  Plaintiffs do not plead that any of the conduct at issue in this case has

resulted in a charge against the Company.  In this context, the Second Circuit has explicitly held

that disclosure "'is not a rite of confession,' and companies do not have a duty 'to disclose

uncharged, unadjudicated wrongdoing.'"  *UBS*, 752 F.3d at 184.

Plaintiffs' assertion that the Company failed to disclose wrongdoing, as well as the

potential of regulatory scrutiny in connection with the alleged conduct (AC ¶¶ 8, 69–70), which

would have required the Company to essentially *admit guilt* upon the commencement of any

investigation, is untenable.  Companies have no obligation to disclose uncharged illegal conduct,

*even if* government investigations have commenced, as "[t]o hold otherwise would be to subject

corporations to a preemptive duty to 'confess' as soon as a regulatory agency begins an investigation." *Menaldi I*, 164 F. Supp. 3d at 582.  In *UBS*, for example, UBS disclosed that the DOJ and SEC were investigating the company regarding an alleged illegal tax scheme.  752 F.3d at 178.  UBS subsequently disclosed that the company had entered into a deferred prosecution agreement with the government, revealing that the company had violated tax laws.  *Id.* Consequently, plaintiffs there alleged that UBS failed to previously disclose that the company violated the law.  *Id.*  The Second Circuit, however, rejected this argument, finding that "UBS complied with its disclosure obligations under our case law" when it disclosed to the public its involvement in multiple government investigations and described the potential impact of them. *Id.* at 184.  Similarly, in *Employees Retirement System of the City of Providence v. Embraer S.A.*, Judge Berman recently held that Embraer had met its disclosure obligations regarding a government investigation when, as CEMEX did here, it "disclosed that it was under investigation by the [DOJ] and the [SEC] for alleged violations of the FCPA" and "continued to warn the public" during the class period that the investigations could cause the company "to pay substantial fines and/or to incur other sanctions, as provided in the FCPA."  2018 WL 1725574, at *5–6.[10]

CEMEX promptly and continually reinforced to the market that it was under investigation.  In December 2016, the Company publicly disclosed when the SEC issued a subpoena, which was spurred by the Company's own disclosure of the rogue Cemex Colombia employees' malfeasance less than three months earlier.  In that disclosure, the Company provided a significant amount of details about the steps CEMEX and its subsidiaries were taking to rectify

---

[10] *See also In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (allegation that Citigroup failed to disclose revenues derived from "unsustainable and illegitimate sources" was "unavailing, for the federal securities laws do not require a company to accuse itself of wrongdoing"), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006).

any internal issues.  (*See supra* at 11.)  For instance, CEMEX timely disclosed that the SEC

subpoena related to issues "previously reported by CEMEX regarding the new cement plant"; the

subsidiaries "had already, in September 2016, brought the matter to the attention of the

Colombian Attorney General"; the Company "retained external counsel to assist [the

subsidiaries] in their collaboration with the Colombian Attorney General"; and the Company

engaged an independent audit team.  (Ex. 7, Form 6-K, Dec. 9, 2016, at 1.)  Additionally,

although CEMEX disclosed that it did not believe the SEC investigation would have a material

impact on the Company's "consolidated results of operations, liquidity or financial position," the

Company nonetheless warned investors that it was "unable to predict the duration, scope, or

outcome of the SEC investigation or any other investigation that may arise."  (*Id.*)

The Company was similarly forthcoming in its disclosures about the possibility of a DOJ

investigation.  In the same disclosure announcing the SEC subpoena in December 2016 and *more*

*than a year* before the Company received a DOJ subpoena, CEMEX disclosed that it was

"possible that the United States Department of Justice or investigatory entities in other

jurisdictions may also open investigations into this matter."  (*Id.*)  CEMEX reiterated the

possibility of a DOJ investigation on February 28, 2017, April 28, 2017 and March 5, 2018.  (*See*

*supra* at 11.)  And the Company promptly disclosed the DOJ subpoena only *two days* after

receipt.  (*See supra* at 13.)  In that disclosure, the Company explained that it would fully

cooperate with the DOJ and that due to the "preliminary nature of the DOJ investigation,"

CEMEX was "unable to predict" the scope of "potential sanctions" or the potential material

effect of those sanctions.  (*Id.*)  Overall, CEMEX was a prudent company, promptly disclosing

updates into government investigations and the possibility that others would arise.  Therefore,

regardless of whether a bribery scheme has been sufficiently pleaded (and it has not), CEMEX

19

met its disclosure obligations in connection with the underlying conduct and government investigations.[11]

        2.     Plaintiffs Fail to Adequately Plead that the
                   <u>Company Misrepresented its Financial Statements</u>

Plaintiffs' assertion that CEMEX's financial statements were inaccurate because they failed to reflect the bribes is similarly legally insufficient.  As Judge Engelmayer explained, "[a] corporation, by reporting its income, does not take on a duty to disclose that some of that income may be due, in part, to unlawful conduct." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 753 (S.D.N.Y. 2017).  Thus, in *In re Sanofi Securities Litigation*, Judge Castel dismissed a complaint containing similar allegations to those made by Plaintiffs here and stated, "[a]bsent an allegation that Sanofi reported income that it did not actually receive or sales growth that did not actually occur, this Court agrees that 'a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data.'" *Sanofi*, 155 F. Supp. 3d at 404 (citation omitted); *see also Embraer*, 2018 WL 1725574, at *7 ("Because, as in *Sanofi*, Plaintiff does not dispute that the Embraer financial statements were (literally) accurate, the statements or omissions concerning Embraer's financial statements are not actionable."); *In re Axis*, 456 F. Supp. 2d at 587 ("As a matter of law, no statements regarding [the defendant's] accurately

