UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

CHRISTOPHER SCHIRO, *individually and on behalf*
*of all others similarly situated*,

                             Plaintiff,

              -against-

CEMEX, S.A.B. de C.V., FERNANDO A.
GONZALEZ OLIVIERI, and JOSÉ ANTONIO
GONZALEZ FLORES,

                          Defendants.

------------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/12/2019

18-CV-2352 (VEC)

<u>OPINION AND ORDER</u>

VALERIE CAPRONI, United States District Judge:

       Lead Plaintiffs Carlos Llantada, Richard Storm, Jr., and Stationary Engineers Local 39

Pension Fund have sued Cemex, S.A.B. de C.V. ("Cemex" or the "Company") and two of

Cemex's officers for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of

1934, 15 U.S.C. §§ 78j(b), 78t(a). *See* Am. Compl., Dkt. 39. Defendants have moved to dismiss

the Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Notice of

Mot., Dkt. 43. For the following reasons, Defendants' motion to dismiss is GRANTED WITH

LEAVE TO AMEND. Plaintiffs must file a Second Amended Complaint no later than

**August 1, 2019**. Defendants must move against or answer the Second Amended Complaint no

later than **September 5, 2019**.

## BACKGROUND[1]

       Cemex is a multinational building-materials company. *See* Am. Compl. ¶ 2. Fernando

A. González Olivieri is Cemex's Chief Executive Officer ("CEO"), and José Antonio González

---

[1]        On this motion to dismiss, the Court accepts all factual allegations in the pleadings as true and draws all
reasonable inferences in the light most favorable to Plaintiffs. *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir.
2013). The Court may also "consider any written instrument attached to the complaint, statements or documents
incorporated into the complaint by reference, legally required public disclosure documents filed with the [Securities

Flores is Cemex's Chief Financial Officer ("CFO") (collectively, the "Individual Defendants"). *See id.* ¶¶ 21–22. Organized under the laws of Mexico, Cemex operates in over 50 countries worldwide, holds over $28 billion in assets, and employs approximately 40,000 employees. *See* Defs.' Mem. of Law, Dkt. 44, at 6–8. As is relevant here, the Company operates two cement plants in Colombia through a subsidiary, Cemex Colombia S.A. ("Cemex Colombia"). *See id.* at 8. Cemex owns Cemex Colombia through a series of other subsidiaries, including Cemex Latam Holdings S.A. ("Cemex Latam"). *See id.* The Company's operations in Colombia represent approximately 4 percent of its net sales and 4 percent of its total assets. *See* Am. Compl. ¶ 3.

In mid-2012, the Company began taking steps to build a new cement plant in Maceo, a town in northwest Colombia (the "Maceo Plant" or the "Plant"). *See* Defs.' Mem. of Law at 9. In August 2012, Cemex Colombia signed a memorandum of understanding ("MOU") to purchase the Plant's land and mining rights from CI Calizas y Minerales S.A. ("CI Calizas"), a Colombian company. *See id*; Am. Compl. ¶ 4.

Cemex broke ground on the Maceo Plant two years later, in August 2014. *See* Am. Compl. ¶ 41. According to the Company's public disclosures, the Plant was expected to have a production capacity of approximately 1 million tons per year and to cost approximately $340 million. *See id.* ¶¶ 41, 46. For the next two years, Cemex provided periodic updates in its public disclosures, including information on the progress of construction, the Plant's expected cost, and the plans for financing it. *See, e.g.*, *id.* ¶¶ 44, 46, 48, 57.

In March 2016, Cemex disclosed that it had commenced litigation in Colombia relating to Cemex Colombia's efforts to purchase the land, mining rights, and tax benefits for the Maceo

---

and Exchange Commission], and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

Plant.  *See* Am. Compl. ¶ 59.  The Company stated that after execution of the MOU in August 2012, one of CI Calizas's partners had been "linked to a [Colombian] legal process for expiration of property" and that, as a result, the Colombian authorities had suspended CI Calizas's right to sell the Plant's land, mining rights, and tax benefits to Cemex Colombia.  *Id.*  Cemex stated that in order for construction to proceed, Cemex Colombia had agreed to lease the assets while the expiration issues were litigated.  *See id.*

Throughout this time, Cemex made several representations about its internal controls and its compliance with anti-bribery laws.  In its 2014 and 2015 annual reports, the Company stated that its management, including its CEO and "principal financial and accounting officers," had "concluded that internal control over financial reporting [had been] effective" for each of the previous years.  Am. Compl. ¶¶ 50, 62.  The Company also stated in Securities and Exchange Commission ("SEC") filings and on its website that it had an internal Code of Ethics, pursuant to which it "reject[ed] all forms of corruption" and was "committed to conducting [its] business with transparency and integrity."  *Id.* ¶¶ 52–53, ¶ 68.

In the fall of 2016, Cemex announced that an "internal audit process" had revealed that Cemex Colombia had made approximately $20 million in payments to CI Calizas's legal representative in connection with the acquisition of the Maceo Plant's land, mining rights, and tax benefits.  Moritz Decl., Dkt. 45, Ex. 6; *see also id.* Ex. 5; Am. Compl. ¶¶ 70, 72.  Cemex stated that these payments had been made "in violation of Cemex and Cemex Latam's internal policies and, potentially, of applicable Colombian laws."  Moritz Decl. Ex. 6.  At the time of this announcement, Cemex Latam's CEO resigned, and the Company terminated Cemex Latam's Vice President of Planning and General Counsel.  *See id.* ¶ 70.   In the months that followed, Cemex disclosed that it had received subpoenas from the SEC and the Department of Justice

("DOJ") as part of an investigation into whether the irregular payments had violated the Foreign Corrupt Practices Act ("FCPA").[2] *See* Am. Compl. ¶¶ 73, 75. In April 2017, Cemex also announced that the discovery of the irregular payments had revealed "a material weakness in [its] internal control over financial reporting" and, consequently, that the Company's internal controls had not been effective during the time that the payments had been made. *Id.* ¶ 74. Cemex's share price dropped following these disclosures. *See id.* ¶¶ 71, 76.

Plaintiffs allege that the irregular payments were bribes that were part of a broader "culture of corruption" at Cemex Colombia. Am. Compl. ¶ 33; *see also id.* ¶¶ 27, 28. According to a confidential witness, bribes were "commonly paid" by Cemex Colombia. *Id.* ¶ 34. This witness asserts that Cemex Colombia had previously paid government officials to reopen a mine that Colombia had closed; that Cemex Colombia had paid bribes to avoid closure of an unlicensed manufacturing plant; and that Cemex Colombia employees had taken kickbacks while purchasing a parcel of land needed to expand a road to the Maceo Plant. *Id.* ¶¶ 34, 38. The witness also asserts that "everyone" knew about financial "mismanagement" at Cemex Colombia, including "rampant inflation of all expenses" and payments to "buy [the] silence" of the Maceo Plant's workers. *Id.* ¶ 35. According to two other confidential witnesses, political favors were "recurrent" at Cemex Colombia, and employees were told to "stay out of" the "strange dealings" relating to the Maceo Plant's real-estate purchases. *See id.* ¶¶ 36–37.

