**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRISTOPHER SCHIRO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CEMEX, S.A.B. de C.V., CEMEX LATAM HOLDINGS, S.A., FERNANDO A. GONZÁLEZ OLIVIERI and JOSÉ ANTONIO GONZALEZ FLORES,<br><br>Defendants | Case No. 1:18-cv-02352<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiffs Carlos Llantada, Jr., Richard Storm, and Stationary Engineers Local 39 Pension Trust Fund ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cemex, S.A.B. de C.V. ("Cemex" or the "Company") and/or Cemex Latam Holdings, S.A. ("Cemex Latam"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired securities of Cemex between April 23, 2015 and March 13, 2018, both dates inclusive (the "Class Period"), and who were damaged thereby. Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b), 20(a), and 20(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. Cemex S.A.B. de C.V. is an operating as well as a holding company, which generally operates its business through subsidiaries that, in turn, hold interests in Cemex's cement and ready-mix concrete operating companies, as well as other businesses. Cemex operates throughout the Americas, Europe, Africa, the Middle East, and Asia.

3. Per Cemex's SEC filings, one of its subsidiaries, Cemex Latam Holdings, S.A. ("Cemex Latam") is the holding company for Cemex's "most significant operations" in Brazil, Colombia, Costa Rica, Guatemala, Nicaragua, Panama and El Salvador. Collectively, operations in these South, Central America and the Caribbean sectors constituted ***13% of Cemex's overall net sales.*** Through Cemex Latam, Cemex owns approximately 99.7% of Cemex Colombia S.A. ("Cemex Colombia"), its main subsidiary in Colombia and the second largest cement producer in Colombia. As of December 31, 2017, Cemex's operations in Colombia represented 4% of its net sales and 4% of its total assets. As of December 21, 2015 and December 31, 2016, Cemex's operations in Colombia represented 5% of its net sales and 4% of its total assets.

4. During the Class Period, Defendants touted the construction of a new cement plant in Maceo, Colombia which they expected to "increase [Cemex Latam's] cement production

capacity in Colombia from 4.5 million to close to 5.5 million tons per year." Cemex Colombia acquired the land for the construction from CI Calizas y Minerales SA ("CI Calizas"), a Colombian company described online as a cement and concrete supplier. The negotiations for the acquisition took place with a legal representative of CI Calizas.

5. However, unbeknownst to investors, top executives at Cemex Latam and Cemex Colombia paid bribes worth approximately $20.5 million to a legal representative of CI Calizas in connection with the acquisition of the land, mining rights and benefits of the tax-free area for the plant.

6. Thereafter, Cemex and Cemex Latam both became involved in a legal proceeding in Colombia in connection with the Memorandum of Understanding Cemex Colombia had signed with CI Calizas pertaining to its acquisition of the land, the mining title and the free zone for construction the Maceo plant. Specifically, one of CI CALIZAS' partners was linked to a legal process for expiration of property and, as a result, the Attorney General's Office, among other measures, suspended its rights to dispose of the assets offered to CEMEX Colombia. Cemex Colombia became a party to the proceeding.

7. Defendants issued statements regarding this legal proceeding during the Class Period that were materially false and misleading because they failed to disclose that: (i) top executives at Cemex Latam and Cemex Colombia had engaged in an unlawful bribery scheme in connection with the Company's acquisition of the land, mining rights, and free zone for the Maceo plant from CI Calizas; and (ii) the discovery of the foregoing conduct would likely subject the Company to heightened regulatory scrutiny and potential criminal sanctions, which could result in a material adverse impact on CEMEX's results of operations, liquidity and financial condition.

8. On September 23, 2016, post-market, ***two years after*** the Company first announced the construction of the cement plan in Colombia, Cemex disclosed the Company's dismissal of two senior executives after an internal probe found that payments worth $20.5 million relating to a land deal in Colombia had breached company protocols. In addition to the termination of the two senior executives directly involved in the bribery scheme, the press release also announced that the chief executive officer of Cemex Latam and director of Cemex Colombia, Carlos Jacks, resigned the same day. On this news, Cemex's ADS price fell $0.17, or 2.28%, to close at $7.26 on September 26, 2016.

9. A month and a half later, on December 9, 2016, Cemex disclosed receipt of a subpoena from the SEC seeking information about the irregular payments in connection with the cement plant being built by Cemex Colombia in order "to determine whether there have been any violations of the U.S. Foreign Corrupt Practices Act." In both the September 23 and December 9, 2016 disclosures, the Company assured investors that "If any legal or administrative actions are brought against CEMEX Latam and these are ultimately resolved against CEMEX Latam, ***these actions are currently not expected to have a material adverse impact on CEMEX's results of operations, liquidity and financial condition***."

10. On April 28, 2017, Cemex ***admitted*** in its annual Form 20-F to a "***material weakness***" in internal controls relating to the bribery scandal.

