UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHRISTOPHER SCHIRO, Individually and on
Behalf of All Others Similarly Situated,

                             Plaintiff,

        v.

CEMEX, S.A.B. de C.V., CEMEX LATAM
HOLDINGS, S.A., FERNANDO A.
GONZÁLEZ OLIVIERI and JOSÉ
ANTONIO GONZALEZ FLORES,

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        18 Civ. 2352 (VEC)

## THE CEMEX DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS WITH PREJUDICE THE SECOND AMENDED CLASS ACTION COMPLAINT

Jay B. Kasner
Scott D. Musoff
Michael D. Moritz
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
Phone: (212) 735-3000
Fax: (212) 735-2000
jay.kasner@skadden.com
scott.musoff@skadden.com
michael.moritz@skadden.com

*Attorneys for CEMEX, S.A.B. de C.V.,*
*   Fernando Ángel González Olivieri and*
*   José Antonio González Flores*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ........................................................................................................ 4

      A.     The Parties ................................................................................................ 4

      B.     CLH and Cemex Colombia .................................................................... 5

      C.     The Maceo Project and Colombian Expiration of Property Proceedings ............... 6

      D.     CEMEX Discloses the Company's Discovery of Improper Conduct in Colombia and Subsequent Receipt of Government Subpoenas ............................ 7

      E.     Subsequent Disclosures Regarding the Maceo Project ............................ 9

ARGUMENT .............................................................................................................................. 9

I.      PLAINTIFFS' FIRST CLAIM FOR RELIEF UNDER SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 SHOULD BE DISMISSED ........................ 9

      A.     Plaintiffs Did Not Remedy Their Failure to Plead Scienter ................... 9

             1.     Plaintiffs Fail to Adequately Plead Corporate Scienter ........... 10

             2.     Plaintiffs Fail to Adequately Plead that the Individual Defendants Acted With Scienter ................................................. 14

      B.     Plaintiffs Do Not Adequately Plead Any Actionable Misstatement or Omission ................................................................................................ 14

             1.     Plaintiffs Do Not Adequately Plead Improper Underlying Conduct ......... 14

             2.     Plaintiffs Fail to Adequately Plead That CEMEX Did Not Meet Its Disclosure Obligations in Connection with Regulatory Investigations ............................................................................ 17

      C.     The Complaint Has Additional Deficiencies That This Court Need Not Reach ...................................................................................................... 19

             1.     Plaintiffs Fail to Adequately Plead that Any Statement was Material ................................................................................... 19

             2.     Plaintiffs Fail to Adequately Plead Loss Causation .................. 22

3.      Plaintiffs Llantada and Storm Fail to State a Claim Under
                *Morrison* ..................................................................................................23

II.     PLAINTIFFS FAIL TO STATE A "CONTROL PERSON" CLAIM AGAINST
        THE INDIVIDUAL DEFENDANTS UNDER SECTION 20(a) OF THE
        EXCHANGE ACT..............................................................................................25

CONCLUSION..........................................................................................................25

## **TABLE OF AUTHORITIES**

### **CASES**

*Aaron v. SEC,*
    446 U.S. 680 (1980) ......................................................................................................13

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
    677 F.3d 60 (2d Cir. 2012) ......................................................................................3, 23

*Acito v. IMCERA Group, Inc.,*
    47 F.3d 47 (2d Cir. 1995) ............................................................................................18

*In re Alstom SA Securities Litigation,*
    406 F. Supp. 2d 433 (S.D.N.Y. 2005) .................................................................13, 14

*In re Axis Capital Holdings Ltd., Securities Litigation,*
    456 F. Supp. 2d 576 (S.D.N.Y. 2006) .......................................................................15

*In re Banco Bradesco S.A. Securities Litigation,*
    277 F. Supp.3d 600 (S.D.N.Y. 2017) ..................................................................15, 16

*Banco Safra S.A. – Cayman Islands Branch v. Samarco Mineração S.A.,*
    No. 16 Civ. 8800 (RMB), 2019 WL 2514056 (S.D.N.Y. June 18, 2019) .........................24

*Barrett v. PJT Partners, Inc.,*
    No. 16-CV-2841 (VEC), 2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017) ........1, 3, 11, 21, 25

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1998) ..............................................................................................17, 19

*In re Citigroup, Inc. Securities Litigation,*
    330 F. Supp. 2d 367 (S.D.N.Y. 2004) , *aff'd sub nom. Albert Fadem Trust v.*
    *Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006) .............................................................21

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG,*
    752 F.3d 173 (2d Cir. 2014) .............................................................................2, 3, 18, 19, 23

*Das v. Rio Tinto PLC,*
    332 F. Supp. 3d 786 (S.D.N.Y. 2018) ..............................................................2, 8, 14, 15

*Dura Pharmaceuticals, Inc. v. Broudo,*
    544 U.S. 336 (2005) ......................................................................................................22

*Employees Retirement System of Providence v. Embraer S.A.,*
    No. 16 Civ. 6277 (RMB), 2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018) ....................3, 19

*In re FBR Inc. Securities Litigation,*
    544 F. Supp. 2d 346 (S.D.N.Y. 2008) .........................................................................18

*Fries v. Northern Oil & Gas, Inc.*,
    354 F. Supp. 3d 384 (S.D.N.Y. 2018).........................................................................18, 19

*Harris v. AmTrust Financial Services, Inc.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016)....................22

*Janbay v. Canadian Solar, Inc.*,
    No. 10 Civ. 4430(RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ..........................15

*Johnson v. Holder*,
    564 F.3d 95 (2d Cir. 2009)...........................................................................................9, 14

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)...........................................................................................3, 22

*In re Lions Gate Entertainment Corp. Securities Litigation*,
    165 F. Supp. 3d 1 (S.D.N.Y. 2016) .........................................................................3, 18, 21

*In re Lone Pine Resources, Inc.*,
    No. 12 Civ. 4839(GBD), 2014 WL 1259653 (S.D.N.Y. Mar. 27, 2014) ...............3, 20, 21

*Lorenzo v. SEC*,
    139 S. Ct. 1094 (2019) ......................................................................................................13

*Malouf v. SEC*,
    No. 16-9546, 2019 WL 3788225 (10th Cir. Aug. 13, 2019) ............................................13

*Menaldi v. Och-Ziff Capital Management Group LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016)........................................................2, 15, 16, 17, 18

*Merryman v. J.P. Morgan Chase Bank, N.A.*,
    319 F.R.D. 468 (S.D.N.Y. 2017) .......................................................................................9

*Monroe County Employees Retirement Systems v. YPF Sociedad Anonima*,
    15 F. Supp. 3d 336 (S.D.N.Y. 2014)............................................................................3, 23

*Morrison v. National Australia Bank Ltd.*,
    561 U.S. 247 (2010)......................................................................................................3, 23

*Patel v. L-3 Communications Holdings Inc.*,
    Nos. 14-CV-6038 (VEC) *et seq.*, 2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016)..............20

*In re Petrobras Securities*,
    862 F.3d 250 (2d Cir. 2017)..........................................................................................3, 23

*In re Petrobras Securities Litigation*,
    150 F. Supp. 3d 337 (S.D.N.Y. 2015).........................................................................23, 24

iv

*Resnik v. Swartz,*
    303 F.3d 147 (2d Cir. 2002)...................................................................................17

*Schiro v. Cemex, S.A.B. de C.V.,*
    No. 18-CV-2352 (VEC), 2019 WL 3066487 (S.D.N.Y. July 12, 2019) .................. *passim*