---

[11] Other assertions about Company statements, including "we continue strengthening our footprint" (AC ¶ 44); the Company has a "solid asset base" (AC ¶ 44); Defendant González Olivieri "touted" the Maceo plant (AC ¶ 46); the plant would be "financed with Cemex Latam's free cash flow" (AC ¶¶ 48, 60); and "construction of grinding phase was completed" (AC ¶ 57), also fail.  First, Plaintiffs fail to adequately plead that the Company engaged in an unlawful bribery scheme.  Second, Plaintiffs fail to plead that any of these statements were otherwise false.  Third, *even if*, *arguendo*, Plaintiffs adequately pleaded bribery, Plaintiffs fail to plead that—contrary to well-settled circuit precedent—there was any duty to disclose *additional* information in these statements, as "there must be a connection between the illegal conduct and the [prior] misleading statements beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations or the bottom line." *Bradesco*, 277 F. Supp. 3d at 653.  Plaintiffs do not plead any such connectivity, other than concluding, absent support, that the Maceo Project was *only* secured through bribery. (*See, e.g.*, AC ¶¶ 44, 46, 57.)  Plaintiffs do not plead facts to demonstrate that CEMEX would not have otherwise been able to secure Maceo, nor that these alleged misstatements relate to Maceo.

reported revenue and income have been rendered materially misleading by failing to disclose that such income was 'unsustainable.'").

Here, Plaintiffs do not plead either that CEMEX's income or sales numbers were *wrong* or that the Company has even generated any income from the Maceo Project; instead, Plaintiffs allege that "Cemex did not properly account for the $20.5 million bribery payment" and that CEMEX "failed to properly book the $20.5 million bribery payment."  (*See, e.g.*, AC ¶¶ 47, 49.) Plaintiffs, though, make no attempt to describe how any such payments were in fact improperly "accounted for" or "booked."  Further belying Plaintiffs' allegation of a material financial misstatement is the Company's disclosure in its 2016 Form 20-F—which Plaintiffs *do not challenge*—stating that CEMEX *did not* need to restate any of its financials:

> While the irregularities occurred in a number of periods prior to 2016, CEMEX performed a qualitative and quantitative evaluation of the resulting financial statement effects and concluded that none of them individually, or in aggregate, were material to any such periods. Accordingly, we have not restated any previously issued financial statements.

(Ex. 9, 2016 20-F, at 235); *see, e.g., Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405(RPP), 2009 WL 174656, at *29 (S.D.N.Y. Jan. 26, 2009) (plaintiffs failed to plead that financial results were false or misleading in part because "none of the control weaknesses led to a restatement of the Company's previously given financial statements").

### 3.   Allegations Regarding Company Policies Are Not Actionable

CEMEX's disclosures about its policies are also not actionable.  "[G]eneral statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery'" because "they are 'too general to cause a reasonable investor to rely upon them.'"  *UBS*, 752 F.3d at 183 (citation omitted).  Such is "particularly true" when statements are "explicitly aspirational," including words such as "aims to," "wants to," and "should."  *Id.*  Consequently, "[c]orporate

codes of conduct are rarely actionable." *Barrett*, 2017 WL 3995606, at *5.  In *Barrett*, for instance, this Court concluded that a defendant's statement that its Code of Conduct was designed to "ensure" that employees maintained high ethical standards in their business dealings were "[b]y their terms . . . aspirational statements." *Id.* at *6.  Judge Berman applied a similar analysis in *Embraer* to claims about a company's anti-bribery policies, stressing that "it cannot be that every time a violation of that code occurs, Embraer will be liable under federal laws.  And, an undisclosed breach of Embraer's anti-bribery prohibitions is, without more, similarly not actionable under the securities laws." *Embraer*, 2018 WL 1725574, at *8 (citation omitted).

CEMEX's policies at issue are similarly not actionable.  For instance, in its Code of Ethics, outlined annually in its Form 20-Fs filed with the SEC, CEMEX stated, "we are committed to conducting our business with transparency and integrity, and ***try to ensure*** that all transactions comply with anti-bribery laws."  (AC ¶ 52; Ex. 11, 2014 20-F, at 224; Ex. 12, 2015 20-F, at 179; Ex. 9, 2016 20-F, at 237 (emphasis added).)  The Company further promotes these aspirations by seeking awareness and compliance with the Company's policies.  (AC ¶ 52.)  And while Plaintiffs put significant emphasis on CEMEX's "Ethics + Compliance" policy on its website (*see, e.g.,* AC ¶¶ 6, 68), these statements are similarly non-actionable because they convey the Company's sentiments, not a guarantee of absolute success.  Simply stating that "CEMEX does not tolerate bribery" (AC ¶¶ 6, 68) and "we reject all forms of corruption" (AC ¶ 52) does not signify that no one has ever committed or could commit wrongdoing.  Rather, by highlighting that "[b]ribery and corruption represent illegal, unethical and socially irresponsible activities" (AC ¶¶ 6, 68), CEMEX seeks to promote compliance and convey to the marketplace that it does not tolerate such conduct and will punish anyone caught committing such acts.  CEMEX is not touting any sort of perfect record among all of its current 40,000 employees and

all those in its century-long history—nor would it be reasonable for an investor to rely on such an incorrect belief. *See Barrett*, 2017 WL 3995606, at *6 n.6 ("The fact that a code of conduct prohibits certain conduct by employees is not a factual representation that those policies will always be followed by all employees or that they are 100% effective.").[12]

Lastly, permitting fraud claims to advance because a few employees of a 40,000-person company violated an ethics code would exact an unrealistic burden on global businesses, and would wrongly penalize companies for taking the commendable steps of implementing codes in the first place. *See Braskem*, 246 F. Supp. 3d at 755–56 ("Because a 'code of ethics is inherently aspirational[,] it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all.'" (citation omitted)).