Plaintiffs allege that Defendants fraudulently failed to disclose the alleged bribery scheme in several of its disclosures between the time that the Maceo Plant was first announced (August 2014) and the time that the irregular payments were first disclosed (September 2016).

---

[2]     Cemex's disclosures maintained that the payments had been made to a "non-governmental individual," Am. Compl. ¶ 74, and that the subpoenas did not mean that the SEC or DOJ had "concluded that Cemex or any of its affiliates [had] broken the law," *id.* ¶ 73; *see also id.* ¶ 75.

*See* Am. Compl. ¶¶ 40–69.  Plaintiffs also allege that several of Defendants' statements were false and misleading in light of the alleged bribery scheme.  *See id.*

## DISCUSSION

## I.     Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief."  *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). "Although for the purposes of a motion to dismiss [the Court] must take all of the factual allegations in the complaint as true, [the Court] '[is] not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  The complaint need not "contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level."  *Keiler v. Harlequin Enters.*, 751 F.3d 64, 70 (2d Cir. 2014).

## II.    Defendants' Motion to Dismiss Plaintiffs' Section 10(b) Claim is Granted

### A.     The Elements of the Claim

Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).  The SEC's implementing rule, Rule 10b–5, makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5.  To state a claim under these provisions, a plaintiff must plausibly plead six elements:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) (quoting *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

Because claims under Section 10(b) and Rule 10b–5 sound in fraud, a heightened pleading requirement applies. Pursuant to Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)); *see also* 15 U.S.C. § 78u–4(b)(1)(B).

### B. Other Than a Limited Number of Statements About the Litigation Regarding the Maceo Plant, the Amended Complaint Fails to Plead an Actionable Misstatement or Omission

Plaintiffs allege four categories of false and misleading statements and omissions. They allege that Cemex: (1) misleadingly failed to disclose the alleged bribery scheme when disclosing information about the Colombian litigation relating to the Maceo Plant; (2) attributed the Company's growth and success to various factors without mentioning the role that bribery had played; (3) falsely stated that its employees complied with a Code of Ethics and with applicable anti-bribery laws; and (4) made false statements about the effectiveness of its internal controls and failed to account for the bribery scheme in its periodic financial statements. *See* Pls.' Mem. of Law, Dkt. 50, at 18–26; Am. Compl. ¶¶ 40–69. As a matter of law, only the first of these categories is actionable under § 10(b).[3]

---

[3] Defendants argue that Plaintiffs have failed to allege that the irregular payments relating to the Maceo Plant were bribes or that any bribe scheme existed in connection with these payments. *See* Defs.' Mem. of Law at 14–17.

### 1.     Statements About the Litigation Relating to the Maceo Plant

A failure to disclose "is actionable under the securities laws only when the [defendant] is subject to a duty to disclose the omitted facts." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). Such a duty may arise when, absent disclosure of the contested information, a corporate statement would be "inaccurate, incomplete, or misleading." *Stratte-McClure*, 776 F.3d at 101 (quoting *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992)). "A statement is materially misleading if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 758 (S.D.N.Y. 2017) (quoting *In re Sotheby's Holdings, Inc.*, No. 00-CV-1041, 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000)); *see also Basic*, 485 U.S. at 231–32; *In re Time Warner*, 9 F.3d at 267–68.

A company has a duty to disclose "uncharged, unadjudicated wrongdoing" only if "its statements are or become materially misleading in the absence of disclosure." *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 580–81 (S.D.N.Y. 2016) (collecting cases); *see also City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014). Accordingly, for the duty to disclose uncharged wrongdoing to arise, "there must be a connection between the illegal conduct and the misleading statements 'beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations

---

The Court will assume, without deciding and without prejudice to any future decision, that Plaintiffs have adequately pleaded the existence of a bribery scheme. The Court notes, however, that Plaintiffs' allegations that Cemex announced that it had uncovered "bribe[]" payments, *e.g.*, Am. Compl. ¶ 72, are not accurate. The Company announced that it had uncovered irregular payments, not bribes. *Id.* at ¶ 70. While Plaintiffs could be correct that those payments were bribes, it is not accurate to allege that Cemex has admitted that fact.

in general or the bottom line.'" *Menaldi*, 164 F. Supp. 3d at 581 (quoting *In re FBR Sec. Litig.*, 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2008)).  Put differently, there must be a "direct nexus" between the alleged wrongdoing and the company's statements.  *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 588–90 (S.D.N.Y. 2006); *see also, e.g.*, *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016) ("The critical consideration . . . in determining whether a corporation must disclose mismanagement or uncharged criminal conduct is whether 'the alleged omissions . . . are sufficiently connected to defendants' existing disclosures to make those public statements misleading.'" (quoting *In re Marsh & McLennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006))); *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 802–03 (S.D.N.Y. 2018).

The alleged bribery scheme bears a direct nexus to Cemex's statements about the Colombian "expiration of property" proceeding:  in the mind of a reasonable investor, both the scheme and the proceeding could have raised serious doubts about Cemex Colombia's ability to acquire the Plant's land, mining rights, and tax benefits from CI Calizas.  In disclosures relating to the expiration proceeding, Cemex stated that the proceeding had resulted in the suspension of CI Calizas's "rights to dispose of the assets offered to Cemex Colombia" and that the suspension had "affected the transfer of full ownership rights" of these assets to Cemex Colombia.  Am. Compl. ¶ 59.  Similarly, armed with information about the alleged bribery scheme, an investor could have reasonably questioned whether Cemex Colombia's rights to the Maceo Plant assets, allegedly obtained pursuant to a bribe-induced MOU, were legally enforceable, "or whether—like all illegal arrangements—[they were] legally unenforceable and subject to abrupt termination."  *In re Braskem*, 246 F. Supp. 3d at 760.  "The market, too, might have questioned

whether [Cemex Colombia's] business practice of . . . bribery left [it] open to the risk of exposure, scandal, and instability." *Id.*

Because Cemex did not disclose the alleged bribery scheme during this time, the Company's statements about the Colombian expiration-of-property litigation are actionable under § 10(b).