11. Then, on March 14, 2018, Cemex disclosed that it received subpoenas from the U.S. Department of Justice ("DOJ") seeking to determine whether the Company had committed violations of the Foreign Corrupt Practices Act ("FCPA") in connection with the building of the new cement plant in Colombia. However, the Company revealed that the DOJ investigation also encompassed "***other jurisdictions***" aside from Colombia. In the March 14, 2018 disclosure, ***the***

***Company no longer claimed that it did not expect potential sanctions to have a "material impact on its results of operations, liquidity and financial condition."***

12. On this news, Cemex's ADS price fell $0.12, or 1.64%, to close at $7.21 on March 14, 2018.

13. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), §78t(a), and §78t(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

15. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

16. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Cemex's ADSs trade on the NYSE, located within this Judicial District.

17. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18. Plaintiffs Richard Storm, Jr., Carlos Llantada, and International Union of Operating Engineers Stationary Engineers Local 39 Health and Welfare Trust Fund, which

maintains its principal place of business in California, as set forth in the certifications previously filed with this Court, purchased Cemex securities at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities laws violations alleged herein.

19. Defendant Cemex, founded in 1906, is headquartered in Mexico, with the Company's principal executive offices located at Avenida Ricardo Margain Zozaya, 325, Colonia Valle del Campestre, San Pedro Garza Garcia, NL 66265 Mexico. Cemex's American Depository Shares ("ADSs") trade on the NYSE under the ticker symbol "CX."

20. Defendant Cemex Latam Holdings, S.A., ("Cemex Latam"), organized and incorporated in Spain, is the holding company for CEMEX's operations in Brazil, Colombia, Costa Rica, Guatemala, Nicaragua, Panama and El Salvador. Cemex Latam's common shares are listed on the Colombian Stock Exchange (Bolsa de Valores de Colombia S.A.) under ticker symbol "CLH."

21. Defendant Fernando A. González Olivieri ("Olivieri") has served at all relevant times as the Company's Chief Executive Officer ("CEO") and Director.

22. Defendant José Antonio González Flores ("Flores") has served at all relevant times as the Company's Chief Financial Officer ("CFO") and Executive Vice President of Finance and Administration.

23. The Defendants referenced above in ¶¶ 21-22 are sometimes referred to herein as the "Individual Defendants."

24. The Individual Defendants possessed the power and authority to control the contents of Cemex's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their

positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

25. Cemex S.A.B. de C.V. is an operating as well as a holding company, which, according to its Class Period SEC filings, "conduct[s] our business through subsidiaries." generally operates its business through subsidiaries that, in turn, hold interests in CEMEX's cement and ready-mix concrete operating companies, as well as other businesses. Cemex operates throughout the Americas, Europe, Africa, the Middle East, and Asia. Per Cemex's SEC filings, one of its subsidiaries, Cemex Latam Holdings, S.A. ("Cemex Latam") is the holding company for CEMEX's "most significant operations" in Brazil, Colombia, Costa Rica, Guatemala, Nicaragua, Panama and El Salvador. Collectively, operations in these South, Central America and the Caribbean sectors constituted ***13% of Cemex's overall net sales.***

26. Through Cemex Latam, Cemex owns approximately 99.7% of Cemex Colombia S.A. ("Cemex Colombia"), its main subsidiary in Colombia and the second largest cement producer in Colombia. As of December 31, 2017, Cemex's operations in Colombia represented 4% of its net sales and 4% of its total assets. For the two years prior, Cemex's operations in Colombia represented 5% of its net sales.

### CEMEX's Relationship with Cemex Latam

27. Cemex owned approximately 74% of Cemex Latam, a controlling percentage, as of December 31, 2016.

28. Cemex's relationship with Cemex Latam is covered by a Framework Agreement, filed with the SEC, dated October 5, 2012. Section 3.1 of the Framework Agreement provides that: a) Cemex Latam must give Cemex access to its books and internal controls as well as any affiliate member of Cemex Latam; b) certain directors of Cemex Latam must certify quarterly that there are no material breaches of relevant matters and laws; c) on both a quarterly and annual basis, Cemex Latam must provide Cemex with financials for inclusion in Cemex quarterly financials; d) Cemex and Cemex Latam are to use their best efforts to coordinate their auditors' opinions; e) Cemex Latam is to provide its auditor reports to Cemex; f) Cemex Latam is to provide to Cemex any presentations or reports that are turned over to Colombian regulators; g) Cemex Latam is to allow Cemex to perform any inspection of its properties, books and records and allow for discussions regarding same; h) Cemex Latam is to provide Cemex, on a monthly basis, a summary of its net income; i) Cemex Latam is to provide Cemex detailed financial information including state of operations, changes in operating and net income; j) regarding quarterly unaudited financials, Cemex Latam is provide Cemex very detailed financials including a narrative/discussion/analysis by Cemex Latam of its financial conditions, including drafts prepared; k) Cemex Latam must provide Cemex with annual audited financials; and l) Cemex Latam must also provide Cemex any other financial info that CEMEX requests.