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.,*
    531 F.3d 190 (2d Cir. 2008)...................................................................................10

*Valentini v. Citigroup, Inc.,*
    837 F. Supp. 2d 304 (S.D.N.Y. 2011)..............................................................2, 12, 13

*Youngers v. Virtus Investment Partners Inc.,*
    No. 15CV8262, 2017 WL 5991800 (S.D.N.Y. Dec. 4, 2017)................................2, 11, 12

## STATUTES

15 U.S.C. § 78j(b) ....................................................................................................9

15 U.S.C. § 78u-4(b)(4) ...........................................................................................22

17 C.F.R. § 240.10b-5(b) ...........................................................................................9

## OTHER AUTHORITIES

SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (Aug. 19, 1999)............................20

Defendants CEMEX, S.A.B. de C.V. ("CEMEX" or the "Company"), Fernando Ángel González Olivieri and José Antonio González Flores (together, the "Individual Defendants," and together with CEMEX, the "CEMEX Defendants") respectfully submit this memorandum of law in support of their motion to dismiss with prejudice the Second Amended Class Action Complaint (Dkt. No. 60) ("Second Amended Complaint" or "SAC").[1]

## PRELIMINARY STATEMENT

In dismissing the First Amended Complaint, this Court held that Plaintiffs failed to allege any actionable misstatement other than "a limited number of statements" about litigation relating to CEMEX's Colombian Maceo plant and, significantly, that they "failed to come anywhere close to alleging facts that raise a strong inference of scienter." *Schiro v. Cemex, S.A.B. de C.V.*, No. 18-CV-2352 (VEC), 2019 WL 3066487, at *14 (S.D.N.Y. July 12, 2019) ("*Cemex I*"). Although skeptical that Plaintiffs could cure these fatal flaws, the Court afforded Plaintiffs an opportunity to try. The Court's skepticism was well-justified, as Plaintiffs filed a barebones Second Amended Complaint that actually stripped away even the flawed factual allegations and simply (1) named as a defendant Cemex Latam Holdings, S.A. ("CLH"), a publicly-owned and traded Spanish indirect subsidiary of CEMEX listed on the Colombian Stock Exchange, and (2) alleged certain general means of collaboration between CEMEX and CLH. Neither of these "additions" cures Plaintiffs' fatal pleading defects.

*First*, Plaintiffs again fail to plead a strong inference of scienter. They still do not allege how any individual at any CEMEX subsidiary possessed the requisite knowledge and position such that scienter of a purported bribery scheme could be imputed to CEMEX. *Barrett v. PJT Partners Inc.*, No. 16-CV-2841 (VEC), 2017 WL 3995606, at *7–8 (S.D.N.Y. Sept. 8, 2017)

---

[1] The CEMEX Defendants also join in and incorporate the motion to dismiss of Cemex Latam Holdings, S.A. to the extent applicable to the CEMEX Defendants.

(Caproni, J.).  Additionally, Plaintiffs still fail to plead that CEMEX possessed any degree of control over, or awareness of, the purported scheme; merely alleging some managerial connections between a subsidiary and parent, however, does not signify *actual knowledge* from which to impute scienter.  *Youngers v. Virtus Inv. Partners Inc.*, No. 15CV8262, 2017 WL 5991800, at *5 (S.D.N.Y. Dec. 4, 2017); *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 317 (S.D.N.Y. 2011).  Plaintiffs also plead no red flags that imply recklessness.  Indeed, Plaintiffs stripped their new complaint of confidential witness allegations after this Court discredited them. Further, there are no new allegations about the Individual Defendants; as a result, Plaintiffs still fail to plead scienter as to them pursuant to the law of the case doctrine.

*Second*, while the Court assumed for purposes of the previous motion that Plaintiffs had adequately pleaded the existence of a bribery scheme, *Cemex I*, 2019 WL 3066487, at *3 n.3, Plaintiffs have now stripped all confidential witness allegations and simply rely on an attenuated reading of the Company's own disclosures that this Court already held *do not* admit to bribery. Because Plaintiffs now fail to plead any underlying wrongdoing with any degree of specificity, their complaint should be dismissed with prejudice.  *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 803 (S.D.N.Y. 2018); *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 579 (S.D.N.Y. 2016).  Moreover, in addition to failing to plead a bribery scheme, Plaintiffs fail to plead that CEMEX had a duty to disclose anything beyond what it actually disclosed because (i) before receipt of a subpoena from the Securities and Exchange Commission ("SEC"), CEMEX had no obligation to accuse itself of wrongdoing, and (ii) following receipt, even though there was no obligation, CEMEX immediately warned of the possibility that a Department of Justice ("DOJ") investigation could follow, thereby complying with any disclosure obligations the Company may have had.  *City of Pontiac Policemen's & Firemen's*

*Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014); *Emps. Ret. Sys. of Providence v. Embraer S.A.*, No. 16 Civ. 6277 (RMB), 2018 WL 1725574, at *5–6 (S.D.N.Y. Mar. 30, 2018).

For those reasons and the following others (which the Court did not and again does not need to reach), the Second Amended Complaint should be dismissed with prejudice:

- **Plaintiffs fail to plead that any purported misstatement or omission was material.** The amount of the payments at issue and the overall size of CEMEX's Colombian business are quantitatively immaterial, and Plaintiffs do not plead any material effect on the Company's financial results. *In re Lone Pine Res., Inc.*, No. 12 Civ. 4839(GBD), 2014 WL 1259653, at *4 (S.D.N.Y. Mar. 27, 2014). Additionally, merely alleging that there was a "risk" of "potential" consequences of government investigations is insufficient to plead the materiality of any alleged misstatements. *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 14 (S.D.N.Y. 2016).

- **Plaintiffs fail to adequately plead loss causation.** CEMEX publicly warned about the possibility of a DOJ investigation starting in 2016, when the Company disclosed the SEC subpoena. This was more than a year before the Company received a DOJ subpoena, which it promptly disclosed two days later. Thus, Plaintiffs' assertion that CEMEX's stock dropped in March 2018 due to the revelation of a DOJ subpoena fails to satisfy loss causation because the possibility of the investigation had not been concealed. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172–73 (2d Cir. 2005); *Monroe Cty. Emps. Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 357–58 (S.D.N.Y. 2014).

- **Plaintiffs Llantada and Storm fail to state a claim under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).** Plaintiffs Llantada and Storm allege that they purchased CEMEX "common stock" during the Class Period, but CEMEX does not have any "common stock" listed on a U.S. exchange. Instead, only its American Depositary Shares ("ADS") are listed on a domestic exchange.[2] Despite being informed of this defect in the last motion to dismiss, Llantada and Storm still do not reconcile this discrepancy and do not plead that they otherwise engaged in any type of domestic transaction for CEMEX securities. *In re Petrobras Sec.*, 862 F.3d 250, 262 (2d Cir. 2017); *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012).

- **Plaintiffs' claim under Section 20(a) against the Individual Defendants should be dismissed.** Plaintiffs fail to adequately plead all of the elements necessary to state a "control person" claim against the Individual Defendants. *Barrett*, 2017 WL 3995606, at *10.

---

[2] An ADS is "a security that represents an ownership interest in a specified number of a company's ordinary shares," *Embraer*, 2018 WL 1725573, at *1 n.3, which "have been deposited with a U.S. bank." *In re Petrobras Sec.*, 862 F.3d 250, 258 n.6 (2d Cir. 2017) (citation omitted).