### 4.    Plaintiffs Fail to Adequately Plead Falsity of the SOX Certifications

Plaintiffs also seek to predicate liability based upon the Individual Defendants' SOX Certifications in certain annual filings with the SEC.  In *Barrett*, this Court rejected a similar claim.  There, the plaintiff alleged that individual defendants who signed SOX Certifications had misled the public because, among other things, the individuals signed SOX Certifications "based on [their] most recent evaluation of internal controls over financial reporting," after which it was discovered that a rogue employee had circumvented those controls.  *Barrett*, 2017 WL 3995606,

---

[12]  Similarly, other Company statements, such as "we continue strengthening our footprint" (AC ¶ 44), are very generic and lack the specificity on which an investor could reasonably rely (not to mention Plaintiffs do not plead such statements were false).  Additionally, statements on the Company's website, such as "[w]e act with honesty" (AC ¶ 68), are inactionable absent allegations regarding the *makers* of those statements because "group pleading does not apply to documents such as . . . websites, which are not the sort of documents typically drafted or reviewed by senior corporate officers." *Barrett*, 2017 WL 3995606, at *4 n.4.  Some quotations, including the Company's "competitive advantage" (AC ¶¶ 26, 40, 67), also misconstrue the Company's statements.  This particular statement is from the Company's website, under the title "Company Values," and under the sub-heading "Work as One CEMEX," highlighting the Company's global connectivity and ability to share information on a global level to create synergies, stating in full: "Leveraging our global knowledge in our local markets is our competitive advantage; we share ideas globally to maximize our individual contributions." *See Our History: Company Values*, CEMEX, https://www.cemex.com/about-us/our-history.  Regardless, in addition to these statements also being too general and vague to warrant liability, Plaintiffs additionally fail to plead that CEMEX actually received any sort of "competitive advantage" in connection with securing the Maceo plant.

at *3 (citation omitted).  In dismissing the claim, this Court stated, "[p]utting aside the fact that a company with good internal controls can have rogue employees who circumvent those controls, the Complaint does not allege with particularity how the SOX Certifications are false."  *Id.* at *6. Specifically, this Court explained:

> The Complaint does not allege: that [the individual defendants] failed to evaluate the effectiveness of [the company's] controls; that there were any undisclosed changes in [the company's] internal controls over financial reporting; that [the individual defendants] were aware of a deficiency or material weakness in [the company's] internal controls over financial reporting that was not reported to [the company's] auditors and board; or that [the rogue employee] was an employee with a "significant role in [the company's] internal control over financial reporting."

*Id.* (citation omitted); *see also Rio Tinto*, 2018 WL 4189512, at *15 (plaintiff failed to plead defendants did not honestly hold opinions in SOX Certifications that included the "important qualification" that such certifications were "based on [their] knowledge").

Here, Plaintiffs ignore that the Individual Defendants signed SOX Certifications only "***to the best of [their] knowledge***," and again "***[b]ased on [their] knowledge***."  (*See supra* at 12 (emphasis added).)  Although the Company would later disclose in 2016 a shortcoming in the Company's internal controls (a finding even its auditors had not made (*see id.*)), Plaintiffs fail to plead that *when the Individual Defendants signed SOX Certifications before that time*, they did not believe *to the best of their knowledge* that the Company's controls were adequate.  (*See also* Section I.C (scienter).)  Nor do Plaintiffs plead that the Individual Defendants failed to evaluate the Company's internal controls.  Thus, the claims premised on these SOX Certifications should be dismissed.

### B.      Plaintiffs Fail To Adequately Plead Materiality

#### 1.      Plaintiffs Fail to Adequately Plead that Any Statement was Material

A statement is deemed material if there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (citation omitted).  In connection with a company's financial statements, "to guide materiality determinations," the Second Circuit considers SEC Staff Accounting Bulletin No. 99 ("SAB 99") to be "persuasive authority." *Patel*, 2016 WL 1629325, at *16.  SAB 99 "suggests that there exists a preliminary assumption, or 'rule of thumb,' that changes of less than 5% to financial statements are immaterial, although there are various 'qualitative factors' that could make even a small change material." *Id.* (citation omitted).[13]

Here, Plaintiffs do not plead that any action specifically caused a greater than 5% negative financial impact on the Company; thus, any alleged misstatement in CEMEX's financial statements is not quantitatively material.[14]  Nor do Plaintiffs plead that CEMEX's actions trigger any qualitative factors.  Pleading qualitative materiality requires "demonstrating a *substantial* likelihood that a reasonable shareholder would think that the addition of that fact '*significantly* alter[s] the "total mix" of information made available.'" *In re Lone Pine Res., Inc.*, No. 12 Civ. 4839(GBD), 2014 WL 1259653, at *4 (S.D.N.Y. Mar. 27, 2014) (citation omitted).  Here, Plaintiffs do not plead factors such as masking a change in earnings, changing a loss into income, or misstating information about a business that plays a "significant role in the registrant's

---

[13] *See* SAB 99, 64 Fed. Reg. 45,150, 45,152 (Aug. 19, 1999) (listed in 17 C.F.R. pt. 211, subpt. B).