### 2.    Statements About the Source of Cemex's Success and Growth

A duty to disclose uncharged wrongdoing may also arise "when a corporation puts the reasons for its success at issue, but 'fails to disclose that a material source of its success is the use of improper or illegal business practices.'" *Menaldi*, 164 F. Supp. 3d at 580 (quoting *In re FBR*, 544 F. Supp. 2d at 358); *see also Das*, 332 F. Supp. 3d at 802–03. The securities laws, however, do not impose "a freestanding legal duty" to disclose uncharged wrongdoing or "an affirmative duty to disclose any and all material information"; they require disclosure only when, absent disclosure, a statement would be false or misleading. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011); *Das*, 332 F. Supp. 3d at 808 (quoting *In re Braskem*, 216 F. Supp. 3d at 752).

In October 2014, Cemex stated that it had "continue[d] strengthening [its] footprint with expansion projects" such as the Maceo Plant and that the Company's "solid asset base together with [its] unique portfolio of building solutions, [would] allow [it] to continue promoting growth in [its] markets." Am. Compl. ¶ 44. Plaintiffs argue that these statements "placed the cause of [Cemex's] growth at issue," thereby giving rise to a duty to disclose that this growth was actually attributable to the alleged bribery scheme. Pls.' Mem. of Law at 18. This argument fails. As an initial matter, Plaintiffs have failed to allege that this omitted statement was true: it is not at all clear whether the alleged bribe scheme played a role in the Company's growth or success. Additionally, Cemex's statements are far too generic to be actionable under the securities laws. The statements attributed the Company's growth to broad trends and corporate strengths, without

pointing to any specific factors or sources of revenue. Under similar circumstances, courts have held that the duty to disclose does not arise. *See, e.g.*, *Menaldi*, 164 F. Supp. 3d at 580 (statements that "transparency" was a company's "competitive strength" and that the company actively managed its "reputational risks" did not trigger a duty to disclose a bribery scheme); *In re Axis Capital*, 456 F. Supp. 2d at 589 (similar); *In re ITT Educ. Servs., Inc. Sec. and Shareholder Deriv. Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) (statements regarding a company's growth were "not misleading because they [did] not suggest that the undisclosed improper activity alleged by Plaintiff was not occurring").[4]

Accordingly, the statements about the causes of Cemex's growth and success are not actionable under § 10(b) as a matter of law.

### 3. Statements About Cemex's Code of Ethics and Anti-Bribery Policies

"[G]eneral statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (quoting *City of Pontiac*, 752 F.3d at 183). "Such statements are not actionable as securities fraud because investors do not rely on 'generalizations regarding integrity, fiscal discipline and risk management.'" *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11-CV-4665, 2014 WL 4832321, at *15 (S.D.N.Y. Sept. 29, 2014) (quoting *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 632–33

---

[4]  Cases in which courts have found a duty to disclose involved far more specific statements than the ones at issue here. *See, e.g.*, *In re VEON Ltd. Sec. Litig.*, No. 15-CV-08672, 2017 WL 4162342, at *7 (S.D.N.Y. Sept. 19, 2017) (company had a duty to disclose a scheme to bribe government officials in Uzbekistan when it stated that all corporations in Uzbekistan "have equal rights and enjoy equal protection guaranteed by the law"); *Braskem*, 246 F. Supp. 3d at 758–59 (statements attributing the low cost of raw materials to "market prices," foreign exchange rates, and other factors were misleading in light of the company's failure to disclose a bribery scheme that fixed the materials' prices at a low rate); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400–01 (S.D.N.Y. 2005) (market maker's statements that attributed its "opportunities to trade" to market forces were misleading in light of the company's failure to disclose illegal trading practices that artificially generated trading opportunities).

(S.D.N.Y. 2005), and collecting other cases). In particular, statements that are "explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should'" are too general to give rise to a securities-fraud violation. *City of Pontiac*, 752 F.3d at 183.

Throughout the relevant time period, Cemex made statements that, as part of the "main guidelines" in its Code of Ethics, the Company "reject[s] all forms of corruption," is "committed to conducting [its] business with transparency and integrity," and "tr[ies] to ensure that all transactions comply with anti-bribery laws." Am. Compl. ¶ 52; *see also id.* ¶¶ 53, 63; Moritz Decl., Ex. 11, at 4. The Company also stated on its website that it "act[s] with honesty and transparency in all [its] interactions" and that, as Cemex's "Golden Rule," the Company "does not tolerate bribery in any form." Am. Compl. ¶ 68.

These statements are classic puffery. Many of the statements were preceded by explicitly aspirational language (*e.g.*, "committed to"; "tr[ies] to ensure"), thus unmistakably signaling that they were statements about goals, not statements of fact. Am. Compl. ¶ 52; *see also City of Pontiac*, 752 F.3d at 183. As to the statement that Cemex "does not tolerate bribery in any form," the Company framed this statement as a "Golden Rule," again indicating that the statement was a goal of its compliance efforts, not a statement about the Company's actual compliance. Similarly, the statement that the Company "reject[s] all forms of corruption" was framed as a "guideline[]" contained in Cemex's Code of Ethics, foreclosing an inference that this was a factual statement. Moritz Decl. Ex. 11 at 4; *see also Singh*, 918 F.3d at 61 ("The Code of Ethics statements, which amount to general declarations about the importance of acting lawfully and with integrity, fall squarely within [the] category" of non-actionable puffery); *In re Sanofi*, 155 F. Supp. 3d at 401 (corporation's statements that it "maintain[s] an effective compliance organization" and has "zero tolerance for any unethical conduct" were "too general to cause a

reasonable investor to rely on them"); *City of Brockton*, 2014 WL 4832321, at *16 (statements about the defendant's compliance policy were not actionable because they "offer[ed] no assurance that [the defendant's] compliance efforts [would] be successful, and [did] not suggest that [its] compliance systems give [it] a competitive advantage over other companies").[5]

### 4. Statements About Cemex's Internal Controls and the Company's Financial Statements

In each of its 2014 and 2015 annual reports, Cemex represented that its management had "conducted an evaluation of the effectiveness of [its] internal control over financial reporting" and that management had "concluded that internal control over financial reporting [had been] effective" for the previous year. Am. Compl. ¶ 50; *see also id.* ¶ 62. These statements are not actionable under the securities laws because there is no allegation that they were false. *See Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (misstatements are actionable only if they were "false when made"). Although Cemex later disclosed that its financial controls had not been effective during this time period, *see* Am. Compl. ¶ 74, the 2014 and 2015 statements did not state that the Company's internal controls were effective—they stated only that management had *concluded* as much, *see id.* ¶ 50. Plaintiffs offer no allegation that management had not so

---

[5]    Even if Cemex's statements had not been explicitly aspirational, they would still not be actionable as a matter of law.  The distinguishing feature of puffery is its use of broad generalities, not its use of talismanic aspirational language.  *See Singh*, 918 F.3d at 63 (statement is not actionable if it is "too general to cause a reasonable investor to rely upon [it]" (quoting *City of Pontiac*, 752 F.3d at 183)); *City of Brockton*, 2014 WL 4832321, at *15 (statements about integrity and compliance are not actionable because "investors do not rely on [such] 'generalizations'").  Cemex's statements are far too general to be reasonably relied upon, regardless of their use of aspirational language.