29. Throughout the Class Period, Cemex filed Forms 6-K with the SEC announcing when Cemex Latam would issue its quarterly reports, often directing investors to Cemex Latam's website. On the date Cemex Latam filed its quarterly results, Cemex would file another Form 6-K attaching those results with a press release from Cemex Latam. Given that Cemex conducts all of its business through its subsidiaries, its quarterly and annual results, filed with the SEC, encompassed Cemex Latam's financial results.

30. Cemex Latam's relationship with Cemex is a key component to its successful operation. Indeed, an entire section of Cemex Latam's website is devoted to touting its relationship with Cemex: http://www.cemexlatam.com/AboutUs/RelationshipWithCemex.aspx. Therein Cemex Latam boasts of the advantages it enjoys as a result of that relationship, including, but not limited to:

a. "Access to CEMEX's breadth of experience and exposure to multiple sectors allows us to benefit from best practices, technologies and know-how in production techniques, marketing and sales strategies. These benefits not only let us implement programs aimed at increasing sales but also reduce production costs by adopting new techniques such as our use of alternative fuel sources."

b. "We also capitalize on our relationship with CEMEX to capture synergies and exploit cross-selling opportunities, resulting, for example, from CEMEX's global building materials trading network, or the strong brand recognition it has in the relevant industries. Our relationship with CEMEX is documented in the Framework Agreement, a management services agreement and a license and trademark agreement."

c. "With an average of 18 years of experience at CEMEX, we have a highly experienced senior management team that has been ***working together for many years***."

d. "CEMEX's research and development efforts, which are concentrated at CEMEX's research and development center in Switzerland, help us in achieving our goal of increasing market share in the markets in which we operate."

e. "***Through CEMEX LatAm's relationship with CEMEX***, we will have access to their work in cutting-edge technologies to improve the energy efficiency of our operations and the thermal energy efficiency of clinker production."

f. "***Through our relationship with CEMEX*** we seek to generate strategic value by consolidating procurement volume, attaining the best cost possible for CEMEX LatAm, using the best products and services to sustain our leadership position and the region and adding value to the supply chain."

g. "***Due to our relationship with CEMEX***, we will have access to their best-in-class corporate services such as treasury, legal, and tax planning."

h. "***Through our relationship with CEMEX***, we will have the backing of its globally recognized brand and its image as a global leader in the building materials industry that provides high-quality products and reliable service to customers and communities worldwide."

31. That Cemex maintained hands on involvement in the operating of Cemex Latam during the Class Period is exemplified by the job descriptions of the following Cemex employees, set forth in Cemex's Form 20-F, filed on April 28, 2017 ("2016 20-F"), which demonstrate that these individuals, while employees of the parent company, also held top management positions in the subsidiary, Cemex Latam:

a. According to the 2016 20-F, Jaime Gerardo Elizondo Chapa ("Chapa"), President of Cemex Europe, "***Joined CEMEX*** in 1985 and since then he has headed several operations, including Panama, Colombia, Venezuela and Mexico, and more recently was President of CEMEX South America (including Central America) and the Caribbean. He is the current President of CEMEX Europe, and is also in charge of CEMEX's global technology area. Mr. Elizondo served as President and Vice President of the National Chamber of Cement (*Cámara Nacional del Cemento*) and as Vice President of the Transformation Industry Chamber of Nuevo León (*Cámara de la Industria de la Transformación de Nuevo León*). ***Mr. Elizondo is currently the Vice Chairman of CEMEX Latam's board of directors***.

b. According to the 2016 20-F, Ignacio Madridejos Fernández ("Fernández"), President of Cemex USA, "***Joined CEMEX*** in 1996 and, after holding management positions in the Strategic Planning area, he headed CEMEX's operations in Egypt, Spain, Western Europe and Northern Europe. He is currently President of CEMEX USA, and is also responsible for our Global Energy, Health and Safety and Sustainability areas. ***Mr. Madridejos Fernández is also a member of the board of directors of CEMEX Latam***. He has served as a member of the board of directors of COMAC (*Comercial de Materiales de Construcción S.L.*), member of the board and President of OFICEMEN, member of the board and President of IECA (*Instituto Español del Cemento y sus Aplicaciones*), President of CEMA (*Fundación Laboral del Cemento y el Medioambiente*), Patron of the Junior Achievement Foundation and Vice President and Chairman of CEMBUREAU (European Cement Association), member of the board of Inversiones Danaime SICAV S.A. and **member of the board of CEMEX Latam**.

c. According to the 2016 20-F, Jaime Muguiro Domínguez ("Domínguez"), President of Cemex South, Central America and the Caribbean, "***Joined CEMEX*** in 1996 and has held several executive positions in the areas of Strategic Planning, Business Development, Ready-mix Concrete, Aggregates, and Human Resources. He headed CEMEX's operations in Egypt and our former Mediterranean Region. He is currently President of CEMEX's SAC Region, and ***Chief Executive Officer of CEMEX Latam***.

d. According to the 2016 20-F, Juan Pablo San Agustín Rubio ("San Agustín"), Executive Vice President of Strategic Planning and New Business Development,

> "***Joined CEMEX*** in 1994 and has held executive positions in the Strategic Planning, Continuous Improvement, E-business, and Marketing areas. He is currently Executive Vice President of Strategic Planning and New Business Development. ***Mr. San Agustín is Chairman of the board of directors of CEMEX Latam***."