## STATEMENT OF FACTS[3]

### A.   The Parties

CEMEX is a multinational building-materials company organized under the laws of Mexico, with over $28 billion in assets and operating in over 50 countries worldwide with approximately 40,000 employees.  *Cemex I*, 2019 WL 3066487, at *1.  While Plaintiffs asserted that they purchased CEMEX "common stock" (*see* Dkt. No. 24-1 ¶¶ 2–3), the Company does not have any publicly-listed and traded shares of "common stock" in the U.S.  Only its ADSs trade in the U.S. (on the New York Stock Exchange), under the symbol "CX."  (Ex. 1, Form 20-F (Apr. 25, 2019) ("2018 20-F"), at F-7.)

Defendant CLH is a public company organized under the laws of Spain and traded on the Colombian Stock Exchange under the symbol "CLH."  (SAC ¶ 20.)  CLH operates in a number of Central and South American countries, including Colombia.  (*Id.* ¶ 20.)

Defendant Fernando Ángel González Olivieri is the Chief Executive Officer of CEMEX, as well as a director.  (*Id.* ¶ 21.)

Defendant José Antonio González Flores is the Executive Vice President of Finance and Administration, as well as Chief Financial Officer of CEMEX.  (*Id.* ¶ 22.)[4]

---

[3] "On this motion to dismiss, the Court accepts all factual allegations in the pleadings as true and draws all reasonable inferences in the light most favorable to Plaintiffs.  The Court may also 'consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the [Securities and Exchange Commission], and documents possessed by or known to the plaintiff upon which it relied in bringing suit.'"  *Cemex I*, 2019 WL 3066487, at *1 n.1 (citation omitted).  Although at the motion to dismiss stage the Court "must take all of the factual allegations in the complaint as true," it need not "accept as true a legal conclusion couched as a factual allegation."  *Id.* at *3 (citation omitted).  All exhibits ("Ex.") cited herein are attached to the concurrently-filed Declaration of Michael D. Moritz.

[4] Despite Plaintiffs' repeated allegation that the Individual Defendants served as CEO and CFO "at all relevant times" (*id.* ¶¶ 21–22), this Court already noted that "the Individual Defendants did not hold their positions when the alleged bribes were paid."  *See Cemex I*, 2019 WL 3066487, at *13.

Plaintiff Carlos Antonio Llantada Estrada is an investment banker residing in Mexico City, Mexico, who alleges that he "purchased [and sold] CEMEX common stock during the Class Period." (Dkt. No. 24-1 ¶ 2.)

Plaintiff Richard Storm, Jr. is a retired real estate developer and bank executive residing in Tennessee, who alleges that he "purchased CEMEX common stock during the Class Period." (*Id.* ¶ 3.)

Plaintiff Stationary Engineers Local 39 Pension Trust Fund is a fund that allegedly "purchased and/or sold Cemex, S.A.B. de C.V. American Depository Receipts" during the putative Class Period. (Dkt. No. 19-1, Ex. B ¶ 4.)[5]

**B.    CLH and Cemex Colombia**

CLH is a publicly-traded company that operates in Colombia, Panama, Costa Rica, Guatemala, Nicaragua and El Salvador (and formerly Brazil), which all fall within CEMEX's "South, Central America and the Caribbean" ("SCA&C") operating segment. (Ex. 1, 2018 20-F, at 84.) The SCA&C segment, which is led by its own President, includes the company's initiatives in Colombia, Panama, Costa Rica, "Caribbean TCL," Dominican Republic and "Rest of South, Central America and the Caribbean," and as of December 31, 2018, its operations collectively represented 12% of CEMEX's total revenues and 9% of its total assets. (*Id.* at 84–91.) CLH, *of which more than 25% is not owned by CEMEX*, is a subsidiary of CEMEX España, S.A., which is four subsidiary levels down from CEMEX. (*Id.* at 64, F-107.)

CEMEX Colombia S.A. ("Cemex Colombia") is one of CEMEX's hundreds of subsidiaries around the world and is a subsidiary of CLH. (*See id.* at Ex. 8.1.) As of December

---

[5] After Plaintiffs contested each other's appointment as lead plaintiff and then made an "about-face" to seek joint appointment—which was evidently "in tension with earlier arguments"—the Court agreed to appoint them joint lead plaintiffs, "[n]otwithstanding the applicants' shifting and apparently self-serving positions," concluding that their joint representation would nonetheless "best serve the class." (Dkt. No. 35 at 1–2.)

31, 2018, only about 2,600 of CEMEX's more than 40,000 global full-time employees work in Colombia, a country in which only two of CEMEX's 56 cement facilities are located.  (*Id.* at 35, 235.)  The Colombian business as a whole as of the end of 2018 represented approximately 3% of CEMEX's revenues and 4% of its total assets.  (*Id.* at 84.)  In simplified form, Cemex Colombia and CLH are located in the Company's corporate structure as follows:[6]



## C.  The Maceo Project and Colombian Expiration of Property Proceedings

In August 2012—years before the beginning of the putative Class Period—Cemex Colombia signed a memorandum of understanding with CI Calizas y Minerales S.A. ("CI Calizas") to purchase land and gain associated rights to a mining title and "free zone" in Maceo, Colombia in order to build a new cement plant (the "Maceo Project").  (SAC ¶ 40.)  In 2015, though, CEMEX disclosed that the Maceo Project had been placed on hold due to legal proceedings against a shareholder of the seller (the "Expiration Proceedings"):

> [T]he transaction pursuant to which CEMEX Colombia was to receive the transfer of land, mining rights and benefits of the free tax zone in which the new cement plant is being built has been put on hold by Colombian authorities as a result of legal proceedings against one of the shareholders of the transferee.

(SAC ¶ 43; Ex. 2, Form 20-F (Apr. 27, 2015), at 78.)  Cemex Colombia joined those Expiration

---

[6] This hierarchy is only a limited representation; as per Cemex's 2018 Form 20-F, "[t]he chart has been simplified to show only some of CEMEX's major holding companies and/or operating companies in the main countries in which CEMEX operates, and/or relevant companies in which CEMEX holds a significant direct or indirect interest, and does not include all of CEMEX's operating subsidiaries and its intermediate holding companies."  (*Id.* at 63–64.)