[14] Plaintiffs note that the FCPA has "no materiality threshold under the books-and-records provision" (AC ¶ 31), but that is irrelevant here, as liability for *securities fraud* requires pleading with specificity that a misstatement or omission was *material*.  *See, e.g., Barrett*, 2017 WL 3995606, at * 3 (Section 10(b) and Rule 10b-5 make unlawful untrue statements or omissions only of "a material fact").  Plaintiffs seemingly note this in acknowledgement that their claims lack materiality; yet, they provide no rationale to ignore here such a core requirement of securities law.

operations or profitability." *See* SAB 99. Instead, all of those considerations, among others, keep the balance weighted in favor of *immateriality*. For instance, as Plaintiffs acknowledge in the Amended Complaint, Cemex Colombia only comprises *four percent* of the Company's net sales and assets (AC ¶¶ 3, 25), and its Colombian business contains only two of CEMEX's 56 cement facilities located throughout the world. (*See supra* at 8.) The conduct pleaded involves employees at a subsidiary within one country of a regional business segment. (*See supra* at 8–10.) Further, Plaintiffs do not challenge the Company's disclosures that the irregularities *did not* require the Company to restate financials because the Company found them to be not material. (*See supra* at 12–13.) Thus, Plaintiffs fail to plead any material effect. *See, e.g., Lone Pine*, 2014 WL 1259653, at *5 ("The Amended Complaint pleads no facts that would establish that any of the various qualitative factors in SAB No. 99 apply here.").[15]

### 2. Plaintiffs Fail to Plead that CEMEX's Opinions About the Materiality of Investigations into the Maceo Project were False

Plaintiffs also fail to adequately plead that the Company's statements after the announcement of the SEC subpoena regarding its effect likely *not being* material was false. (*See* AC ¶¶ 70–74.) These were future-looking statements of opinion, stating, for instance, "these actions are currently not *expected* to have a material adverse impact on CEMEX's results of operations, liquidity and financial condition." (Ex. 5, Form 6-K, Sept. 26, 2016 (emphasis added).) As the Supreme Court explained, "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong," as plaintiffs do not have "an invitation to Monday morning quarterback an issuer's opinions."

---

[15] This case is therefore distinctive from *Patel*, where this Court concluded that qualitative factors favored materiality when a business segment comprised 36% of the company's total business, the misstatements caused regulatory compliance issues, and the company's share price dropped 12% after disclosure. 2016 WL 1629325, at *16. Further, although SAB 99 also considers the "concealment of an unlawful transaction," this factor is irrelevant here because, as described throughout, Plaintiffs fail to plead that the Company *concealed* any unlawful transaction.

*Omnicare*, 135 S. Ct. at 1327 (2015).  However, opinions "may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).  The burden, though, remains on Plaintiffs, who "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have," which the Supreme Court explained "is no small task."  *Omnicare*, 135 S. Ct. at 1332; *see also Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 753–54 (S.D.N.Y. 2018) (Kaplan, J.).  Here, Plaintiffs plead no facts at all regarding what the Company did or did not know; indeed, they allege nothing "going to the basis for the issuer's opinion."

### C.   Plaintiffs Fail To Plead A Strong Inference Of Scienter

Plaintiffs must also plead with particularity a "strong inference" of scienter, *i.e.*, "a mental state embracing intent to deceive, manipulate or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)); *see* 15 U.S.C. § 78u-4(b)(2)(A); Fed. R. Civ. P. 9(b).  The court "must take into account plausible opposing inferences," and a complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 323–24.  Therefore, Plaintiffs must allege "'facts showing either: 1) a "motive and opportunity to commit the fraud"; or 2) "strong circumstantial evidence of conscious misbehavior or recklessness."'" *Barrett*, 2017 WL 3995606, at *7 (citations omitted).  As to pleading corporate knowledge, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex*

*Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  Plaintiffs do not attempt to allege motive or opportunity and they fail to adequately plead conscious misbehavior or recklessness.

1.   Plaintiffs Fail to Adequately Plead that Defendants Had Knowledge
That Any of Their Statements Were False or Misleading

Plaintiffs fail to allege particularized facts giving rise to a strong inference of scienter because they do not plead that CEMEX or the Individual Defendants (CEMEX's Chief Executive Officer and Chief Financial Officer) had any knowledge, let alone *particular* knowledge, of the rogue employees' actions before the Company received an anonymous tip, or that they recklessly disregarded red flags.  To adequately "plead scienter on the basis that defendants 'knew facts or had access to information suggesting that their public statements were not accurate,'" Plaintiffs "must specifically identify the reports or statements containing this information."  *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 176 (S.D.N.Y. 2015) (Caproni, J.) (citation omitted), *aff'd*, 649 F. App'x 7 (2d Cir. 2016).  In so doing, Plaintiffs' "allegations must show both '(1) *specific* contradictory information [that] was available to the defendants (2) *at the same time* they made their misleading statements.'"  *Glaser*, 772 F. Supp. 2d at 588 (citation omitted).