    Plaintiffs argue that Cemex's statements went beyond mere puffery because they laid out "clear steps" that the Company employed to prevent corruption. Pls.' Mem. of Law at 25–26.  The Court disagrees.  Courts consistently limit actionable statements to statements that go beyond aspirations or general puffery into the realm of false representations of past or present compliance with such policies.  *In re Braskem*, 246 F. Supp. 3d at 756.  Indeed, courts have, on these grounds, expressly distinguished at least one of the cases upon which Plaintiffs rely. *See id.* (distinguishing *In re Goldman Sachs Grp. Inc. Sec. Litig.*, No. 10-CV-3461, 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014)).

concluded, nor any other reason to believe that these statements were false when they were made. *See, e.g.*, *Barrett v. PJT Partners Inc.*, No. 16-CV-2841, 2017 WL 3995606, at *6 (S.D.N.Y. Sept. 8, 2017) (company's certifications relating to internal controls were not actionable because the complaint failed to "allege with particularity how [they were] false").[6] Accordingly, Cemex's statements about its internal controls are not actionable under § 10(b).

Throughout the relevant time period, Cemex released numerous financial statements, including reports of its operating results in Colombia. *See* Am. Compl. ¶¶ 44–45, 47, 49, 55–56, 58, 61. Plaintiffs do not argue that the financial statements were inaccurate; they argue only that the financial statements should have separately accounted for the $20 million payment that was made to CI Calizas. *See id.*; *see also* Pls.' Mem. of Law at 20–22. Plaintiffs' arguments fail. As numerous courts in this District have held, "a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data." *In re Sanofi*, 155 F. Supp. 3d at 404 (quoting *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 401 & n.3 (6th Cir. 1997), and collecting cases); *see also, e.g.*, *Employees Ret. Sys. of City of Providence v. Embraer S.A.*, No. 16-CV-6277, 2018 WL 1725574, at *5 (S.D.N.Y. Mar. 30, 2018) ("Because . . . Plaintiff does not dispute that the [defendant's] financial statements were (literally) accurate, the statements or omissions concerning [its] financial statements are not actionable."); *In re Axis Capital*, 456 F. Supp. 2d at 586–87. Put differently, "[a]ccurately reported financial statements . . . cannot

---

[6]     In contrast, such statements have been held to be actionable when they involve specific and definitive representations that internal controls had been effective. In *City of Brockton*, 2014 WL 4832321, at *16, for example, the defendant stated that it had "a comprehensive and well-documented set of internal controls that provide[d] reasonable assurance that [its] financial transactions are recorded accurately and completely." The defendant also offered concrete examples of its controls, stating that "every single financial reporting location participates in an annual internal control self-assessment and is asked to certify that their control environment is designed and operating efficiently." *Id.* The court held that these statements were actionable because a reasonable investor could interpret them "as reflecting concrete steps that [the defendant] had taken in this area, and might rely upon these statements as a guarantee that such steps had, in fact, been implemented." *Id.*

become actionable simply because companies do not simultaneously disclose some wrongdoing that may have contributed to the company's financial performance." *Fogel v. Vega*, 759 F. App'x 18, 24 (2d Cir. 2018). The Amended Complaint contains no allegations that would make Cemex's financial statements actionable under § 10(b).[7]

In sum, other than the statements about the litigation relating to the Maceo Plant, Plaintiffs have failed to plead a misstatement or omission that is actionable under § 10(b).

### C.      The Amended Complaint Does Not Adequately Plead Scienter

Plaintiffs rely on the following to plead scienter: (1) three executives who either resigned or were terminated upon disclosure of the alleged bribery scheme; (2) various "red flags" that purportedly evince a culture of recurrent corruption at Cemex Colombia; and (3) various actions of the Individual Defendants, including their review of the Company's internal controls, their public statements, and the positions that they held at Cemex. *See* Pls.' Mem. of Law at 29–38.

#### 1.      The Applicable Law

Section 10(b) requires plaintiffs to plead scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference" that the defendant acted with this state of mind. 15 U.S.C. § 78u–4(b)(2)(A); *see also Novak*, 216 F.3d at 306–07. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference

---

[7]      Plaintiffs' citation for this argument is distinguishable. *See* Pls.' Mem. of Law at 21. In *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 93–94 (2d Cir. 2010), the Second Circuit found actionable the defendant's failure to disclose management fees (essentially, kickbacks) separate from a statement of "other expenses" in its prospectus. This failure, however, was actionable because it hid the fact that the defendant's investors "were at the mercy of a faithless fiduciary," *id.* at 93, and because the omission was in violation of SEC rules that reflect the SEC's "strongly held belief in the importance of fees and expenses in a typical investor's decision to invest," *id.* at 94.

one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. To apply this standard, this Court must "take into account plausible opposing inferences" and must consider "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24. The inference of scienter "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324.

"[T]he scienter requirement is met where the complaint alleges facts showing either: (1) a 'motive and opportunity to commit the fraud'; or (2) 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Emps. Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 99). For purposes of the PSLRA, "recklessness" is conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quoting *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)). "Where motive is not apparent . . . the strength of the circumstantial allegations must be correspondingly greater." *Id.* (quoting *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)).

In order to allege that a corporation acted with scienter, a plaintiff must plead with particularity facts giving rise to a strong inference that "someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195–96 (2d Cir. 2008).[8] "Courts in this

---

[8] A plaintiff may also plead corporate scienter by alleging, with particularity, that "a corporate statement is so important and dramatic that it 'would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.'" *Vining v. Oppenheimer Holdings Inc.*, 2010 WL 3825722,

district have not developed a bright-line rule" to determine which employees' scienter may be imputed to a corporation, *Barrett*, 2017 WL 3995606, at *7, but courts have held that "management level" employees are, ordinarily, sufficiently senior to "serve as proxies" for the corporation's mental state, *Thomas v. Shiloh Indus., Inc.*, No. 15-CV-7449, 2017 WL 2937620, at *3 & n.1 (S.D.N.Y. July 7, 2017) (collecting cases).

### 2. The Resignation and Termination of Cemex Latam Executives

In the fall of 2016, when Cemex first disclosed the irregular payments relating to the Maceo Plant, it terminated, "effective immediately," Cemex Latam's Vice President of Planning and its General Counsel (the "Terminated Officers"). Am. Compl. ¶ 70. The Company stated that these two members of Cemex Latam's "senior management" had been "responsible for the implementation and execution" of the irregular payments. *Id.* The CEO of Cemex Latam, Carlos Jacks, also resigned at the time of the announcement. *See id.* ¶¶ 9, 70. Plaintiffs argue that the timing and statements associated with the terminations and resignation raise a strong inference that these officers had a culpable state of mind—scienter which, in Plaintiffs' view, can be attributed to Cemex. *See* Pls.' Mem. of Law at 31–33.