**Corruption and Bribery in Colombia**

32. Throughout the Class Period, Cemex represented on its website that its "competitive advantage" is "leveraging our global knowledge in our local markets." As described more fully below, this representation was false and misleading as Cemex gained competitive advantage in Colombia, including the acquisition of land, mining rights, and free zone for the construction of a new cement plant, using improper bribery payments.

33. Colombia is a country that is plagued by corruption. Indeed, so pervasive are instances of bribery in Colombia that even Colombia's former national director of anti-corruption in the Colombian attorney general's office, Luis Gustavo Moreno Rivera, has been charged for engaging in a foreign bribery scheme.

34. To convince investors that Cemex did not participate in this culture of corruption, Cemex maintained unambiguous anti-bribery policies, described both in its annual 20-F SEC filings and on its website throughout the Class Period. Given the Company's public emphasis on ethics and compliance as well as the known culture of corruption in Colombia, Cemex had a clear reason to shine a discerning eye on the operations of Cemex Latam and Cemex Colombia. Cemex also represented throughout the Class Period that it had effective internal controls, thus assuring the market that it had an appropriately strong risk assessment process that would operate effectively to implement controls that would prevent, or detect and correct, misstatements resulting from apparent collusion or management override of controls in relation to significant unusual transactions and effective monitoring controls to detect non-compliance with its policies related to the financial reporting of significant unusual transactions.

**Foreign Corrupt Practices Act of 1977**

35. Cemex, whose stock is listed on the New York Stock Exchange under ticker "CX" is subject to the dictates of the FCPA. Congress enacted the FCPA, 15 U.S.C. §§ 78dd-1, *et seq*. (1998), to prohibit bribery and corruption of foreign officials and to promote fair business practices, integrity, and accountability in companies operating on a global stage. Specifically, the FCPA's anti-bribery provision makes it a crime to "corruptly" offer any kind of payment to a foreign official "in order to assist . . . in obtaining or retaining business." 15 U.S.C. § 78dd-2.

36. The FCPA also requires companies whose securities are listed in the U.S. to adhere to its accounting provisions. The "books and records" provision requires a company to "make and keep books, records, and accounts . . . in reasonable detail [] to reflect accurately and fairly transactions and dispositions of [] assets, and to devise and maintain a system of internal accounting controls . . ." 15 U.S.C. § 78m(b)(2); 15 U.S.C. § 78m(b)(5).

37. There is no materiality threshold under the books-and-records provision. Instead, issuers must maintain books and records that accurately and fairly represent the company's activity, as well as "devise and maintain a system of internal accounting controls sufficient to assure management's controls, authority, and responsibility over the firm's assets."

38. When a Company mischaracterizes bribery payments in their filings with the SEC, it is in violation of the books-and-records accounting provisions of the FCPA.

**Materially False and Misleading Statements Issued During the Class Period**

39. Throughout the Class Period, Cemex issued false and misleading statements regarding legal proceedings in Colombia pertaining to its acquisition of the land, mining title and free zone for construction of the Maceo plant.

40. On April 10, 2015, Cemex filed a press release alerting investors that Cemex Latam would report its first quarter 2015 results on April 23, 2015. Investors could access the

first quarter report, presentation, and consolidated financial statements on Cemex Latam's website. In the consolidated financial statements, Cemex Latam reported on the legal proceedings pertaining to the acquisition of the land for construction of the plant in Maceo:

> In connection with the construction of the new cement plant in the municipality of Maceo (Antioquia) in Colombia (note 13), in August 28, 2012, CEMEX Colombia signed a memorandum of understanding ("MDE") with CALIZAS CI S.A. for the transfer to CEMEX Colombia of the land, the mining title and the free zone for the construction of the new cement plant. After the execution of the MDE, one of CI CALIZAS S.A.'s partners was linked to a legal process for expiration of property and, as a result, the Attorney General's Office, among other measures, suspended CI CALIZAS S.A.'s rights to dispose of the assets offered to CEMEX Colombia. In order to protect its interests, CEMEX Colombia presented to the competent authorities the information of the cement project under development and explained how this measure affected the transfer of full ownership rights of the related assets under negotiation. Considering CEMEX Colombia's efforts, and as a temporary solution while the request for the revocation of the measures against CI CALIZAS is resolved, CEMEX Colombia entered into a lease contract with the National Department of Anti-narcotics (Dirección Nacional de Estupefacientes) (depository of the affected assets) pursuant to which CEMEX Colombia is authorized to continue with the necessary works for the construction of the cement plant and consequently to protect all the infrastructure works and investments already made by CEMEX Colombia. Additionally, CEMEX Colombia became part in the legal proceeding to enforce its rights resulting from the MDE and to conclude the negotiation once the proceeding is resolved which is expected to occur in a lapse of three to six months. As of March 31, 2015, CEMEX Colombia has made investments of approximately $78 million in the new plant in Maceo. As of March 31, 2015, CEMEX Colombia considers that its investments in the development of the plant are protected by virtue of the lease contract. Nonetheless, if there is a final adverse resolution of the authority with respect to CI CALIZAS S.A.'s rights to dispose of the land, the mining title and the free zone, and if CEMEX Colombia exhausts all legal resources available against the adverse resolution, in such event that the lease could not be extended, the resolution could have a material adverse effect on the Company's results of operations, liquidity or financial condition.