Proceedings "as an affected third party" and also "signed a lease agreement with the government of Colombia that allows CEMEX Colombia to continue the use of the property and advance the construction of the new cement plant while the legal proceedings are resolved." (*Id.*)[7]

**D.     CEMEX Discloses the Company's Discovery of Improper Conduct in Colombia and Subsequent Receipt of Government Subpoenas**

On September 26, 2016—midway through the putative Class Period—CEMEX voluntarily issued the first of many public disclosures regarding the Company's discovery of improper conduct within its Colombian subsidiary.  In relevant part, CEMEX disclosed that, among other things, "an 'internal audit process' had revealed that Cemex Colombia had made approximately $20 million in payments to CI Calizas's legal representative in connection with the acquisition of the Maceo Plant's land, mining rights, and tax benefits," which "had been made 'in violation of Cemex and [CLH]'s internal policies and, potentially, of applicable Colombian laws." *Cemex I*, 2019 WL 3066487, at *2; (Ex. 3, Form 6-K (Sept. 26, 2016), at 1.)  CEMEX further added that the Vice President of Planning and the General Counsel of CLH/Cemex Colombia were immediately terminated, while the CEO of CLH/Director of Cemex Colombia resigned effective as of the disclosure's date.  (SAC ¶ 54.)  CEMEX also disclosed that "CEMEX Colombia and [CLH] have brought this matter to the attention of the Colombian Attorney General and presented to him the results of their audits and investigations concerning these payments, which were made to a non-governmental third party in the amount of approximately U.S.$20 million." (Ex. 3, at 1.)  CEMEX added it did not expect these events to have a material impact on its "results of operations, liquidity and financial condition." (*Id.*)  The following

---

[7] Although Plaintiffs allege that "Cemex and Cemex Latam both became involved in a legal proceeding in Colombia" (SAC ¶ 6), the cited disclosures state only that <u>Cemex Colombia</u> was involved in the Expiration Proceedings.  (*See id.* ¶¶ 40, 43, 45, 47, 49.)

week, CEMEX updated the market by making additional detailed disclosures about the revelations from the audit process.  (*See* SAC ¶ 56; Ex. 4, Form 6-K (Oct. 3, 2016), at 1.)

On December 9, 2016, CEMEX disclosed that the SEC served a document subpoena on the Company "seeking information to determine whether there have been any violations of the Foreign Corrupt Practices Act.  This subpoena arises from the matter previously reported by CEMEX regarding the new [Maceo] cement plant."  (SAC ¶ 57; Ex. 5, Form 6-K (Dec. 9, 2016), at 1.)[8]  CEMEX explained the background of the allegations, that the subpoena did not imply the Company had broken the law and that CLH and Cemex Colombia had brought the matter to the attention of the Attorney General of Colombia.  (Ex. 5, at 1.)  CEMEX nonetheless included cautionary language that, among other things, it was "possible that the United States Department of Justice or investigatory entities in other jurisdictions may also open investigations into this matter."  (*Id.*)  CEMEX issued further disclosures about the discovery of wrongdoing, the SEC subpoena and the possibility of a DOJ subpoena following on February 28 and April 28, 2017 and March 5, 2018.[9]

On March 14, 2018, CEMEX timely disclosed that it had (two days earlier) received a grand jury subpoena from the DOJ.  (SAC ¶ 59.)  Among other things, CEMEX added that it was unable to predict the outcome or potential material effects of any investigation or possible sanctions.  (*See* Ex. 9, Form 6-K (Mar. 14, 2018), at 1.)  This action was commenced two days after CEMEX's disclosure.  (Dkt. No. 1.)

---

[8] To the extent Plaintiffs invoke the Foreign Corrupt Practices Act ("FCPA"), Plaintiffs fail to adequately plead a violation of the FCPA, which requires, among other things, establishing payments to foreign officials – something that was not pleaded here.  *See Rio Tinto*, 332 F. Supp. 3d at 803–04 (plaintiffs failed to plead actionable misstatement based on a violation of FCPA where they did not plead that any payment was made to a "foreign official").  Nor do Plaintiffs adequately plead a violation of the FCPA in any other manner.

[9] (*See* Ex. 6, Form 6-K (Feb. 28, 2017), at Ex. 1, 61, Ex. 2, 32; Ex. 7, Form 20-F (Apr. 28, 2017), at 121; Ex. 8, Form 6-K (Mar. 5, 2018), at Ex. 1, 63, Ex. 2, 33.)

### E.      Subsequent Disclosures Regarding the Maceo Project

Plaintiffs' amended complaint ignores disclosures following the putative class period in which CEMEX stated that Cemex Colombia entered into an agreement with the Colombian Attorney General's Office to develop and operate the Maceo plant for a duration of 21 years, with the ability to extend for another 10 years.  (Ex. 1, 2018 20-F, at 212.)  CEMEX further disclosed that this agreement "will remain in full force and effect regardless of the outcome" of the Expiration Proceedings, unless the court were to conclude that Cemex Colombia is the outright owner, in which case the agreement would not be necessary.  (*Id.*)

## ARGUMENT

## THE SECOND AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

### I.      PLAINTIFFS' FIRST CLAIM FOR RELIEF UNDER SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 SHOULD BE DISMISSED

The elements of a claim under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b), promulgated thereunder, are well settled.  *See Cemex I*, 2019 WL 3066487, at *3.

### A.      Plaintiffs Did Not Remedy Their Failure to Plead Scienter[10]

The standards for pleading with particularity a strong inference of scienter are set forth in this Court's previous decision.  *See Cemex I*, 2019 WL 3066487, at *8.  The Second Amended Complaint does not remedy the fatal flaws previously identified by the Court.

---

[10] To the extent Plaintiffs' claims are duplicative of those in the First Amended Complaint that were dismissed, they should likewise be dismissed here pursuant to the law of the case doctrine.  *See Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) ("The law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'" (citation omitted)); *Merryman v. J.P. Morgan Chase Bank, N.A.*, 319 F.R.D. 468, 469 n.2 (S.D.N.Y. 2017) (Caproni, J.) ("For the sake of clarity, the [previous] Opinion applies to the Amended Complaint, and any claims dismissed in that Opinion that are reasserted in the Amended Complaint are dismissed in accordance with that Opinion.").

1.    <u>Plaintiffs Fail to Adequately Plead Corporate Scienter</u>

Plaintiffs allege that CEMEX purportedly knew of wrongdoing within its partially-owned subsidiary without pleading any allegations of specific knowledge.  To plead corporate scienter, "a plaintiff must plead with particularity facts giving rise to a strong inference that 'someone whose intent could be imputed to the corporation acted with the requisite scienter.'"  *Id.* (citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195–96 (2d Cir. 2008)).  There are two ways "to impute the scienter of an officer of a subsidiary to the subsidiary's parent corporation": (1) "the officer is sufficiently senior in the parent's management that he serves as a 'prox[y]' for the parent" or (2) "the parent otherwise 'possessed some degree of control over, or awareness about, the fraud.'"  *Cemex I*, 2019 WL 3066487, at *9 (citations omitted).  Plaintiffs previously failed to plead any basis to impute scienter to CEMEX, *id.* at *9–12, and the Second Amended Complaint does not alter that result.

This Court already rejected Plaintiffs' allegation that conduct of certain employees of CLH and Cemex Colombia who had been terminated (the "Terminated Officers") could be imputed to CEMEX due to their positions.[11]  Yet, in the Second Amended Complaint, Plaintiffs again do not allege whether and/or how the "Terminated Officers participated in the overall management of the Company, reported directly to Cemex's senior managers, or otherwise served as proxies for the Company."  *Id.* at *10.  Indeed, the Second Amended Complaint does not even identify *who* the Terminated Officers are.  Without a single allegation as to the actions and roles

---

[11] *See Cemex I*, 2019 WL 3066487, at *10 ("The Terminated Officers were not sufficiently senior within Cemex to serve as a proxy for the Company.  Although these officers occupied senior positions at [CLH], [CLH] comprises less than 6 percent of the total assets, and less than 13 percent of the total net sales, of Cemex, a company with operations in more than 50 countries across several continents.  [CLH] does not comprise a sufficiently large portion of Cemex's overall business to raise a reasonable inference that the Terminated Officers were part of the parent company's senior management.  Nor do Plaintiffs allege that the Terminated Officers participated in the overall management of the Company, reported directly to Cemex's senior managers, or otherwise served as proxies for the Company. . . . Given the tiny share of Cemex's business that [CLH] comprises, the scienter of officers of [CLH] cannot, without more, be fairly attributed to Cemex." (citations omitted)).

of the Terminated Officers, Plaintiffs still do not and cannot meet their heightened pleading obligations. *See Barrett*, 2017 WL 3995606, at *7–8 (plaintiffs failed to plead that manager of a business line was senior enough to impute scienter to the issuer).  Plaintiffs similarly offer no new allegations about the CEO of CLH, thereby negating any imputation of scienter to CEMEX. *See Cemex I*, 2019 WL 3066487, at *11–12 (Plaintiffs failed to allege facts from which Court could infer any scienter on part of CLH's CEO that could be attributed to CEMEX).