Plaintiffs seem to rely entirely upon the Individual Defendants for their scienter allegations.  Plaintiffs merely assert that the Individual Defendants signed SOX Certifications, and that Mr. González Olivieri "touted" the construction of the Maceo plant in one earnings call in 2014, without disclosing that it came "as a direct result" of bribery.  (AC ¶¶ 46, 54, 64.)[16]  To plead scienter in connection with these statements (*i.e.*, that the Individual Defendants knew their

---

[16] Plaintiffs also include one statement of former Cemex Latam CEO Carlos Jacks, but that statement is remarkably broad and general, merely asserting that Cemex Latam was "work[ing] intensively to expand our operations," continuing to "strengthen[] our footprint with expansion projects like the new cement plant in Colombia" and having a "solid asset base," which would assist in continuing to "promot[e] growth."  (AC ¶ 44.)  In addition to Plaintiffs failing to plead that this statement was false, the statement is additionally inactionable puffery.  Further, Plaintiffs fail to plead that this statement in any event could be imputed to CEMEX.  (*See infra* Section I.C.3.)

statements were misleading), Plaintiffs must establish that the Individual Defendants *knew* of a bribery scheme—which Plaintiffs fail to plead occurred—at CEMEX's Colombian subsidiary at the time of their disclosures.  Yet, these disclosures were *before* the Company disclosed in 2016 that it had just learned of impropriety.  The Complaint is devoid of any factual allegations regarding the actions, knowledge or intent of the Individual Defendants, or for that matter, any executive of the Company at any time, let alone facts supporting an inference that they had known about *bribery* at the Colombian subsidiary.

In this regard, Judge Gardephe's decision in *City of Brockton Retirement System v. Avon Products, Inc.* is instructive.  There, plaintiffs claimed that the defendant's CEO knew or consciously disregarded the fact that the defendant company's employees "were violating the FCPA when they made statements praising [the company's] success without disclosing that it resulted from bribing foreign officials."  *City of Brockton*, 2014 WL 4832321, at *19.  But the court noted that because the complaint did not allege any facts showing that the CEO was *aware* of the payments, "[p]laintiffs' allegations are not sufficient to demonstrate that [the CEO] knew or consciously disregarded the alleged bribery when making [the company's] financial disclosures."  *Id.* at *20 (citation omitted).  And when the plaintiffs claimed that the CEO and CFO must have known of the wrongdoing because of their positions within the company, Judge Gardephe similarly rejected this argument, explaining that "generalized allegations founded solely on an individuals' [*sic*] corporate position are not sufficient to demonstrate scienter."  *Id.*[17]

Here, Plaintiffs have not even sufficiently alleged that CEMEX or its subsidiaries facilitated an illegal bribery scheme, let alone that the Individual Defendants or others at

---

[17]  *See also Dynex*, 531 F.3d at 196 (plaintiff failed to adequately plead scienter where plaintiff had "not 'specifically identified any reports or statements' or any dates or time frame in which Defendants were put on notice of contradictory information" (citation omitted)).

CEMEX had been aware of it *before* the anonymous tip.  These shortcomings are even more

exacerbated by the fact that—despite Plaintiffs' assertions that the Individual Defendants served

in their current roles *at all relevant times* (AC ¶¶ 21–22)—both were, respectively, appointed

CEO and CFO in 2014 (*see supra* at 7 n.5), yet Plaintiffs allege the improper bribes occurred in

2012 (AC ¶ 72), *before* the Individual Defendants were appointed to their current positions.

Further, in *Barrett*, this Court explained that in a large company, the fact that senior

leadership "had a duty to review [the company's] internal controls is not a substitute for specific

allegations that the individual defendants were provided with information that demonstrated the

inadequacy of [the company's] internal controls."  *Barrett*, 2017 WL 3995606, at *9.  The Court

continued that it was "unpersuaded that the so-called 'core operations' doctrine" was applicable

because "the Court cannot assume that senior officers [at the parent] would necessarily be aware

of the details of billing and compliance practices at a single unit of the company."  *Id.*  Thus, the

blank claim here that the Individual Defendants knew of adverse facts merely because they had

"access to material information" about a subsidiary's practices in another country (AC ¶ 24),

without any factual support, is woefully insufficient to meet the pleading burden.

Additionally, the fact that the Company internally investigated wrongdoing does not

support an inference of scienter, but instead, supports the opposing inference that the Defendants

had previously *not* known of wrongdoing.  Here, the Company very promptly disclosed the

results of its internal audit.  Any assertion that Defendants should have informed the market even

sooner than it did lacks support.  For instance, in *City of Brockton*, Judge Gardephe explained

that the singular fact that the CEO received a whistleblower report did not demonstrate that the

company "knew that the allegations in the letter were true or consciously disregarded proof of

the alleged bribery scheme in making [the company's] financial disclosures.  Moreover, the fact

that [the company] commenced an internal investigation tends to undermine any inference of scienter." *City of Brockton*, 2014 WL 4832321, at *24.  Instead, an "alternative and much more reasonable inference" was that the company had been using the time "to investigate, to gather more information, and to confer with [the DOJ and the SEC] before taking any action," an "alternative inference" that was "bolstered by the fact that, after a preliminary investigation, Defendants disclosed in their next public filing . . . the whistleblower letter and the resulting internal investigation." *Id.* (citation omitted).[18]

For similar reasons, Plaintiffs fail to plead that Defendants had the requisite scienter with respect to alleged misstatements and omissions regarding the Company's financial disclosures and SOX Certifications.  *See, e.g., Barrett*, 2017 WL 3995606, at *9 ("The fact that [the CEO and CFO] had a duty to review [the defendant's] internal controls is not a substitute for specific allegations that the individual defendants were provided with information that demonstrated the inadequacy of [the company's] internal controls."); *City of Brockton*, 2014 WL 4832321, at *33 (company's announcement of internal investigation suggested that upon their new awareness, "they sought to uncover any inadequacies and improve [the company's] compliance programs," leading to a compelling "non-fraudulent inference").  In any event, as this Court previously explained, "[f]inancial statements are complicated documents and reasonable minds can differ on the appropriate level of disclosure; . . . correcting errors simply does not suggest that the initial disclosures were made with fraudulent intent." *Harris*, 135 F. Supp. 3d at 177.  Lastly, Plaintiffs' allegations are further undermined by the fact that CEMEX's auditors issued an *approval* of the

---

[18] *See also Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) ("Ordering an investigation . . . was 'a prudent course of action that weakens rather than strengthens an inference of scienter.'" (citation omitted)); *In re Iconix Brand Grp.*, 15 Civ. 4860 (PGG), 2017 WL 4898228, at *19 (S.D.N.Y. Oct. 25, 2017) (actions, such as fully cooperating with outside auditors, disclosing accounting judgments and taking steps to correct errors supported "a more cogent and compelling inference of non-fraud").