### (i) The Terminated Officers

Given the Company's announcement that the Terminated Officers were responsible for the irregular payments, Plaintiffs have adequately alleged that these officers acted with scienter. Additionally, in light of the Terminated Officers' senior positions at Cemex Latam, their mental states can, arguably, be imputed to that entity. Cemex Latam, however, is not the Defendant. The only corporate Defendant in this case is Cemex, Cemex Latam's indirect parent corporation.

---

at *13 (S.D.N.Y. Sept. 29, 2010) (quoting *Teamsters Local 445*, 531 F.3d at 196). Plaintiffs have not asserted, nor could they, that the statements at issue in this case are of that ilk.

Regardless of whether the Terminated Officers' scienter is attributable to Cemex Latam, Plaintiffs have not adequately alleged that it is attributable to Cemex.

"[T]he mere existence of a parent-subsidiary or affiliate relationship is not on its own sufficient to impute the scienter of the subsidiary to the parent or affiliate." *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 317 (S.D.N.Y. 2011) (citing *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270–71 (2d Cir. 1996)); *see also In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 553–54 (6th Cir. 1999); *Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 218–19 (S.D.N.Y. 2009); *In re Marsh*, 501 F. Supp. 2d at 482–83.[9]  In order to impute the scienter of an officer of a subsidiary to the subsidiary's parent corporation, the plaintiff must allege either that the officer is sufficiently senior in the parent's management that he serves as a "prox[y]" for the parent, *Thomas*, 2017 WL 2937620, at *3, or that the parent otherwise "possessed some degree of control over, or awareness about, the fraud," *Valentini*, 837 F. Supp. 2d at 317.

The Terminated Officers were not sufficiently senior within Cemex to serve as a proxy for the Company.  Although these officers occupied senior positions at Cemex Latam,

---

[9]     As Judge Kaplan of this District has explained:

> [T]here is no . . . rule requiring the imputation of a subsidiary's knowledge to its parent . . . .  Nor should there be.  An employee acting within the scope of his or her employment is an agent of his or her employer.  The same cannot be said of a subsidiary vis-à-vis its parent, at least not necessarily.  [Their] relationships vary considerably and do not yield to a simple rule of agency.

*Defer*, 654 F. Supp. 2d at 218 (footnotes omitted).

Plaintiffs point to a recent case, *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 722 (S.D.N.Y. Mar. 25, 2019), which stated that "a subsidiary's . . . scienter may be imputed to the parent company . . . particularly where the subsidiary is at the center of the alleged fraud."  *See* Pls.' Ltr. (Mar. 27, 2019), Dkt. 57.  Given the overwhelming precedent to the contrary, it is not plausible that this court intended to hold that a subsidiary's scienter is, automatically and without more, imputed to its parent when the subsidiary stands at the center of a fraud. *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." (internal quotation marks omitted)); *Chill*, 101 F.3d at 271 ("[I]ntentional misconduct or recklessness cannot be presumed from a parent's reliance on its subsidiary's internal controls."); *Valentini* 837 F. Supp. 2d at 317; *Defer*, 654 F. Supp. 2d at 218–19; *In re Marsh*, 501 F. Supp. 2d at 482–83.

Cemex Latam comprises less than 6 percent of the total assets, and less than 13 percent of the total net sales, of Cemex, a company with operations in more than 50 countries across several continents. *See* Defs.' Mem. of Law, at 7–8; Form 20-F (Apr. 27, 2015) at 76, *available at* https://www.sec.gov/Archives/edgar/data/1076378/000119312515147499/d912321d20f.htm.[10] Cemex Latam does not comprise a sufficiently large portion of Cemex's overall business to raise a reasonable inference that the Terminated Officers were part of the parent company's senior management. *Cf. Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at *14 (S.D.N.Y. Apr. 21, 2016) (imputing scienter to a parent company based on the scienter of the CFO of a business segment that comprised 36 percent of the parent's total business); *In re Marsh*, 501 F. Supp. 2d at 482–83 (imputing scienter to a parent company based on a business segment that generated 60 percent of the parent's total revenue). Nor do Plaintiffs allege that the Terminated Officers participated in the overall management of the Company, reported directly to Cemex's senior managers, or otherwise served as proxies for the Company.

Plaintiffs argue that Cemex Latam's scienter should be imputed to Cemex because Cemex conducts "all of its business" through subsidiaries. Pls.' Mem. of Law at 33. Regardless of whether that is true, some subsidiaries are more central to Cemex's overall business than others. Cemex's operations in the United States, for example, constitute 44 percent of the Company's total assets and 21 percent of its net sales. *See* Form 20-F (Apr. 27, 2015) at 58. Its operations in Mexico constitute 15 percent of its net assets and 22 percent of its net sales. *See id.*

---

[10]     Cemex Latam comprises an even smaller share of Cemex's overall business than these numbers suggest. Cemex Latam is one subsidiary within Cemex's "South America and the Caribbean" business segment, which comprises 6 percent of the Company's total assets and 13 percent of its net sales. *See* Form 20-F (Apr. 27, 2015) at 76. But the South America and Caribbean business segment includes numerous other subsidiaries apart from Cemex Latam. *See id.* at 53. Data isolating the net sales and total assets of Cemex Latam, apart from the broader business segment, do not appear to be available in the Company's SEC filings.

at 54.  Given the tiny share of Cemex's business that Cemex Latam comprises, the scienter of officers of Cemex Latam cannot, without more, be fairly attributed to Cemex.[11]

### (ii)  The Resignation of the CEO of Cemex Latam

As to the resignation of the former CEO of Cemex Latam, Plaintiffs have not raised a strong inference that he possessed the requisite state of mind or that his state of mind can be imputed to Cemex.

"For executive resignations to raise a strong inference of scienter, they must be highly unusual and suspicious."  *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 499 (S.D.N.Y. 2017) (quoting *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp.*, 902 F. Supp. 2d 329, 343 (S.D.N.Y. 2012), *aff'd sub nom. IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp.*, 783 F.3d 383 (2d Cir. 2015)); *see also, e.g.*, *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007).  That can happen when there is a factual basis to conclude that the resignation was tied to participation in or knowledge of the fraud alleged.  *See Glaser*, 772 F. Supp. 2d at 598 (collecting cases).  Put differently, a resignation can establish scienter only if the plaintiff alleges independent evidence corroborating that the employee who resigned held a

---

[11]     Plaintiffs also allege that Cemex Latam is the holding company for some of Cemex's "most significant operations."  Am. Compl. ¶¶ 3, 25; *see also* Pls.' Mem. of Law at 3, 33.  This allegation mischaracterizes the record. In Cemex's SEC filings, the Company stated that Cemex's operations in Colombia "represent[] [its] most significant operations" in the "South America and the Caribbean" region—not that Cemex Latam represents the "most significant operations" of Cemex as a whole.  Form 20-F (Apr. 27, 2015) at 133.