41. The foregoing statements were misleading because Defendants failed to disclose that top executives at Cemex Latam and Cemex Colombia had violated Company protocols by paying $20.5 million in bribes to the legal representative of the selling entity of the land, mining rights, and free zone acquired for the construction of the new cement plant in Maceo, thus

putting the Company at risk of regulatory investigation and/or action for potential violations of the FCPA.

42. On April 23, 2015 Cemex filed a Form 6-K announcing that Cemex Latam had reported its first quarter 2015 results. The 6-K included three exhibits: Cemex Latam press release, Cemex Latam first quarter report, and first quarter presentation.

43. On April 27, 2015, Cemex filed an annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2014 (the "2014 20-F"). Regarding the land acquired for construction of the Maceo plant, the 2014 20-F stated in relevant part:

> Regarding the new cement plant being built by CEMEX Colombia in the Antioquia department of the Municipality of Maceo, Colombia, the transaction pursuant to which CEMEX Colombia was to receive the transfer of the land, mining rights and benefits of the free tax zone in which the new cement plant is being built has been put on hold by Colombian authorities as a result of legal proceedings against one of the shareholders of the transferee. As a result, and while the legal proceedings take place, CEMEX Colombia has joined such legal proceedings as an affected third party and has also signed a lease agreement with the government of Colombia that allows CEMEX Colombia to continue the use of the property and advance the construction of the new cement plant while the legal proceedings are resolved, which could take until the fourth quarter of 2015.

44. The foregoing statements were false and misleading for the reasons stated in ¶41.

45. On March 1, 2016, Cemex filed a Form 6-K with Cemex and its subsidiaries consolidated financial statements for the years ended December 31, 2015, 2014, and 2013 as well as Cemex's individual financial statements for the same years. Exhibit 1 to the 6-K provided an update on construction of the Colombia cement plant. Exhibit 1 also reported on the legal proceeding in Colombia relevant to its acquisition of the land, mining title and free zone for the Maceo plant. Cemex's disclosure regarding the legal proceeding mirrored Cemex Latam's April 23, 2015 disclosure almost verbatim:

> In connection with the construction of the new cement plant in the municipality of Maceo (Antioquia) in Colombia (note 14), on August 28, 2012, CEMEX Colombia signed a memorandum of understanding ("MOU") with CI CALIZAS S.A. for the acquisition of the land, the mining title and the free zone for the construction of such cement plant. After the execution of the MOU, one of CI CALIZAS S.A.'s partners was linked to a legal process for expiration of property and, as a result, the Attorney General's Office, among other measures, suspended CI CALIZAS S.A.'s rights to dispose of the assets offered to CEMEX Colombia. In order to protect its interests, CEMEX Colombia presented to the competent authorities the information of the cement project under development and explained how this measure affected the transfer of full ownership rights of the related assets under negotiation. Considering CEMEX Colombia's efforts, and as a temporary solution while the request for the revocation of the measures against CI CALIZAS is resolved, CEMEX Colombia entered into a lease contract with the authority acting as depository of the affected assets pursuant to which CEMEX Colombia is authorized to continue with the necessary works for the construction of the cement plant and consequently to protect all the infrastructure works and investments already made by CEMEX Colombia. Additionally, CEMEX Colombia became party in the legal proceeding to enforce its rights under the MOU and to conclude the negotiation once the proceeding is resolved. As of December 31, 2015, CEMEX Colombia considers that its investments in the development of the plant are protected by virtue of the lease contract. Nonetheless, if there is a final adverse resolution of the authority with respect to CI CALIZAS S.A.'s rights to dispose of the land, the mining title and the free zone, and if CEMEX Colombia exhausts all legal resources available against the adverse resolution, in such event that the lease could not be extended, the resolution could have a material adverse effect on the Company's results of operations, liquidity or financial condition.

46. The foregoing statements were false and misleading for the reasons stated in ¶41.

47. On March 9, 2016, Cemex filed a Form 6-K with an Exhibit containing "certain information" the Company anticipated "disclosing to prospective investors." In that exhibit, Cemex once again described the construction of the cement plant in Colombia and reiterated that it will be financed with Cemex Latam's free cash flow, which statements were false and misleading for the reasons stated above. The Exhibit further stated with regard to the legal proceedings pertaining to the acquisition of the land for the plant in Maceo:

> Regarding the new cement plant being built by CEMEX Colombia in the Antioquia department of the Municipality of Maceo, Colombia, the transaction pursuant to which CEMEX Colombia was to receive the transfer of the land, mining rights and benefits of the free tax zone in which the new cement plant is