Plaintiffs likewise still fail to plead that CEMEX possessed "some degree of control over, or awareness about, the fraud." *Cemex I*, 2019 WL 3066487, at *9.  In this regard, Plaintiffs attempt to overcome their prior shortcomings by including CLH as a defendant and making generalized references to a "Framework Agreement" that addresses the relationship between CEMEX and CLH (*see* SAC ¶ 28), and stating that CEMEX "maintained hands on involvement in the operating" of CLH (*id.* ¶ 31).  Simply naming the partially-owned, publicly-traded subsidiary as a defendant adds nothing to suggest a strong, cogent and compelling inference of scienter at the parent level.  Plaintiffs allege that pursuant to the Framework Agreement, among other things, CEMEX had access to CLH's books and records, and CLH provides certain financials and reports to CEMEX.  (*Id.* ¶ 28.)  But the mere fact that a parent may be presented with certain information from its subsidiary does not imply that the parent necessarily *knows* of certain immaterial payments being made by individuals at a subsidiary in a different continent. In fact, as Judge Pauley explained in *Youngers*, even if a parent has "complete control" over its subsidiary (which CEMEX does *not* have over CLH), Plaintiffs must still plead a *relationship* to the alleged conduct:

> That VIP exercised complete control over Virtus Investment Advisors is insufficient to impute the latter entity's knowledge to the former. What Plaintiffs were required to do, but could not at the time of the Second Amended Complaint,

11

was plead allegations concerning VIP's *involvement, knowledge, or control over concealment of the calculation errors*.

2017 WL 5991800, at *5 (emphasis added).  Here, CLH is a public company of which more than a quarter is *not* owned by CEMEX.  (*See supra* at 5.)  And even if CLH may have been obligated to provide certain information to CEMEX (*see* SAC ¶ 28) and certain individuals at CLH and CEMEX "worked together" (*id.* ¶ 30), neither implies that CEMEX or the Individual Defendants *actually learned* of a bribery payment within a subsidiary of CLH.  Absent any allegation regarding anyone's awareness of conduct—had it occurred—there is no basis to impute scienter.  *See Youngers*, 2017 WL 5991800, at *5 (plaintiffs failed to plead "involvement, knowledge, or control over concealment" of the wrongdoing).

Plaintiffs also now reference certain individuals identified in CEMEX's SEC filings who, according to Plaintiffs, are "employees of the parent company [CEMEX]" *and* "held top management positions" at CLH.  (SAC ¶ 31.)  As an initial matter, Plaintiffs plead nothing to support their bare assertion that these individuals are in fact "employees of the parent company."  And they do not and cannot allege any facts to justify this incorrect conclusion.  Instead, they only quote CEMEX's public filings, where CEMEX simply states the year when each person "[j]oined CEMEX."  (*Id.* ¶¶ 31(a)-(d).)  Plaintiffs do not plead how CEMEX's statement of when an individual "[j]oined CEMEX" as a whole somehow means that such a person is employed by the parent company.  Regardless, the biographies only state that these individuals were members of the board of CLH, not the parent CEMEX with ADSs.  (*Id.*)  In any event, Plaintiffs do not allege how these individuals relate in any way to the alleged misconduct, let alone how they may have known of specific misconduct within the Colombian subsidiary or how there could be any link between them and the parent company for purposes of scienter.  As a result, Plaintiffs' list of four individuals does not alter their previous inability to plead a strong inference of scienter, as

"the mere existence of a parent-subsidiary or affiliate relationship is not on its own sufficient to impute the scienter of the subsidiary to the parent or affiliate." *Valentini*, 837 F. Supp. 2d at 317.

Nor do Plaintiffs plead that CEMEX's dissemination of CLH's disclosures or references to CLH's website were made with any fraudulent intent. While there may be instances where dissemination of another's disclosures could possibly amount to securities liability, *see Lorenzo v. SEC*, 139 S. Ct. 1094 (2019), Plaintiffs must nonetheless plead scienter. *See Aaron v. SEC*, 446 U.S. 680, 691–92 (1980) (scienter is necessary element of violation under Section 10(b) and Rule 10b-5); *Malouf v. SEC*, No. 16-9546, 2019 WL 3788225, at *7 (10th Cir. Aug. 13, 2019) (after assessing the impact of *Lorenzo*, stating that "[s]cienter is required to find a violation of Rule 10b-5(a) [and] Rule 10b-5(c)").[12] Plaintiffs here plead that CEMEX was *given* information from CLH. (*See* SAC ¶ 28.) But even assuming, *arguendo*, that information within CLH's disclosures was false and misleading, Plaintiffs do not plead whether and/or how CEMEX might have known of that falsity.

Further, Plaintiffs still plead zero red flags that could have signified recklessness. The mere fact that CEMEX disclosed prior misconduct only in 2016 does not imply that CEMEX previously knew of the conduct or was reckless in not knowing. "Statements by a parent company acknowledging the fraud of a subsidiary after that fraud has been discovered do not, without more, raise any reasonable inference that the parent knew about the fraud in advance and nonetheless proceeded to make the statements public." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 471 (S.D.N.Y. 2005). Instead, assertions that the parent "conducted an internal investigation . . . , reorganized operations . . . , and made repeated statements to the public

---

[12] In *Lorenzo*, the Supreme Court explained that it was "consider[ing] whether those who do not 'make' statements (as *Janus* defined 'make'), but who disseminate false or misleading statements to potential investors *with the intent to defraud*, can be found to have violated the *other* parts of Rule 10b-5, subsections (a) and (c)." 139 S. Ct. at 1099 (first emphasis added).

describing the discovery and then the extent of the [subsidiary's] accounting improprieties" suggested more plausibly that the parent "took the approach that would be reasonably followed by any prudent corporation when confronted with this type of crisis."  *Id.*[13]

2. Plaintiffs Fail to Adequately Plead that the Individual Defendants Acted With Scienter

The Second Amended Complaint includes no allegations regarding the Individual Defendants beyond that they "were provided with copies of the Company's SEC filings and press releases," and that "[b]ecause of their positions with the Company, and their access to material information available to them but not to the public," the Individual Defendants "knew that the adverse facts specified [in the complaint] had not been disclosed to and were being concealed from the public."  (SAC ¶ 24.)  This Court already rejected these allegations.  *See Cemex I*, 2019 WL 3066487, at *13.  Therefore, under the law of the case doctrine, Plaintiffs again fail to plead scienter as to the Individual Defendants.  *See Johnson*, 564 F.3d at 99 (courts should adhere to their previous rulings on the same issue in subsequent stages of the same case).