Company's financial statements before the 2016 disclosure of wrongdoing.  (*See supra* at 12);

*Iconix*, 2017 WL 4898228, at *18 (no inference of scienter where, among other things, an

independent public accounting firm had approved of company's financials); *In re Turquoise Hill*

*Res. Ltd. Sec. Litig.*, No. 13 Civ. 8846(LGS), 2014 WL 7176187, at *6 (S.D.N.Y. Dec. 16, 2014)

(no inference of scienter where complaint lacked allegations that a company's auditors disagreed

with the accounting).

2.      The Confidential Witness Testimony Does Not
Support an Inference that Defendants Were Reckless

Plaintiffs include allegations from three "confidential witnesses" in an apparent attempt

to show that the Company was reckless in not knowing of "corruption" in Colombia.  The

standard for recklessness in this context is very high:

> For purposes of the PSLRA, "recklessness" is conduct that is "highly
> unreasonable and which represents an extreme departure from the standards of
> ordinary care to the extent that the danger was either known to the defendant or so
> obvious that the defendant must have been aware of it."

*Barrett*, 2017 WL 3995606, at *7 (citing *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).

Even though "circumstantial evidence of conscious misbehavior or recklessness may support a

strong inference of scienter, 'the strength of the circumstantial allegations must be

correspondingly greater if there is no motive.'"  *Campo v. Sears Holdings Corp.*, 371 F. App'x

212, 216 (2d Cir. 2010) (citation omitted).  Plaintiffs do not allege any motive here.  Further,

there is also a high burden to "credit" confidential witness allegations:

> First, as is obvious, confidential sources cannot be used to "merely parrot [] . . .
> conclusory allegations contained in the complaint." Second, as with all allegations
> going to scienter, confidential source allegations must show that individual
> defendants actually possessed the knowledge highlighting the falsity of public
> statements; conclusory statements that defendants "were aware" of certain
> information, and mere allegations that defendants "would have" or "should have"
> had such knowledge is insufficient.

32

*Glaser*, 772 F. Supp. 2d at 590–91 (citations omitted); *see also Rahman*, 736 F.3d at 244 (confidential allegations lacking specificity should be discounted steeply); *Jones v. Perez*, 550 F. App'x 24, 28 (2d Cir. 2013) (finding no inference of scienter where "none of the confidential witnesses assert direct knowledge that [a certain] view was held by defendants"). In fact, "even confidential high level executives' statements will be insufficient absent some allegation that the witness communicated with the individual defendants claimed against in the case, or else that the witness was privy to the individual defendants' knowledge." *Glaser*, 772 F. Supp. 2d at 589–90.

Plaintiffs seem to lodge a recklessness argument based on the confidential witness statements, such as CW1's allegation that "everyone at Cemex Colombia knew about the mismanagement of the Maceo plant." (AC ¶ 35.) But, as is well-established, "corporate mismanagement" does not amount to securities fraud, as Congress "did not seek to regulate transactions which constitute no more than internal corporate mismanagement." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) (citation omitted). In any event, none of the confidential witness allegations relate *in any way* to the Individual Defendants or anyone else whose intent could be imputed for these purposes to CEMEX, nor do they provide any avenue through which the Defendants would have learned of any such alleged conduct. At best, CW1 asserts that at the subsidiary level "bribes were commonly paid" (AC ¶ 34); there were "rumors of financial mismanagement" (AC ¶ 35); and that "everyone knew" of mismanagement (AC ¶ 35). CW2 (who was not employed during the Class Period) simply adds that there were "strange dealings" in Colombia (AC ¶¶ 33, 36), and CW3 (barely employed during the Class Period) merely provides that someone told CW3 that "she had been aware of strange issues." (AC ¶¶ 33, 37.) Not only are these statements remarkably vague, but they do not in any way establish *knowledge or recklessness* on the part of *anyone* at CEMEX. Confidential witness allegations "must show

that individual defendants actually possessed the knowledge highlighting the falsity of public statements." *Glaser*, 772 F. Supp. 2d at 591.  Such is evidently absent here.[19]

Additionally, all three of the "confidential witnesses" were very low-level employees. CW1 was allegedly a security manager at one Colombian site who reported to another security manager in Colombia; CW2 allegedly worked in "community relations" in Colombia, and CW3 was allegedly an "apprentice."  (AC ¶ 33.)  There are no facts pleaded regarding communications between the confidential witnesses and anyone at the parent CEMEX, nor would it have been reasonably expected that a lower-level employee—subject to intermediate managerial review and working in a subsidiary in Colombia—would have communicated with, for instance, the CEO and CFO, located in a different continent and who oversee 40,000 full-time employees around the world.  Such conclusory assertions by individuals who likely never met the Individual Defendants or others at the parent entity do not nearly establish that the Defendants knew of any such conduct, or should have known that it had occurred.  *See Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 497 (S.D.N.Y. 2017) ("[T]he Amended Complaint does not allege that [some] 'confidential witnesses' . . . had any contact with the Individual Defendants.  In such a case, 'the law is abundantly clear that [their] allegations are insufficient to support scienter.'" (citation omitted)).