Plaintiffs also argue that Cemex should be held liable for the conduct of Cemex Colombia under common-law veil-piercing doctrine.  *See* Pls.' Mem. of Law at 15–16.  That is utter nonsense.  "Disregard of the corporate form is warranted only in extraordinary circumstances, and conclusory allegations . . . will not suffice to defeat a motion to dismiss."  *Societe d'Assurance de l'Est SPRL v. Citigroup Inc.*, No. 10-CV-4754, 2011 WL 4056306, at *5 (S.D.N.Y. Sept. 13, 2011); *see also Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996).  Plaintiffs' allegations fall exceedingly short of establishing the elements of veil-piercing under New York law.  *See Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997) (citing *Morris v. New York State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141 (1993)).

culpable state of mind. *See id.* Standing alone, however, an employee's resignation does not raise a strong inference of scienter. *See Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 605–06 (S.D.N.Y. 2016); *CDTS v. UBS AG*, No. 12-CV-4924, 2013 WL 6576031, at *7 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom. Westchester Teamsters Pension Fund v. UBS AG*, 604 F. App'x 5 (2d Cir. 2015).

Here, the only relevant fact alleged is that the CEO of Cemex Latam resigned on the same day Cemex disclosed that it had discovered the irregular payments. *See* Am. Compl. ¶ 70. The inference of scienter that can be drawn from this allegation is not as compelling as its competing, non-culpable inference. When corporate misconduct is disclosed, members of management resign for all sorts of reasons, including that they were negligent in overseeing the responsible employees or simply because the optics of changing management are better for investors and regulators. *See, e.g.*, *CDTS*, 2013 WL 6576031, at *7 ("[T]here are a number of other, more plausible reasons why personnel may have been demoted and resigned . . . [which] are not suggestive of intentional fraud."); *Lighthouse Fin. Grp.*, 902 F. Supp. 2d at 343 ("[T]he resignations . . . are at least as consistent with punishing those at the helm for their poor judgment and leadership, than resignations relating to concocting a scheme to defraud shareholders."). Section 10(b), however, requires more than mere negligence:  it requires recklessness, a "highly unreasonable and . . . extreme departure from the standards of ordinary care." *Kalnit*, 264 F.3d at 142.[12]  Plaintiffs allege no facts that even remotely suggest that the

---

[12]    Indeed, because Plaintiffs do not allege that the CEO had any motive to commit fraud, "the strength of the circumstantial allegations" raising a strong inference of scienter "must be correspondingly greater." *Kalnit*, 264 F.3d at 142.

CEO's conduct rose to this level; accordingly, Plaintiffs have failed to raise a "strong inference" that he acted with scienter. *Tellabs*, 551 U.S. at 322–23.[13]

In any event, Plaintiffs have failed to allege facts from which the Court could infer that any scienter on the part of Cemex Latam's CEO can be attributed to Cemex. Although the CEO was higher in Cemex Latam's management than the Terminated Officers, Cemex Latam was not sufficiently central to Cemex's overall business that Cemex Latam's CEO would be considered part of Cemex's senior management. Indeed, it appears that this officer was one or two rungs below senior management, as he reported to a regional manager who oversaw Cemex's entire "South American and Caribbean" business segment. *See* Defs.' Mem. of Law at 9; Defs.' Reply Mem. of Law, Dkt. 51, at 8–9.

### 3. "Red Flags" Evincing a "Culture of Corruption"

Plaintiffs allege that a series of "red flags" should have put the Defendants on notice of the alleged bribery scheme, including allegations by confidential witnesses about other alleged bribe schemes at Cemex Colombia and about the litigation relating to the transfer of the Maceo Plant's assets. *See* Pls.' Mem. of Law at 34–38.

### (i) Confidential Witness Allegations

According to Plaintiffs' confidential witnesses, Cemex Colombia paid bribes to the Colombian government and other third parties on occasions other than those relating to the

---

[13]     In cases in which courts held that resignations supported a strong inference of scienter, plaintiffs included substantial independent evidence corroborating the executive's state of mind. *See, e.g.*, *In re Salix Pharm., Ltd.*, No. 14-CV-8925, 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016) (resignations of executives were "highly unusual and suspicious" because the company exercised "clawback provisions" in their resignation agreements, which could be triggered by a finding of intentional wrongdoing); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 603, 608 (S.D.N.Y. 2009) (resignation of a board member who was on the defendant's Audit Committee supported an inference of scienter because his resignation email laid out specific examples of "poor corporate governance," including not being provided copies of the company's financials and being denied access to the company's auditors).

Maceo Plant. *See* Am. Compl. ¶¶ 34, 38. Plaintiffs do not allege, however, that this information was relayed to Cemex's senior management or to any other person whose scienter could be imputed to the Company. As a matter of common sense, "red flags are only suggestive of fraud 'to those who were or should have been aware of them.'" *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 244 (S.D.N.Y. 2010) (quoting *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007)); *see also, e.g.*, *Glaser*, 772 F. Supp. 2d at 589–90 ("[E]ven confidential high level executives' statements will be insufficient absent some allegation that the witness communicated with the individual defendants claimed against in the case, or else that the witness was privy to the individual defendants' knowledge."). Plaintiffs do not allege that the "facts" known to the confidential witnesses—a security guard, a community-relations representative, and a budgeting apprentice who worked at Cemex Colombia, *see* Am. Compl. ¶ 33—made their way up the entire corporate hierarchy to the Individual Defendants—the CEO and CFO of a $28 billion company—or to any other person whose scienter can be imputed to Cemex. Accordingly, the confidential witnesses' allegations do not contribute to a strong inference of scienter.