> being built has been put on hold by the Colombian authorities as a result of legal proceedings against one of the former shareholders of the transferee. As a result, and while the legal proceedings take place, CEMEX Colombia has joined such legal proceedings as an affected third party and has also signed a lease agreement with the government of Colombia that allows CEMEX Colombia to continue the use of the property and advance the construction of the new cement plant while the legal proceedings are resolved, which could take until the first half of 2016. CEMEX Colombia has adopted legal measures in order to protect its investments in the development of the cement plant, which as of December 31, 2015 are quantified at approximately U.S.$185 million. As of December 31, 2015, we are not able to assess the likelihood of the Colombian authorities issuing an adverse resolution regarding the transferee's rights to dispose of the land, mining rights and benefits of the free tax zone, and, if CEMEX Colombia receives an adverse resolution and exhausts all legal recourses available against the adverse resolution, and if the lease agreement entered into with the government of Colombia cannot be extended, then the adverse resolution and the lease not being renewed could have a material adverse impact on our results of operations, liquidity and financial condition.

48. The foregoing statements were false and misleading for the reasons stated in ¶41.

49. On April 22, 2016, Cemex filed an annual report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 20-F"). In the 2015 20-F, Cemex stated the following with regard to legal proceedings in Colombia pertaining to the acquisition of the land for the plant in Maceo:

> *Maceo, Colombia Legal Proceedings*. Regarding the new cement plant being built by CEMEX Colombia in the Antioquia department of the Municipality of Maceo, Colombia, the transaction pursuant to which CEMEX Colombia was to receive the transfer of the land, mining rights and benefits of the free tax zone in which the new cement plant is being built has been put on hold by the Colombian authorities as a result of legal proceedings against one of the former shareholders of the transferee. As a result, and while the legal proceedings take place, CEMEX Colombia has joined such legal proceedings as an affected third party and has also signed a lease agreement with the government of Colombia that allows CEMEX Colombia to continue the use of the property and advance the construction of the new cement plant while the legal proceedings are resolved, which could take until the first half of 2016. CEMEX Colombia has adopted legal measures in order to protect its investments in the development of the cement plant, which as of March 31, 2016 are quantified at approximately U.S.$185 million. As of March 31, 2016, we are not able to assess the likelihood of the Colombian authorities issuing an adverse resolution regarding the transferee's rights to dispose of the land, mining rights and benefits of the free tax zone, and, if CEMEX Colombia receives an adverse resolution and exhausts all legal recourses

> available against the adverse resolution, and if the lease agreement entered into with the government of Colombia cannot be extended, then the adverse resolution and the lease not being renewed could have a material adverse impact on our results of operations, liquidity and financial condition.

50. The 2015 20-F went on to state:

> In connection with the construction of the new cement plant in the municipality of Maceo (Antioquia) in Colombia (note 14), on August 28, 2012, CEMEX Colombia signed a memorandum of understanding ("MOU") with CI CALIZAS, S.A. for the acquisition of the land, the mining title and the free zone for the construction of such cement plant. After the execution of the MOU, one of CI CALIZAS, S.A.'s partners was linked to a legal process for expiration of property and, as a result, the Attorney General's Office, among other measures, suspended CI CALIZAS, S.A.'s rights to dispose of the assets offered to CEMEX Colombia. In order to protect its interests, CEMEX Colombia presented to the competent authorities the information of the cement project under development and explained how this measure affected the transfer of full ownership rights of the related assets under negotiation. Considering CEMEX Colombia's efforts, and as a temporary solution while the request for the revocation of the measures against CI CALIZAS is resolved, CEMEX Colombia entered into a lease contract with the authority acting as depository of the affected assets pursuant to which CEMEX Colombia is authorized to continue with the necessary works for the construction of the cement plant and consequently to protect all the infrastructure works and investments already made by CEMEX Colombia. Additionally, CEMEX Colombia became party in the legal proceeding to enforce its rights under the MOU and to conclude the negotiation once the proceeding is resolved. As of December 31, 2015, CEMEX Colombia considers that its investments in the development of the plant are protected by virtue of the lease contract. Nonetheless, if there is a final adverse resolution of the authority with respect to CI CALIZAS S.A.'s rights to dispose of the land, the mining title and the free zone, and if CEMEX Colombia exhausts all legal resources available against the adverse resolution, in such event that the lease could not be extended, the resolution could have a material adverse effect on the Company's results of operations, liquidity or financial condition.

51. The foregoing statements were false and misleading for the reasons stated in ¶41.

52. On June 7, 2016, Cemex filed a Form 6-K that reiterated the update to legal proceedings impacting the construction of the cement plant in Colombia, as described in the 2015 20-F.