**B.    Plaintiffs Do Not Adequately Plead Any Actionable Misstatement or Omission**

1. Plaintiffs Do Not Adequately Plead Improper Underlying Conduct

The Court previously "assume[d], without deciding and without prejudice to any future decision, that Plaintiffs have adequately pleaded the existence of a bribery scheme."  *Cemex I*, 2019 WL 3066487, at *3 n.3.  Nonetheless, the Court noted that "Plaintiffs' allegations that Cemex announced that it had uncovered 'bribe[]' payments . . . are not accurate.  The Company announced that it had uncovered irregular payments, not bribes. . . . [I]t is not accurate to allege

---

[13] *See also Rio Tinto*, 332 F. Supp. 3d at 815 ("[T]hat Rio Tinto took disciplinary action in 2016 does not lead to a cogent inference that the Company was aware of, or consciously disregarded, any fraud at the time it was committed.  The more plausible inference is that Rio Tinto became aware of misconduct around 2016 and subsequently initiated appropriate disciplinary action.").

that Cemex has admitted that [those payments were bribes]."  *Id.*  In the Second Amended

Complaint, Plaintiffs stripped away all allegations upon which this Court could have assumed the

existence of a bribery scheme.  Because the new complaint now has no allegations of underlying

misconduct, let alone with specificity, Plaintiffs should not be accorded any benefit this time.

"[W]here, as here, securities fraud claims are based on failure to disclose uncharged

illegal conduct, 'the complaint must state a plausible claim that the underlying conduct

occurred.'"  *Rio Tinto*, 332 F. Supp. 3d at 803 (citation omitted).  Thus, "[i]f the complaint fails

to allege facts which would establish such an illegal scheme, then the securities law claims

premised on the *nondisclosure* of the alleged scheme are fatally flawed."  *In re Axis Capital

Holdings Ltd., Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006).[14]  In Plaintiffs' First

Amended Complaint, they relied on purported allegations from three unnamed confidential

witnesses, who allegedly knew of bribes made in Colombia.  (*See* 1st Am. Compl. ¶¶ 33–39.)

However, this Court concluded that the confidential witness allegations were "too vague,

speculative, and conclusory to contribute to an inference of scienter" and called a number of the

allegations "so vague as to be meaningless."  *Cemex I*, 2019 WL 3066487, at *12–13.  In the

Second Amended Complaint, instead of bolstering their allegations, Plaintiffs instead *struck all

confidential witness allegations*.  (*See* Dkt. No. 60-1, at 14–16.)  Now, Plaintiffs do not plead any

allegations—let alone with specificity—of an improper bribery scheme, leaving only the

Company's own disclosures, which the Court already rejected as *not* admitting to bribery, and the

following remarkably general allegation simply repeated throughout the complaint: "[T]op

---

[14] *See also In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 632 (S.D.N.Y. 2017) ("Blanket allegations that payments were made . . . standing alone, do not satisfy Rule 9(b)'s requirement to plead the 'who, what, when, where, and how' of the alleged transactions." (citation omitted)); *Menaldi*, 164 F. Supp. 3d at 579 (plaintiffs insufficiently pleaded wrongful conduct when they did not allege "how, when, and whether" conduct was improper); *Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430(RWS), 2012 WL 1080306, at *4 (S.D.N.Y. Mar. 30, 2012) ("Where sham transactions are alleged, specific facts about each one of these transactions are required.").

executives at [CLH] and Cemex Colombia paid bribes worth approximately $20.5 million to a legal representative of CI Calizas in connection with the acquisition of the land, mining rights and benefits of the tax-free area for the plant."  (SAC ¶ 5; *see also id.* ¶¶ 41, 44, 46, 48, 53.) Having failed to plead the "who, what, when, where, and how" of alleged improper transactions, Plaintiffs' claims should be dismissed.  *See Menaldi*, 164 F. Supp. 3d at 578–79 (plaintiffs failed to plead that defendant company had "violated any law"); *cf. Bradesco*, 277 F. Supp. 3d at 632 (Plaintiffs are obligated to plead with specificity the "who, what, when, where, and how" of alleged improper transactions).

Plaintiffs' belated reference in the Second Amended Complaint to a *post-class-period* article does not cure their pleading defects.  Plaintiffs merely state that "directors of the subsidiary in fact informed the parent company in Mexico regarding the $20.6 million payment." (SAC ¶ 62.)  The issue here, though, is not whether individuals at Cemex Colombia *paid* $20.6 million, but rather, whether there was anything *improper* about that payment.  Additionally, even if certain individuals at CEMEX may have been aware that Cemex Colombia would have to pay someone to acquire land and rights to build a new plant, Plaintiffs' reference still does not specify that *bribery* occurred.  Indeed, even accepting the truth of the conclusory assertions about the newspaper article, they still do not suffice to tie allegations of the purported bribery payment (had it occurred) to someone at CEMEX whose knowledge could be imputed for disclosure purposes prior to the time that CEMEX actually made the disclosures discussed above.  (*See also supra* at 10–14 (Plaintiffs still fail to plead a strong inference of scienter that can be imputed to CEMEX).)  Meanwhile, Plaintiffs' egregious allegation that CEMEX must have committed bribes because Colombia "is plagued by corruption" with "pervasive" bribery (SAC ¶ 33), absent any support, lacks credibility.

2.      Plaintiffs Fail to Adequately Plead That CEMEX Did Not Meet Its
Disclosure Obligations in Connection with Regulatory Investigations

Plaintiffs allege that CEMEX failed to disclose that bribes were occurring in Colombia and that "discovery of the [purported bribery scheme] would likely subject the Company to heightened regulatory scrutiny and potential criminal sanctions, which could result in a material adverse impact on CEMEX's results of operations, liquidity and financial condition."  (SAC ¶ 7.) As an initial matter, Plaintiffs do not and cannot plead that CEMEX had a duty to disclose a bribery scheme because they fail to plead that any such conduct in fact occurred.  (*See supra* at 14–16.)  In terms of disclosing the possibility of regulatory scrutiny that could follow, Plaintiffs likewise fail to meet their burden for several reasons.  "Silence, absent a duty to disclose, is not misleading under Rule 10b-5."  *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17 (1988). Additionally, "[d]isclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor."  *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002).  There are certain instances, though, when an issuer may have a duty to disclose:

> [F]or the duty to disclose uncharged wrongdoing to arise, "there must be a connection between the illegal conduct and the misleading statements 'beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or the bottom line.'" Put differently, there must be a "direct nexus" between the alleged wrongdoing and the company's statements.

*Cemex I*, 2019 WL 3066487, at *4 (citations omitted).  Courts have highlighted three scenarios: (1) "a statute or regulation requires disclosure"; (2) "disclosure is necessary to avoid rendering existing statements misleading by failing to disclose material facts"; or (3) "a defendant states an opinion that, absent disclosure, misleads investors about material facts underlying that belief." *Menaldi*, 164 F. Supp. 3d at 579, 581.

Before CEMEX received an SEC subpoena, Plaintiffs do not allege that any statute or regulation required disclosure; nor that Defendants rendered misleading any *existing statement* about the possibility of investigations arising; nor that any misleading opinion had been made about the possibility of investigations arising.  As a result, there was nothing that Defendants had any obligation to disclose.  *See Lions Gate*, 165 F. Supp. 3d at 14–15 ("The securities laws do not require a company to hypothesize the worst results of an investigation when those results do not materialize and when the company chooses not to speak about the investigation."); *cf. Fries v. N. Oil & Gas, Inc.*, 354 F. Supp. 3d 384, 392–93 (S.D.N.Y. 2018) (statement of fact that SEC was not investigating company was not misleading).  Indeed, the notion that CEMEX had an obligation to disclose the mere possibility of a government investigation before it even discovered wrongdoing would subject CEMEX to a preemptive duty to disclose; but that is not the law, as disclosure "'is not a rite of confession,' and companies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'"  *UBS*, 752 F.3d at 184; *see also In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2008) ("[C]ompanies are 'not obligated to speculate as to the myriad of consequences, ranging from minor setbacks to complete ruin, that might have befallen the company if the [illegal conduct were] discovered, disclosed or terminated.'" (alteration in original) (citation omitted)).