3.     <u>The Rogue Employees' Conduct Cannot Be Imputed to CEMEX</u>

Although "[c]ourts in this district have not developed a bright-line rule to determine when an executive is sufficiently senior such that his or her scienter can be attributed to the entity," this Court and others suggested that "the Court should consider the individual's relative seniority *at*

---

[19] *See In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) ("Plaintiffs cannot rely on assertions that the information presented by confidential witnesses was known or common knowledge within the company; these assertions are too vague and conclusory to support a finding that defendants knew they were making false statements or made those statements with reckless disregard for their truth or falsity.").

*the issuing entity* and the connection between the executive's role and the fraudulent statements." *Barrett*, 2017 WL 3995606, at *7 (emphasis added).

This Court's decision in *Barrett* is instructive.  There, the rogue individual at issue was *not alleged* to be senior management at the issuer, *nor* was he involved in crafting the issuer's internal controls or public disclosures.  *Barrett*, 2017 WL 3995606, at *8.  Further, the individual worked in one of four lines of business of an entity that accounted for less than one third of the issuer's business, he was one of 31 partners and the complaint did not allege that he directly reported to the issuer's senior management.  *Id.*  Thus, this Court held that the individuals' "role in the company weigh[ed] against imputing his knowledge" to the defendant, elaborating that the "determinative question" was whether the individual "was involved in formulating [the defendant's] internal controls or its disclosure of those policies to the market," and finding that because there were no such allegations, knowledge could not be imputed.  *Id.*[20]

The same deficiencies highlighted in *Barrett* are present here.  The rogue employees were located at a regional subsidiary of the Company, *not* at the issuer level.  There are no allegations that the rogue employees communicated with the Individual Defendants, contributed in any manner to the Company's policies regarding internal controls and compliance, or were involved in preparing CEMEX's disclosures.  Further, the Amended Complaint is devoid of any details about the work and/or operations of the rogue employees in Colombia; in fact, Plaintiffs do not even state the names of the wrongdoers, or how they contributed to the alleged wrongdoing.  Overall, the Amended Complaint lacks any specificity regarding the alleged acts *and* actors.

---

[20] This Court specifically contrasted the facts in *Barrett* to those in another case decided by the Court, *Patel*, where the Court imputed to the company an individual's conduct because he was the CFO of one of the defendant's "four business segments, was situated one management level down from the CEO and CFO of [the defendant] and was responsible for a business segment comprising 36% of [the defendant's] total business."  2016 WL 1629325, at *14.

Additionally, the mere fact that CEMEX disclosed allegations of a subsidiary's acts does not mean that the Company previously knew of those acts: "Statements by a parent company acknowledging the fraud of a subsidiary after that fraud has been discovered do not, without more, raise any reasonable inference that the parent knew about the fraud in advance and nonetheless proceeded to make the statements public." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 471 (S.D.N.Y. 2005). To the contrary, assertions that the parent "conducted an internal investigation . . . , reorganized operations . . . , and made repeated statements to the public describing the discovery and then the extent of the [subsidiary's] accounting improprieties" instead "more plausibly suggest that [the parent] took the approach that would be reasonably followed by any prudent corporation when confronted with this type of crisis." *Id.*[21]

### D.    Plaintiffs Fail To Adequately Plead Loss Causation

Pursuant to the PSLRA, "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). The Second Circuit has explained that to establish loss causation, Plaintiffs must allege "'that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise, the loss in question was not foreseeable." *Lentell*, 396 F.3d at 173 (citation omitted). Merely pleading that "the market reacted negatively to new information about a publicly-traded company, without more, is insufficient to plead loss causation in a private securities fraud action." *Harris*, 135 F. Supp. 3d at 173 n.30; *see also Dura Pharm., Inc. v.*

---

[21] *See also Rio Tinto*, 2018 WL 4189512, at *18 ("[T]hat Rio Tinto took disciplinary action in 2016 does not lead to a cogent inference that the Company was aware of, or consciously disregarded, any fraud at the time it was committed. The more plausible inference is that Rio Tinto became aware of misconduct around 2016 and subsequently initiated appropriate disciplinary action.").

*Broudo*, 544 U.S. 336, 342 (2005) ("Normally, . . . an inflated purchase price will not itself constitute or proximately cause the relevant economic loss.").

Plaintiffs allege that CEMEX's stock dropped on March 14, 2018 in reaction to its disclosure about the receipt of a DOJ subpoena.  (AC ¶ 76.)  But it is unclear how the March 14 disclosure was corrective or how this or prior disclosures were false, inducing a loss as a result. *See Harris*, 135 F. Supp. 3d at 173 n.30 (plaintiffs failed to plead that alleged misstatement "actually caused the plaintiffs any losses" where they failed to plead that the statement at issue was a misrepresentation or involved a *corrective* disclosure).  Specifically, CEMEX disclosed numerous times over the prior year that it was possible a DOJ investigation might be opened. The market was therefore *aware* that this eventual result was possible.  And when CEMEX in fact received the subpoena, it disclosed its receipt *two days later*.  Although the price of CEMEX's ADSs dropped on March 14, 2018, even if, *arguendo*, the disclosure in part caused the drop, it cannot be said that this was due to any *concealment* of risk, as opposed to the materialization of a *disclosed* risk (a potential DOJ investigation).  Because CEMEX disclosed the possibility of a DOJ investigation since 2016, its March 2018 disclosure was not corrective, and those prior were not misleading.  Therefore, Plaintiffs fail to plead causation as to the alleged March 2018 loss.  *See YPF Sociedad Anonima*, 15 F. Supp. 3d at 357–58 (loss causation theory "not plausible" where price drop "likely represented the materialization of a known risk, rather than the disclosure of a concealed one").