In any event, the confidential witnesses' allegations are too vague, speculative, and conclusory to contribute to an inference of scienter. In order for a court to credit the allegations of confidential witnesses, the witnesses must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314; *see also Glaser*, 772 F. Supp. 2d at 589; *In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 467 (S.D.N.Y. 2008). Plaintiffs allege, based on the allegations of "Confidential Witness 1" ("CW-1"), a security guard, that Cemex Colombia paid bribes to government officials to reopen a mine that had been closed. *See* Am. Compl. ¶ 34. The alleged basis for CW-1's knowledge, however, is that CW-1

"accompanied" unidentified Cemex Colombia executives to a town hall at which the bribe payments were allegedly made. *See id.* Plaintiffs do not allege that CW-1 witnessed money changing hands, that anyone told him that bribes were being paid, or any other facts from which the Court could infer either that bribes were paid or that CW-1 would have known about them. As to another of CW-1's allegations, that Cemex Colombia paid bribes to avoid closure of a plant for which it did not have a construction license, Plaintiffs fail entirely to allege the basis for CW-1's purported knowledge. *See id.* In short, CW-1's allegations are precisely the sort of speculative "leap[s] of logic" that courts have rejected. *Patel*, 2016 WL 1629325, at *9; *see also, e.g.*, *Glaser*, 772 F. Supp. 2d at 595.[14]

Other allegations from Plaintiffs' confidential witnesses are so vague as to be meaningless. "Confidential Witness 2" ("CW-2"), a community-relations representative, was allegedly told to "stick to [his] job" and to "stay out of it" when he asked a Cemex attorney and a consultant about the Maceo properties. Am. Compl. ¶¶ 33(2), 36. The inference of culpability arising from these statements is not nearly as compelling as its competing, non-culpable inference—namely, that an attorney or a consultant involved in delicate, and possibly confidential, real-estate negotiations would be uninterested in discussing such negotiations with a low-ranking community-relations employee as to whom the negotiations were not relevant. Other confidential witnesses assert, without further explanation, that "everyone at Cemex Colombia knew about . . . mismanagement of the Maceo Plant," *id.* ¶ 35; that they were told that there were "strange dealings" relating to the Plant, *id.* ¶ 36; and that security employees told

---

[14]     Plaintiffs appear to hang their hat on the allegation that security guards routinely accompany employees during land-acquisition negotiations because of the unstable security situation in Colombia. *See* Am. Compl. ¶ 39. This allegation fails to raise a strong inference of scienter. Absent some further information about the guard's basis of knowledge, it is not plausible—let alone cogent and at least as compelling—that a low-ranking security guard accompanying an executive during a negotiation would have intimate knowledge about the negotiation's details, including the particulars of any illicit agreements that were reached.

them that there were "inconsistencies" relating to the Plant, *id.* ¶ 35. "[G]eneric and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of [the PSLRA]." *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 336 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010); *see also In re Citigroup*, 753 F. Supp. 2d at 244 ("Plaintiffs cannot rely on assertions that the information presented by confidential witnesses was known or common knowledge within the company; these assertions are too vague and conclusory to support" an inference of scienter). Because the Amended Complaint includes no further details or explanations of these witness' allegations, the allegations do not raise a strong inference of scienter.

### (ii)     The Maceo Plant Litigation

Plaintiffs argue that Cemex's public disclosures about the Maceo Plant's expiration-of-property proceedings, statements that were made while the Individual Defendants were officers of the Company, indicate that the Defendants must have known about the alleged bribery scheme. *See* Pls.' Mem. of Law at 35. The Court disagrees. Although both the legal proceedings and the alleged bribery scheme had an impact on Cemex's ability to purchase the assets necessary to build the Plant, nothing about the legal proceeding should have raised a red flag about bribery. As discussed, the litigation pertained to property rights under Colombian law; there is no indication that it had anything to do with fraud or wrongdoing. *See* Am. Compl. ¶ 59. Accordingly, Defendants' knowledge of the litigation does not contribute to an inference of scienter.

Plaintiffs argue that, in light of this litigation, "[i]t is implausible that [Cemex] did not investigate and analyze all of the circumstances surrounding its acquisition of the [Maceo Plant's] land," an investigation that, in Plaintiffs' view, would have uncovered the bribery

scheme.  Pls.' Mem. of Law at 35.  Plaintiffs' argument is rank speculation.  The Amended

Complaint does not allege that any such investigation actually took place, let alone one deep

enough to uncover the irregular payments.  The inference of culpability here is not nearly as

compelling as its non-culpable counterpart:  that Cemex's senior management was informed that

its ability to acquire the Maceo Plant assets had been frozen pending Colombian legal

proceedings and that a temporary lease with the Colombian authorities was a strategic option for

proceeding with construction while the litigation proceeded.  *See* Am. Compl. ¶ 59.  "[C]laims of

securities fraud cannot rest 'on speculation and conclusory allegations.'"  *In re Comshare*, 183

F.3d at 553 (quoting *San Leandro Emergency Med. Plan v. Philip Morris Cos.*, 75 F.3d 801, 813

(2d Cir. 1996)).  Absent further allegations, the Amended Complaint fails to allege scienter

based on management's general knowledge of the litigation surrounding the Maceo Plant.

### 4.     The Actions and Statements of the Individual Defendants

Plaintiffs argue that Cemex's 2017 admission that its internal controls had not been

effective in 2012 to prevent the alleged bribery scheme contributes to a strong inference of

scienter.  *See* Pls.' Mem. of Law at 33–34, 36–37.  In particular, Plaintiffs point out that,

according to Cemex's disclosures, the Individual Defendants certified that they had reviewed the

Company's internal controls during the time that Cemex made the allegedly false and misleading

statements about the Maceo Plant.  *See id.* at 33.  These allegations establish nothing.  First, the

Individual Defendants did not hold their positions when the alleged bribes were paid, *see* Defs.'

Mem. of Law at 7 n.5, and Plaintiffs do not allege how a review of internal controls *after* the

alleged scheme was consummated would have uncovered the scheme.  More important, "[t]he

fact that [a defendant] had a duty to review [the Company's] internal controls is not a substitute

for specific allegations that [he was] provided with information that demonstrated the

*inadequacy* of [those] internal controls." *Barrett*, 2017 WL 3995606, at *9 (emphasis added). In other words, the fact that the Individual Defendants, in 2017, came to learn that the Company's controls had been ineffective in past years does not show that they knew that the internal controls were inadequate in 2012, when the payments were made, or between 2014 and 2016, when the allegedly misleading statements were made. *See Rombach*, 355 F.3d at 172 (misstatements are actionable only if they were "false when made"). Cemex's *ex post* discovery of inadequate controls, therefore, does not contribute to an inference of scienter.[15]

Plaintiffs also argue that Cemex's periodic updates about the Maceo Plant between 2014 and 2016 "implied [its] knowledge" of all of the facts underlying the Plant, including the alleged bribery scheme. Pls.' Mem. of Law at 35–36. The Court disagrees. Cemex's statements about the Plant were generic updates about the progress of construction, limited information about the cost and financing of the Plant, and news about the expiration-of-property litigation. *See* Am. Compl. ¶¶ 41, 46, 48, 57, 59–60, 63, 65. Cemex made no statements evincing any knowledge that the Maceo Plant assets were illicitly acquired or any other indication of wrongdoing. Accordingly, the Company's statements do not raise an inference of a culpable state of mind.[16]

---

[15]     The cases that Plaintiffs cite for this argument are distinguishable. *See* Pls.' Mem. of Law at 33–34, 36–37. In all of them, the defendants had ample reason to know that their companies' internal controls were ineffective to prevent fraud. *See Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 247 (S.D.N.Y. 2012) (auditor's discovery of "multiple control deficiencies" was summarized and presented in meetings that defendants "regularly attended"); *Varghese*, 672 F. Supp. 2d at 608 (plaintiffs alleged both that the subject company had "weak internal controls" and that the defendants "were aware of the problems"); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006) (plaintiffs alleged that the subject company's "accounting department was dramatically reduced," allowing "defendants to conceal accounting improprieties and false financial reporting"); *Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 114 (D. Mass. 2014) (plaintiffs alleged "many instances where the Company acknowledged internal control deficiencies" during the relevant period).