53. The foregoing statements were false and misleading for the reasons stated in ¶41.

**The Truth Begins to Emerge**

54. On September 23, 2016, post-market, more than two years after the Company first announced the construction of the cement plant in Colombia, Cemex issued a press release, filed on Form 6-K with the SEC, announcing that an internal probe had uncovered that two senior executives had improperly paid $20 million in bribes in connection with the acquisition of land, mining rights and benefits of the tax-free area where it was building a new cement plant in Maceo, northern Colombia. The press release, which stated that the two senior executives had been terminated as a result, merely characterized the payments as a breach of company protocols but did not give investors any reason to suspect the payments had violated any law or regulation that would subject Cemex to regulatory scrutiny. The press release also claimed that Cemex could not assess the likelihood of regulatory action but assured investors that any such actions, "are currently not expected to have a material adverse impact on CEMEX's results of operations, liquidity and financial condition." Specifically, the press release stated:

> On September 23, 2016, CEMEX, S.A.B. de C.V. (NYSE: CX) ("CEMEX") informed the Mexican Stock Exchange (*Bolsa Mexicana de Valores*) that CEMEX's indirect subsidiary, CEMEX Latam Holdings, S.A. ("CEMEX Latam"), informed the Colombian Stock Exchange (*Bolsa de Valores de Colombia*) and Colombian Financial Superintendency (*Superintendencia Financiera de Colombia)* that with respect to the matter previously reported by CEMEX Latam regarding the new cement plant being built by CEMEX Colombia S.A. ("CEMEX Colombia") in the department of Antioquia in the municipality of Maceo, Colombia ("Maceo"), internal audits and investigations performed in accordance with the Corporate Governance policies and Code of Ethics of CEMEX Latam and CEMEX, have raised questions about the payment procedures related to the acquisition of the land and mining rights and benefits of the free tax zone in which the new cement plant is being built in Maceo. These payments did not adhere to CEMEX's and CEMEX Latam's established protocols.
>
> As officers responsible for the implementation and execution of the above referenced payments, two members of senior management of CEMEX Latam and CEMEX Colombia (the Vice President of Planning of CEMEX Latam and CEMEX Colombia and the General Counsel of CEMEX Latam Holdings and CEMEX Colombia), have been terminated effective immediately. In addition, the

> Chief Executive Officer of CEMEX Latam/Director of CEMEX Colombia has resigned, effective today.

55. On this news, Cemex's ADS price fell $0.17, or 2.28%, to close at $7.26 on September 26, 2016.

56. On October 3, 2016 Cemex filed a Form 6-K providing additional information regarding the improper payments disclosed on September 23, 2016, which it had provided to the Mexican Stock Exchange the day before. Specifically, the Company explained that the bribery payments had been deposited in the bank accounts of the legal representative "as advances under the [memorandum of understanding]," signed in August of 2012, pursuant to which "CEMEX Colombia acquired all of the shares of a subsidiary of the Maceo selling entity which was the owner of the special tax and trade zone benefits" and "for the other land CEMEX Colombia was purchasing." Given that that MOU was signed in August 2012, it took Cemex ***four years*** to reveal the bribery payments to the market. With this announcement, Cemex continued to maintain that it does not expect "a material adverse impact on CEMEX's results of operations, liquidity and financial condition."

57. Less than two months later, on December 9, 2016, Cemex issued a press release, filed on Form 6-K with the SEC, disclosing receipt of a subpoena from the SEC seeking information about "the matter previously reported by CEMEX regarding the new cement plant being built by CEMEX Colombia" in order "to determine whether there have been any violations of the U.S. Foreign Corrupt Practices Act ("FCPA")." The press release made clear that the subpoena "does not mean that the SEC has concluded that Cemex or any of its affiliates has broken the law" and assured investors that "***CEMEX does not expect this matter to have a material adverse impact on its consolidated results of operations, liquidity or financial position.***" (Emphasis added)

58. The Company then admitted on April 28, 2017, when it filed its annual report on Form 20-F, that its "internal control over financial reporting was not effective." Cemex made clear that this "material weakness" in internal controls "relates, in part, to the previously disclosed irregular payments to a non-governmental individual made in connection with the construction by CEMEX Colombia of a new integrated cement plant in the Antioquia department near the municipality of Maceo, Colombia (the "Maceo Project")." The Form 20-F described the internal control deficiency as follows:

> We have identified a material weakness in our internal control over financial reporting. Our management, including CEMEX, S.A.B. de C.V.'s Chief Executive Officer and Executive Vice President of Finance and Chief Financial Officer, has concluded that our disclosure controls and procedures were not effective as of December 31, 2016 to achieve their intended objectives. We have identified the following material weakness in our internal control over financial reporting: our risk assessment process did not operate effectively to implement controls that would prevent, or detect and correct, misstatements resulting from apparent collusion or management override of controls in relation to significant unusual transactions. In addition, we did not design and operate effective monitoring controls to detect non-compliance with our policies related to the financial reporting of significant unusual transactions. This material weakness relates, in part, to the previously disclosed irregular payments to a non-governmental individual made in connection with the construction by CEMEX Colombia of a new integrated cement plant in the Antioquia department near the municipality of Maceo, Colombia (the "Maceo Project"). As of December 31, 2016, the investigations of this failure, and the implementation of our remediation plan to address it, were not far enough advanced to provide a sufficient level of assurance that such circumvention or override of controls and misuse of funds by management would be prevented.