The non-obligation to disclose uncharged and unadjudicated conduct also continues beyond the commencement of government investigations: "To hold otherwise would be to subject corporations to a preemptive duty to 'confess' as soon as a regulatory agency begins an investigation."  *Menaldi*, 164 F. Supp. 3d at 582.  Additionally, "the securities laws do not impose an obligation on a company to predict the outcome of investigations."  *Lions Gate*, 165 F. Supp. 3d at 12; *see also Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995)

18

("[D]efendants' lack of clairvoyance simply does not constitute securities fraud.").[15]

Nonetheless, when CEMEX received a subpoena from the SEC less than three months after it publicly disclosed discoveries of wrongdoing, in that very disclosure, CEMEX explicitly stated that it was "possible that the United States Department of Justice or investigatory entities in other jurisdictions may also open investigation into this matter."  (Ex. 5, Form 6-K (Dec. 9, 2016).)  Over the next many months, CEMEX repeatedly reminded investors of this possibility, which ultimately arose nearly a year and a half after its initial disclosure.  (*See supra* at 7–8.)  Therefore, to the extent Defendants had any disclosure obligations in connection with the possibility of investigations arising, those were satisfied.  *See UBS*, 752 F.3d at 184 (defendant complied with obligations when it disclosed involvement in government investigations and described the potential impact); *Embraer*, 2018 WL 1725574, at *5–6 (defendant complied with obligations when it disclosed that it was under investigation and continued to warn the public that it could pay fines or incur sanctions).

### C.  The Complaint Has Additional Deficiencies That This Court Need Not Reach

As before, the Court need not reach other pleading deficiencies.[16]  Nonetheless, the Second Amended Complaint should also be dismissed for the following additional reasons.

#### 1.  Plaintiffs Fail to Adequately Plead that Any Statement was Material

A statement is deemed material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic*, 485 U.S. at 231–32 (citations

---

[15] *See also Fries*, 354 F. Supp. 3d at 393 ("Plaintiff's argument that the moment Defendants acknowledged the SEC investigation . . . , they became obliged to disclose all of [the defendant's] uncharged, related wrongdoing, runs in the face of the general rule in this district" against such a duty to disclose).

[16] *See Cemex I*, 2019 WL 3066487, at *14 n.17 ("In light of the Court's ruling, the Court need not address Defendants' arguments that the Amended Complaint fails to plead materiality, loss causation, and a domestic transaction.").

omitted).  While "[t]here is no bright line numerical rule by which to judge materiality," the

Second Circuit considers SEC Staff Accounting Bulletin No. 99 ("SAB 99")[17] "persuasive

authority," and pursuant to SAB 99, "there exists a preliminary assumption, or 'rule of thumb,'

that changes of less than 5% to financial statements are immaterial," although other "qualitative

factors" may come into consideration.  *Patel v. L-3 Commc'ns Holdings Inc.*, Nos. 14-CV-6038

(VEC) *et seq.*, 2016 WL 1629325, at *16 (S.D.N.Y. Apr. 21, 2016) (Caproni, J.) (citations

omitted).

Here, Plaintiffs never alleged that CEMEX's financial results were inaccurate as a result

of a $20 million payment.  *See Cemex I*, 2019 3066487, at *7.  Given that Plaintiffs do not plead

any effect on financial results (nor that this purported bribe constituted a significant financial

event for a company with billions of dollars of revenues and assets), any alleged omission is thus

quantitatively immaterial.  *See Lone Pine*, 2014 WL 1259653, at *4 (plaintiffs did not plead

quantitative materiality where "the Amended Complaint pleads no facts establishing that the

omission . . . had any quantitative impact on the financial information reported . . . , let alone one

of 5% or more").  Additionally, the alleged improper conduct took place within Cemex

Colombia, a regional subsidiary of CEMEX, which as a whole only accounts for less than five

percent of CEMEX's revenues and total assets.  (*See supra* at 6.)[18]

Plaintiffs also do not plead the quantitative materiality of any alleged misstatements, such

as masking a change in earnings, changing a loss into income or misstating information about a

business that plays a "significant role in the registrant's operations or profitability."  *See* SAB 99.

---

[17] *See* SAB 99, 64 Fed. Reg. 45,150, 45,152 (Aug. 19, 1999) (listed in 17 C.F.R. pt. 211, subpt. B).

[18] This case is therefore distinctive from *Patel*, where this Court concluded that qualitative factors favored materiality when a business segment comprised 36% of the company's total business, the misstatements caused regulatory compliance issues and the company's share price dropped 12% after disclosure.  2016 WL 1629325, at *16.  Further, although SAB 99 also considers the "concealment of an unlawful transaction," this factor is irrelevant here because, as described throughout, Plaintiffs fail to plead that the Company *concealed* any unlawful transaction.

Additionally, even assuming the existence of a $20 million payment, Plaintiffs do not plead why anyone would expect it to have a material effect. *See Lone Pine*, 2014 WL 1259653, at *5 (complaint alleged nothing from which to infer that defendant "should have expected . . . a material impact on sales, revenue or income").[19] Further, Plaintiffs do not plead that government investigations resulted in any material adverse effect, instead merely alleging that CEMEX is exposed to the "*risk* of regulatory investigation and/or action for *potential* violations of the FCPA." (SAC ¶ 41 (emphasis added).)[20] In *Lions Gate*, for instance, plaintiffs argued that "uncertainty" or the "potential risk of loss" was material, but that argument was rejected: "The materiality analysis thus requires a showing of actual materiality; the possibility that the information may be material does not suffice if a reasonable investor would not view the information as significantly altering the total mix of information." 165 F. Supp. 3d at 14. As the plaintiffs had not pleaded "how the knowledge of a preliminary SEC staff investigation, for which there was no settlement in place during the Class Period, would have significantly altered an investor's total mix of information," the plaintiffs failed to plead materiality. *Id.*[21] Finally, despite Plaintiffs' references to the Company stating that it did not "expect" government investigations to have a material adverse effect (*see, e.g.*, SAC ¶ 57), they still do not and cannot plead that those statements were subjectively or objectively false.

---

[19] *See also In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 378 (S.D.N.Y. 2004) ("Plaintiff fails to proffer facts supporting an inference that the transactions complained of were material in the context of Citigroup's overall business. Even if, for instance, a particular transaction did violate a Citigroup risk management policy, it is not a foregone conclusion that such knowledge would alter the 'total mix' of information available to the reasonable investor.") (citation omitted), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006).

[20] Plaintiffs note that the FCPA has "no materiality threshold under the books-and-records provision" (SAC ¶ 37), but that is irrelevant here, as liability for *securities fraud* requires pleading with specificity that a misstatement or omission was *material*. *See, e.g., Barrett*, 2017 WL 3995606, at * 3 (Section 10(b) and Rule 10b-5 make unlawful untrue statements or omissions only of "a material fact").