### E.       Plaintiffs Llantada And Storm Fail To State A Claim Under *Morrison*

The claims of Plaintiffs Llantada and Storm must also be dismissed because they do not adequately plead that they purchased CEMEX ADSs on a domestic national exchange or otherwise purchased CEMEX securities in a domestic transaction.  Section 10(b) of the

Exchange Act does not apply extraterritorially; instead, it "reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." *Morrison*, 561 U.S. at 273. To state claim under Section 10(b) regarding securities *not* traded on a U.S. exchange, either "(1) the purchaser must have 'incurred irrevocable liability within the United States to take and pay for a security, or . . . the seller [must have] incurred irrevocable liability within the United States to deliver a security,'" or "(2) legal title to the security must have transferred in the United States." *Petrobras*, 862 F.3d at 262 (citing *Absolute Activist*, 677 F.3d at 68). In this regard, "[t]he location or residency of the buyer, seller, or broker will not necessarily establish the situs of the transaction." *Petrobras*, 862 F.3d at 262. Foreign purchasers cannot state a claim merely by alleging that they purchased securities cross-listed in the U.S. if the purchases themselves were not domestic, nor can a claim be based merely on a domestic "buy order" of a foreign security. *See UBS*, 752 F.3d at 180–81.

Courts in this district have elaborated that even if plaintiffs are U.S. residents, they must nonetheless plead that they incurred irrevocable liability in the U.S. to represent a class of domestic purchasers. For instance, in *In re Petrobras Securities Litigation*, 150 F. Supp. 3d 337 (S.D.N.Y. 2015), although certain plaintiffs alleged that (i) they purchased securities in the U.S.; (ii) a depository trust company's "bookkeeping affect[ed] a change in beneficial ownership in New York"; and (iii) "all the underwriters who sold in the initial offerings only did so in the United States," Judge Rakoff dismissed those claims because, among other things, the *purchases* themselves had "occurred outside the United States." *Id.* at 341–42. As Judge Rakoff explained, merely alleging "domestic 'actions needed to carry out . . . transactions, and not the transactions themselves,' [is] insufficient to satisfy *Morrison*," because "they involve neither the substantive

indicia of a contractual commitment necessary to satisfy *Absolute Activist*'s first prong nor the formal weight of a transfer of a title necessary for its second." *Id.* at 342 (citation omitted).[22]

Here, Llantada and Storm do not plead that they purchased CEMEX ADSs (CEMEX's only security listed on a U.S. exchange (*see supra* at 7)), or otherwise engaged in domestic transactions. Llantada and Storm each declared that they "purchased **CEMEX common stock** during the Class Period." (Dkt. No. 24-1 ¶¶ 2–3 (emphasis added).) Their Certifications were equally obfuscatory, repeating the vague term "Cemex securities." (Dkt. No. 22-2, at 2, 5.)[23] Because Llantada and Storm fail to plead that they purchased CEMEX ADSs or otherwise engaged in a domestic transaction, their claims should be dismissed.[24]

## II.   PLAINTIFFS FAIL TO STATE A "CONTROL PERSON" CLAIM AGAINST THE INDIVIDUAL DEFENDANTS UNDER SECTION 20(a) OF THE EXCHANGE ACT

"[T]o state a claim under Section 20(a) a plaintiff must allege '(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Barrett*, 2017 WL 3995606, at *10 (citation omitted). When individuals face no primary liability under Section 10(b), claims under Section 20(a) must be dismissed. *See id.* ("[B]ecause the Court has concluded that the Complaint does not plausibly allege a Section 10(b) claim, [plaintiff's] Section 20(a) claim must also be dismissed."). Having failed to adequately plead (i) a primary violation under Section 10(b), (ii) adequate control, *and* (iii) culpable participation,

---

[22] *See also In re Satyam Comput. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 474–76 (S.D.N.Y. 2013) (dismissing sub-class claims where exercise of option to purchase ADRs was effectuated in India).

[23] *See also* AC ¶ 19 ("Plaintiffs . . . , as set forth in the certifications previously filed with this Court, purchased Cemex securities.").

[24] To the extent Plaintiffs raise claims under Rule 10b-5(a) and (c) (*see* AC ¶ 90), these should be dismissed because when the "sole basis for [Rule 10b-5(a) and (c)] claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b5-(a) and (c)." *Lentell*, 396 F.3d at 177. Plaintiffs also do not plead "manipulation," such as "wash sales, matched orders, or rigged prices." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 129–30 (2d Cir. 2011) (quoting *Santa Fe Indus*, 430 U.S. at 476).

Plaintiffs fail to plead control person liability against the Individual Defendants, warranting dismissal of this claim as well.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Amended Complaint be dismissed in its entirety with prejudice.

Dated: New York, New York
September 14, 2018

Respectfully submitted,

/s/ Jay B. Kasner
Jay B. Kasner
Scott D. Musoff
Michael D. Moritz
SKADDEN, ARPS, SLATE
    MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
Phone: (212) 735-3000
Fax: (212) 735-2000
jay.kasner@skadden.com
scott.musoff@skadden.com
michael.moritz@skadden.com

*Attorneys for CEMEX, S.A.B. de C.V.,*
    *Fernando Ángel González Olivieri and*
    *José Antonio González Flores*

40