[16]     Plaintiffs cite two cases for its argument that scienter can be inferred from Cemex's statements, both of which are distinguishable. *See* Pls.' Mem. of Law at 35–36. In *In re Ashanti Goldfields Sec. Litig.*, 184 F. Supp. 2d 247, 270 (E.D.N.Y. 2002), unlike here, a statement of an individual defendant related directly to the subject of the alleged fraud. Specifically, the plaintiff alleged that a commodities firm had failed to inform investors that it had entered into unduly risky transactions in its "hedge book." *Id.* One of the individual defendants made "statements regarding the hedge book's ability to withstand a price rise," which, the court held, raised an inference that he was "aware of the nature of the transactions in the hedge book." *Id.* Plaintiffs' citation to *In re Sears, Roebuck & Co.*

Additionally, Plaintiffs suggest that the Individual Defendants acted with scienter because as "senior executives," they "had access to . . . relevant information" about the alleged bribery scheme. Pls.' Mem. of Law at 36. In order to allege scienter based on access to information, however, a plaintiff must either "specifically identify the reports or statements that are contradictory to the statements made" or "provide specific instances in which Defendants received information that was contrary to their public declarations." *Glaser*, 772 F. Supp. 2d at 587–88 (emphasis omitted) (quoting *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010)); *see also Jones v. Perez*, 550 F. App'x 24, 28 (2d Cir. 2013). Plaintiffs have made no such allegations.

Finally, Plaintiffs allege several times throughout the Amended Complaint that when Cemex first disclosed the alleged bribe scheme, it stated that it did not expect any regulatory investigations to have "a material adverse impact" on its financial position. Am. Compl. ¶¶ 10, 70, 72–73, 75. It is not clear whether Plaintiffs intended to allege that these statements were false and misleading, let alone that they were intentionally or recklessly so. *See* Pls.' Mem. of Law at 29 n.9. But regardless of what Plaintiffs intended, the Amended Complaint contains no facts from which the Court could infer that these statements were false when they were made.

D.      **Conclusion**

To summarize, Plaintiffs have failed to allege that Defendants made any actionable misstatements, other than a limited number of statements about litigation relating to the Maceo Plant, and they have failed to come anywhere close to alleging facts that raise a strong inference

---

*Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003), is even less on point, as its holding relates to the "core operations" doctrine, which Plaintiffs have not argued.

of scienter.  For all these reasons, Defendants' motion to dismiss Plaintiffs' § 10(b) claim is granted.[17]

### III.    Defendants' Motion to Dismiss Plaintiffs' Section 20(a) Claim Is Granted

In order to state a claim under § 20(a) of the Securities Exchange Act, a plaintiff must plead, among other things, a "primary violation" of the securities laws.  *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).  Plaintiffs rely on Defendants' alleged violation of § 10(b) to plead this element.  *See* Pls.' Mem. of Law at 40. Because Plaintiffs have failed to plead a violation of § 10(b), Plaintiffs' claim under § 20(a) is also dismissed.  *See, e.g.*, *Barrett*, 2017 WL 3995606, at *10 ("[Plaintiff's] Section 20(a) claim rises and falls with his Section 10(b) claim.").

### IV.    Leave to Amend the Amended Complaint Is Granted

Plaintiffs have moved for leave to amend their pleading, albeit in a cursory footnote at the end of their response brief.  *See* Pls.' Mem. of Law at 40 n.15.  Under Rule 15(a), a court "should freely give leave" to a party to amend its pleading "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  This rule is a "permissive standard," *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011) (per curiam)), although leave to amend may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party," *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).

---

[17]    In light of the Court's ruling, the Court need not address Defendants' arguments that the Amended Complaint fails to plead materiality, loss causation, and a domestic transaction.  *See* Defs.' Mem. of Law at 25–27, 36–39.

Although skeptical that the flaws in the Amended Complaint can be remedied, the Court will allow Plaintiffs to amend their pleading. While Plaintiffs have not specified how they would amend their pleading if granted leave to do so, the Second Circuit has admonished district courts that "[c]omplaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend." *Pasternack v. Shrader*, 863 F.3d 162, 175 (2d Cir. 2017) (quoting *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986)). Because Plaintiffs have not yet had an opportunity to amend in response to a Court order pointing out the deficiencies in their pleading, the Court will afford them an opportunity to do so. Plaintiffs' Second Amended Complaint must be filed no later than **August 1, 2019**. If Plaintiffs fail to file a Second Amended Complaint by that date, this case will be dismissed with prejudice.

Plaintiffs are warned, however, that if the Court grants a motion to dismiss the Second Amended Complaint, the Court will not grant further leave to amend unless Plaintiffs provide a detailed indication of what facts they would add to cure the pleading's defects (and, ideally, a redlined proposed Third Amended Complaint) with an explanation of why the amendment would not be futile. *See F5 Capital v. Pappas*, 856 F.3d 61, 90 (2d Cir. 2017) (affirming denial of leave to amend when the plaintiff failed to "explain how it proposed to amend the complaint to cure its defects"); *Loreley*, 797 F.3d at 190 (leave to amend can properly be denied "where the request gives no clue as to 'how the complaint's defects would be cured'" (quoting *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006))).

## CONCLUSION

For all the foregoing reasons, Defendants' motion to dismiss is GRANTED WITH LEAVE TO AMEND. Plaintiffs must file a Second Amended Complaint no later than **August 1, 2019**. Plaintiffs' submission must include both a redlined version of the Second

Amended Complaint (comparing it to the First Amended Complaint) and a clean version. If Plaintiffs fail to file a Second Amended Complaint by that date, this case will be dismissed with prejudice.

Defendants must move against or answer the Second Amended Complaint no later than **September 5, 2019**.

The Clerk of Court is respectfully directed to close the open motion at Dkt. 43.

**SO ORDERED.**

**Date: July 12, 2019**
      **New York, New York**

**VALERIE CAPRONI**
**United States District Judge**