59. Then, on March 14, 2018, Cemex disclosed that the U.S. Department of Justice also began investigating the Company over payments made by the Company related to a cement plant it is building in Colombia to determine whether any violations of federal bribery laws occurred. However, according to the press release announcing the DOJ investigation, the Company revealed that not only would the DOJ conduct a probe into its operations in Colombia but would also investigate its operations in "other jurisdictions":

> [O]n March 12, 2018, the DOJ issued a grand jury subpoena to CEMEX, S.A.B. de C.V. relating to its operations in Colombia ***and other jurisdictions***.

While stating, as it did when it announced the SEC investigation, that it could not predict the "duration, scope, or outcome" of the investigation, the Company no longer claimed that it "does not expect this matter to have a material adverse impact on its consolidated results of operations, liquidity or financial position."

60. This materialization of the risk created by the undisclosed improper payments as well as the new information that a new regulatory agency would investigate not only Colombian operations, but operations in other locations as well, caused Cemex's ADS price to drop $0.12, or 1.64%, to close at $7.21 on March 14, 2018. The ADS price has never recovered.

61. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

62. Post Class Period, an article published by the *Agencia de Periodismo Investigativo* (Agency for Investigative Journalism) on April 21, 2019, entitled "Cemex and the Two Faces of Justice," revealed that directors of the subsidiary in fact informed the parent company in Mexico regarding the $20.6 million payment while negotiations were ongoing for the acquisition of the land for the Maceo plant. Unsurprisingly, Cemex's attorney is quoted in the article disputing Cemex's knowledge.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

63. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Cemex securities traded on the NYSE during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the

Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

64. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cemex securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Cemex or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

65. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

66. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

67. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Cemex;

- whether Defendants caused Cemex to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Cemex securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

68. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

69. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Cemex securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased and/or sold Cemex securities between the time the Defendants failed to disclose or

misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

70. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

71. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**<u>Against All Defendants</u>**

72. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

73. This Count is asserted against Cemex and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

74. During the Class Period, Cemex and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

75. Cemex and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Cemex securities during the Class Period.

76. Cemex and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Cemex were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of Cemex, their control over, and/or receipt and/or modification of Cemex's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Cemex, participated in the fraudulent scheme alleged herein.

77. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Cemex personnel to members of the investing public, including Plaintiffs and the Class.

78. As a result of the foregoing, the market price of Cemex securities was artificially inflated during the Class Period. In ignorance of the falsity of Cemex's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Cemex securities during the Class

Period in purchasing Cemex securities at prices that were artificially inflated as a result of Cemex's and the Individual Defendants' false and misleading statements.

79. Had Plaintiffs and the other members of the Class been aware that the market price of Cemex securities had been artificially and falsely inflated by Cemex's and the Individual Defendants' misleading statements and by the material adverse information which Cemex and the Individual Defendants did not disclose, they would not have purchased Cemex's securities at the artificially inflated prices that they did, or at all.

80. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

81. By reason of the foregoing, Cemex and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Cemex securities during the Class Period.

**COUNT II**

**Violation of Section 20(a) of The Exchange Act Against The Individual Defendants**

82. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83. During the Class Period, the Individual Defendants participated in the operation and management of Cemex, and conducted and participated, directly and indirectly, in the conduct of Cemex's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's inadequate internal safeguards in data security protocols.

84. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Cemex's

financial condition and results of operations, and to correct promptly any public statements issued by Cemex which had become materially false or misleading.

85. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Cemex disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Cemex to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Cemex within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Cemex securities.

86. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Cemex.

**COUNT III**

**Violation of Section 20(b) of The Exchange Act Against Cemex Latam**

87. Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth herein.

88. Cemex Latam used its relationship with Cemex to cause the Company to issue materially false and misleading information in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder. Cemex Latam was a control person over Cemex for purposes of issuing statements pertaining to Cemex Latam in filings with the SEC. By virtue of Cemex Latam's acts resulting in the issuance by Cemex of materially false and misleading statements to the public, Cemex Latam, directly or indirectly, engaged in conduct that was unlawful for Cemex Latam to do under Section 10(b) of the Exchange Act and the rules and regulations promulgated thereunder through another person, Cemex.

89. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: August 1, 2019

Respectfully submitted,

**POMERANTZ, LLP**

*/s/Jeremy A. Lieberman*
Jeremy A. Lieberman
Tamar A. Weinrib
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: taweinrib@pomlaw.com

Patrick V. Dahlstrom
**POMERANTZ LLP**

Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

Frank R. Schirripa
Daniel B. Rehns
**HACH ROSE SCHIRRIPA & CHEVERIE, LLP**
112 Madison Avenue, 10th Floor
New York, New York 10016
Telephone: (212) 213-8311
Facsimile: (212)779-0028
E-mail: fschirripa@hrsclaw.com
E-mail: drehns@hrsclaw.com

***Co-Lead Counsel for Lead Plaintiffs and the Proposed Class***

Peretz Bronstein
**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 697-6484
Email: peretz@bgandg.com

***Additional Counsel for Lead Plaintiffs Carlos Llantada and Richard Storm***