[21] In fact, even if CEMEX were required to pay a penalty, that alone would not guarantee materiality. *See id.* at 13–14 (plaintiffs failed to plead that penalty of $7.5 million, which was less than one percent of defendant's consolidated revenue, was material).

2.      Plaintiffs Fail to Adequately Plead Loss Causation

"[T]he plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).  To establish loss causation, Plaintiffs must allege "'that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.  Otherwise, the loss in question was not foreseeable." *Lentell*, 396 F.3d at 173 (citation omitted).  However, merely pleading that "the market reacted negatively to new information about a publicly-traded company, without more, is insufficient to plead loss causation in a private securities fraud action." *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 173 n.30 (S.D.N.Y. 2015) (Caproni, J.), *aff'd*, 649 F. App'x 7 (2d Cir. 2016); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) ("Normally, . . . an inflated purchase price will not itself constitute or proximately cause the relevant economic loss.").

Plaintiffs allege that CEMEX's stock dropped on March 14, 2018 in reaction to its disclosure about the receipt of a DOJ subpoena.  (SAC ¶ 60.)  But it is unclear how the March 14 disclosure was corrective or how this or prior disclosures were false, inducing a loss as a result. *See Harris*, 135 F. Supp. 3d at 173 n.30 (plaintiffs failed to plead that alleged misstatement "actually caused the plaintiffs any losses" where they failed to plead that the statement at issue was a misrepresentation or involved a *corrective* disclosure).  Because CEMEX disclosed that it was possible a DOJ investigation might be opened, the market was therefore *aware* that this eventual result was possible.  And when CEMEX in fact received the subpoena, it disclosed its receipt *two days later*.  Although the price of CEMEX's ADSs dropped on March 14, 2018, even if, *arguendo*, the disclosure in part caused the drop, Plaintiffs do not plead any *concealed* risk, as

22

opposed to the materialization of a *disclosed* risk (a potential DOJ investigation).  CEMEX's

March 2018 disclosure was therefore not corrective, and as a result Plaintiffs fail to plead loss

causation.  *See YPF Sociedad Anonima*, 15 F. Supp. 3d at 357–58 (loss causation theory "not

plausible" where price drop "likely represented the materialization of a known risk, rather than

the disclosure of a concealed one").

3. <u>Plaintiffs Llantada and Storm Fail to State a Claim Under *Morrison*</u>

   Plaintiffs Llantada and Storm do not adequately plead that they purchased CEMEX ADSs

on a domestic national exchange or otherwise purchased securities in a domestic transaction.

"Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in

connection with the purchase or sale of a security listed on an American stock exchange, and the

purchase or sale of any other security in the United States."  *Morrison*, 561 U.S. at 273.  If the

securities were *not* traded on a U.S. exchange, either "(1) the purchaser must have 'incurred

irrevocable liability within the United States to take and pay for a security, or . . . the seller [must

have] incurred irrevocable liability within the United States to deliver a security,'" or "(2) legal

title to the security must have transferred in the United States."  *Petrobras*, 862 F.3d at 262

(citing *Absolute Activist*, 677 F.3d at 68).  In this regard, "[t]he location or residency of the

buyer, seller, or broker will not necessarily establish the situs of the transaction."  *Petrobras*, 862

F.3d at 262.  Foreign purchasers cannot state a claim merely by alleging that they purchased

securities cross-listed in the U.S. if the purchases themselves were not domestic, nor can a claim

be based merely on a domestic "buy order" of a foreign security.  *See UBS*, 752 F.3d at 180–81.

   Even if a plaintiff is a U.S. resident, if shares were not purchased in the U.S., the plaintiff

must nonetheless plead that irrevocable liability was incurred domestically.  For instance, in *In re

Petrobras Securities Litigation*, although certain plaintiffs alleged that (i) they purchased

23

securities in the U.S.; (ii) a depository trust company's "bookkeeping affect[ed] a change in beneficial ownership in New York"; and (iii) "all the underwriters who sold in the initial offerings only did so in the United States," Judge Rakoff dismissed those claims because, among other things, the *purchases* themselves had "occurred outside the United States." 150 F. Supp. 3d 337, 341–42 (S.D.N.Y. 2015). As Judge Rakoff explained, merely alleging "domestic 'actions needed to carry out . . . transactions, and not the transactions themselves[,]' [is] insufficient to satisfy *Morrison*," because "they involve neither the substantive indicia of a contractual commitment necessary to satisfy *Absolute Activist's* first prong nor the formal weight of a transfer of title necessary for its second." *Id.* at 342 (citation omitted).[22]

Here, despite being informed of this defect in the prior motion, Llantada and Storm still do not plead that they purchased CEMEX ADSs (CEMEX's only security listed and traded on a U.S. exchange (*see supra* at 4)), or otherwise engaged in domestic transactions. Llantada and Storm each declared that they "purchased *CEMEX common stock* during the Class Period." (Dkt. No. 24-1 ¶¶ 2–3 (emphasis added).) Their Certifications submitted in support of their motions for appointment as Lead Plaintiffs were equally obfuscatory, repeating the vague term "Cemex securities." (Dkt. No. 22-2, at 2, 5; *see also* SAC ¶ 18.) Because Llantada and Storm fail to plead that they purchased CEMEX ADSs or otherwise engaged in a domestic transaction, their claims should be dismissed.

---

[22] *See also Banco Safra S.A. – Cayman Is. Branch v. Samarco Mineração S.A.*, No. 16 Civ. 8800 (RMB), 2019 WL 2514056, at *5–6 (S.D.N.Y. June 18, 2019) (dismissing complaint, concluding that (i) counterparties and/or brokers located in the U.S.; (ii) transactions conducted through accounts in New York; (iii) transactions "consummated with U.S. dollars"; and (iv) transactions reported to U.S. tracking system were all insufficient U.S. connections under *Morrison*).

## II.   PLAINTIFFS FAIL TO STATE A "CONTROL PERSON" CLAIM AGAINST THE INDIVIDUAL DEFENDANTS UNDER SECTION 20(a) OF THE EXCHANGE ACT

"[T]o state a claim under Section 20(a) a plaintiff must allege '(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'"  *Barrett*, 2017 WL 3995606, at *10 (citation omitted).  Plaintiffs here have failed to plead these factors.  As a result, their "control person" claim under Section 20(a) should be dismissed.  *See also Cemex I*, 2019 WL 3066487, at *15 ("Because Plaintiffs have failed to plead a violation of § 10(b), Plaintiffs' claim under § 20(a) is also dismissed." (citation omitted)).

## <u>CONCLUSION</u>

For the foregoing reasons, the Second Amended Complaint should be dismissed in its entirety with prejudice.

Dated:  New York, New York
      September 5, 2019

                              Respectfully submitted,

                              /s/ Jay B. Kasner
                              Jay B. Kasner
                              Scott D. Musoff
                              Michael D. Moritz
                              SKADDEN, ARPS, SLATE,
                                  MEAGHER & FLOM LLP
                              Four Times Square
                              New York, NY 10036
                              Phone: (212) 735-3000
                              Fax: (212) 735-2000
                              jay.kasner@skadden.com
                              scott.musoff@skadden.com
                              michael.moritz@skadden.com

                              *Attorneys for CEMEX, S.A.B. de C.V.,*
                                  *Fernando Ángel González Olivieri and*
                                  *José Antonio González Flores*